PD-1067-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/18/2015 1:11:35 PM
Accepted 8/18/2015 1:57:10 PM
ABEL ACOSTA
CLERK

NO. _____

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

**EX PARTE JAMES RICHARD "RICK" PERRY,**

On Appeal from the 390th Judicial District Court, Travis County, Texas,
Cause No. D-1-DC-14-100139

## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

THE BUZBEE LAW FIRM
Anthony G. Buzbee
State Bar No. 24001820
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, Texas 77002
Tbuzbee@txattorneys.com
Telephone:   713-223-5393
Facsimile:   713-223-5909

BAKER BOTTS L.L.P.
Thomas R. Phillips
State Bar No. 00000102
San Jacinto Center
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
tom.phillips@bakerbotts.com
Telephone:   512-322-2565
Facsimile:   512-322-8363

BOTSFORD & ROARK
David L. Botsford
State Bar No. 02687950
1307 West Ave.
Austin, Texas 78701
dbotsford@aol.com
Telephone:   512-479-8030
Facsimile:   512-479-8040

FILED IN
COURT OF CRIMINAL APPEALS

August 18, 2015

ABEL ACOSTA, CLERK

## ORAL ARGUMENT NOT REQUESTED

## Identity of Judge, Parties, and Counsel

The following is a complete list of the names and addresses of all parties and counsel in this case.

Trial Judge: Honorable Bert Richardson, sitting by appointment; Court of Criminal Appeals, Supreme Court Building, 201 West 14th Street, Austin, Texas, 78701.

Appellant: Former Governor James Richard "Rick" Perry, c/o David Botsford, 1307 West Avenue, Austin, Texas, 78701.

Appellant's Counsel: Anthony G. Buzbee, JPMorgan Chase Tower, 600 Travis Street, Suite 7300, Houston, Texas 77002; Thomas R. Phillips, 98 San Jacinto Blvd., Suite 1500, Austin, Texas 78701-4078; and David L. Botsford, 1307 West Avenue, Austin, Texas, 78701 (Lead Counsel on Appeal).

State of Texas: Attorney Pro Tem Michael McCrum, 700 N. Saint Mary's Street, Suite 1900, San Antonio, Texas 78205; Assistant Attorney Pro Tem David Gonzalez, 206 East 9th Street, Suite 1511, Austin, Texas, 78701.

# Table of Contents

Identity of Judge, Parties, and Counsel.................................................................. i

Index of Authorities ................................................................................... iii

Statement Regarding Oral Argument ...................................................................1

Statement of the Case................................................................................1

Statement of the Procedural History ..................................................................2

Grounds for Review ...............................................................................3

Argument................................................................................4

    A.   Overview .....................................................................4

    B.   Reasons for Review ...........................................................5

    C.   Explanation of Reasons for Review .........................................7

Prayer for Relief...............................................................................19

Certificate of Compliance ......................................................................20

Certificate of Service ..........................................................................20

**TAB 1**:  Opinion of the Court of Appeals

**TAB 2**:  Nine Claims Challenging Count I

# Index of Authorities

**Page(s)**

CASES

*Abney v. United States,*
431 U.S. 651 (1977)................................................................13

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 320 (2010)...................................................................9

*Dombrowski v. Eastland,*
387 U.S. 82 (1967)..................................................................13

*Ex parte Boetscher,*
812 S.W.2d 600 (Tex. Crim. App. 1991) .....................................15, 16

*Ex parte Brown,*
158 S.W.3d 449 (Tex. Crim. App. 2005) .......................................7

*Ex parte Elliott,*
973 S.W.2d 737 (Tex. App—Austin 1998, pet. ref'd) .................12, 18

*Ex parte Ellis,*
309 S.W.3d 71 (Tex. Crim. App. 2010) ........................................17

*Ex parte Gill,*
413 S.W.3d 425 (Tex. Crim. App. 2013) ...................................12, 18

*Ex parte Kerr,*
64 S.W.3d 414 (Tex. Crim. App. 2002) .........................................1

*Ex parte Mattox,*
683 S.W.2d 93 (Tex. App.—Austin 1984, pet. ref'd) .......................18

*Ex parte Ramzy,*
424 S.W.2d 220 (Tex. 1968) .....................................................1

*Ex parte Robinson,*
641 S.W.2d 552 (Tex. Crim. App. 1982) .......................................13

*Ex parte Weise,*
55 S.W.3d 617 (Tex. 2001)........................................................17

*Fulmore v. Lane,*
    140 S.W. 405 (Tex. 1911)......................................................14, 17

*Helstoski v. Meanor,*
    442 U.S. 500 (1979)....................................................................13

*Jessen Assocs., Inc. v. Bullock,*
    531 S.W.2d 593 (Tex. 1976) ...........................................14, 17

*Karenev v. State,*
    281 SW.3d 428 (Tex. Crim. App. 2008) ...............................9

*Pickle v. McCall,*
    24 S.W. 265 (Tex. 1893).....................................................14, 17

*State ex rel. Lykos v. Fine,*
    330 S.W.3d 904 (Tex. Crim. App. 2011) ........................12, 17

*State v. Moff,*
    154 S.W.3d 599 (Tex. Crim. App. 2004) ...............................7

*United States v. Hollywood Motor Car Co.,*
    458 U.S. 263 (1982)....................................................................13

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995)......................................................................9

**STATUTES**

Tex. Penal Code § 39.02(a)(2) ..................................................4

Tex. Const. art. II, § 1 ...............................................................7

Tex. Const. art. III, § 21 .......................................................7, 17

Tex. Const. art. IV, § 14...........................................................4, 17

**RULES**

Tex. R. App. P. 4.1(a).................................................................2

Tex. R. App. P. 9.4(i) ...............................................................20

Tex. R. App. P. 66.3(a)..........................................................6, 12

Tex. R. App. P. 66.3(b)...................................................................6, 9, 14, 16, 18

Tex. R. App. P. 66.3(c)...................................................................6, 9, 12, 14, 16

Tex. R. App. P. 66.3(f). .......................................... 6, 8, 9, 12, 14, 16, 18

Tex. R. App. P. 68.1 ....................................................................................1

Tex. R. App. P. 68.2(a)...............................................................................2

**TO THE COURT OF CRIMINAL APPEALS OF TEXAS:**

COMES NOW Appellant, James Richard "Rick" Perry (Governor Perry), and pursuant to Tex. R. App. P. 68.1, presents this Petition for Discretionary Review, and would respectfully show this Honorable Court the following:

## Statement Regarding Oral Argument

Governor Perry does not request oral argument because the grounds presented, while of constitutional magnitude, can be resolved solely upon briefs. Oral argument would be unlikely to aid the Court's understanding and disposition of the issues while it would almost certainly contribute to delay the resolution of this appeal. Such added delay, even if only for a few days or weeks, would be inconsistent with the "purpose of the writ of habeas corpus," which is "to obtain a speedy and effective adjudication of a person's right to liberation from illegal restraint." *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex. Crim. App. 2002) (quoting *Ex parte Ramzy*, 424 S.W.2d 220, 223 (Tex. 1968)). Nonetheless, Governor Perry is willing to present oral argument should the Court request, but he respectfully requests that any argument be scheduled on an expedited basis.

## Statement of the Case

In August 2014, a two-count indictment was returned against Governor Perry for violating Sections 36.03(a)(1), 1.07(a)(9)(F) (Count II, coercion of public servant), and 39.02(a)(2) (Count I, abuse of official capacity) of the Texas Penal

1

Code by threatening to exercise, and then actually exercising, the authority to veto appropriations vested in the Governor by the Texas Constitution. CR4-5. Immediately thereafter, Governor Perry filed an application for pretrial writ of habeas corpus contesting the legality of his restraint and seeking to bar his prosecution on both counts, primarily on constitutional grounds. CR11. After the district court denied relief, CR464-484, he took an appeal to the Third Court of Appeals. In a published opinion, that court granted relief on Count II because the statute was unconstitutionally overbroad, **TAB 1** at 32-97, but denied relief on Count I on cognizability grounds. *Id*. at 10-32. Although the court was overtly skeptical about Count 1, *id*. at 31-32, it denied relief because Governor Perry's challenge was not "facial," but merely "as applied." *Id*. at 10-32. Governor Perry brings this petition for discretionary review to challenge that denial.

## Statement of the Procedural History

On July 24, 2015, the Third Court of Appeals issued a published opinion. *See* **TAB 1**. Governor Perry did not file a motion for rehearing. This petition for discretionary review is timely if filed by Monday, August 24, 2015. *See* Tex. R. App. P. 4.1(a); Tex. R. App. P. 68.2(a).

2

## Grounds for Review

1. Whether the Third Court of Appeals erred by holding that all nine of Governor Perry's constitutional challenges to Count I were "as applied" challenges to the abuse of official capacity statute and therefore not cognizable in a pretrial application for writ of habeas corpus?[1]

2. Whether the Third Court of Appeals erred by holding that Governor Perry's challenges to Count I based upon Article II, Section I of the Texas Constitution — separation of powers — were "as applied" challenges to the abuse of official capacity statute and therefore not cognizable in a pretrial application for writ of habeas corpus?[2]

3. Whether the Third Court of Appeals erred by holding that Governor Perry's challenges to Count I based upon Article III, Section 21 of the Texas Constitution — Speech and Debate Clause and common law legislative immunity — were "as applied" challenges to the abuse of official capacity statute and therefore not cognizable in a pretrial application for writ of habeas corpus?[3]

4. Whether, even if all of Governor Perry's constitutional challenges to Count I were in fact "as applied" challenges, the Third Court of Appeals erred in failing to recognize that the same rationale that requires "exceptions" for other "as applied" challenges — specifically prosecutions that would constitute double jeopardy or would be barred by limitations — should apply, with even greater force, to a prosecution based solely on a defendant's exercise of conduct protected by the Speech and Debate Clause and the Separation of Powers provisions of the Texas Constitution and the common law doctrine of legislative immunity?[4]

---

[1] *See* CR14-16, 41-42, 48-49, 409, 417-419 and 464-473.

[2] *See* CR14-16, 41-42, 48-49, 409, 417-419 and 464-473.

[3] *See* CR14-16, 41-42, 48-49, 409, 417-419 and 464-473.

[4] *See* CR14-16, 41-42, 48-49, 409, 417-419 and 464-473.

3

## Argument

### A. Overview

Count I alleges that Governor Perry committed abuse of official capacity under Tex. Penal Code § 39.02(a)(2). CR4-5. The gist of this charge is that he "misused" government property by vetoing funding for the Travis County Public Integrity Unit ("PIU"). CR4-5.[5]

Governor Perry filed a pretrial application for writ of habeas corpus challenging the legality of his restraint and specifically "seeking to bar the prosecution" on Count I based on nine constitutional claims, CR11 at 17-18, which are set forth in the court of appeals opinion, *see* **TAB 1** at 6-7, and reproduced at **TAB 2**.[6] Governor Perry freely acknowledged below that a true "as applied" challenge to the constitutionality of a statute usually cannot be decided in a pretrial

---

[5] The Governor has an absolute constitutional right and duty to approve or disapprove "items of appropriation" under Tex. Const. art. IV, § 14. While Count I may not specifically reference his veto, the State conceded that the gravamen of Count I is the exercise of his "gubernatorial power to veto" in its "Bill of Particulars and Amendment of Indictment," which states in part: "Defendant Perry *misused his gubernatorial power to veto* a legislatively-approved appropriation of funds for the Public Integrity Section of the Travis County District Attorney Office." March 2, 2015, Supplemental Clerk's Record at 4. The Bill and Amendment goes on to say that Governor Perry allegedly "misused government property that was subject to his custody and possession in that *he used the lawful power of gubernatorial veto* for an unlawful purpose, to wit: eliminating funding for the Public Integrity Unit after Ms. Lehmberg refused to resign from her elected position as Travis County Attorney." *Id*. at 5 (emphasis added).

[6] The writ also contained eleven challenges to Count II, with only one of those being on non-constitutional grounds. CR17-19; **TAB 1** at 7-8. Seven of those were found to be non-cognizable by the court of appeals.

4

writ. CR41-42,417-19; App. Br. at 28-29. But he maintained that his challenges are the functional equivalent of facial challenges, and so should be cognizable in a pretrial habeas proceeding. App. Br. at 28-29.

First, his challenges rely only on the indictment and the statutes, not underlying facts or circumstances that must be proven at a hearing or trial. *Id*. Second, because Governor Perry seeks to vindicate constitutional rights and powers that are essential to the efficacy of his former office and of paramount public importance, those claims should be addressed before trial. *Id*. He seeks to vindicate his right not to be tried at all, and that right is virtually meaningless if it cannot be asserted and vindicated until after trial. *Id*. Indeed, the mere act of deferring resolution until trial is constitutionally offensive. *Id*.

## B. Reasons for Review

Governor Perry's petition presents exceptionally important issues regarding the cognizability of constitutional claims in a pretrial habeas corpus proceeding. The court of appeals recognized the district court's observations that Governor Perry's claims are "compelling," "unique," "important," and "certainly deserv[ing] of careful consideration in an appropriate forum." **TAB 1** at 8. But it also agreed with the district court that, given the "binding precedents" from this Court, neither court was authorized to consider those important claims in a habeas corpus proceeding. **TAB 1** at 2, 25-32, 97. The principal rationale for this conclusion

5

was that all of Governor Perry's claims to bar the prosecution were merely "as applied" constitutional challenges, regardless of how they were phrased. **TAB 1** at 25-32. Both courts concluded that, in the absence of definitive authority from this Court, they were constrained to deny relief.

The court of appeals' finding of non-cognizability is the error that, as explained and demonstrated below, warrant's this Court's review. Review is justified because the court's opinion ignores and conflicts with its own prior opinions, with opinions of this Court, and with opinions of the Supreme Court of the United States. Tex. R. App. P. 66.3(a & c). Furthermore, review should also be granted because the court of appeals expressly noted the need for this Court's review, stating that "[i]f the Texas criminal justice system should operate differently, that change must come from the Court of Criminal Appeals or the Legislature." **TAB 1** at 32. If this Court disagrees, then it should grant review on the alternative grounds that the court of appeals has decided important questions of state law that have not been but should be decided by this Court. Tex. R. App. P. 66.3(b). Finally, review should also be granted because the court failed to address critical arguments and authorities advanced by Governor Perry. Tex. R. App. P. 66.3(f).

Simply stated, this Court should grant review to explain that pretrial habeas corpus relief must be available in the rare circumstances when, as here, the State

seeks to criminalize conduct that the Constitution itself authorizes and protects from judicial scrutiny.

## C. Explanation of Reasons for Review

With regard to cognizability,[7] the court of appeals' premises were erroneous and its conclusions contrary to the spirit of this Court's case law. Even if "as applied" challenges were never cognizable in habeas, which is of course incorrect, several of Governor Perry's challenges to Count I were facial, not as applied. His claims that Count I violates Separation of Powers,[8] the Speech and Debate Clause,[9] and the doctrine of legislative immunity flowing therefrom are all constitutionally-grounded assertions "that the trial court lacked the power to proceed" at all, not merely "as applied" challenges to the validity of a particular statute or the sufficiency of this indictment. Discretionary review should be granted under Tex. R. App. P. 66.3(b, c & f).

The court of appeals never analyzed whether, under this Court's precedents, such challenges *should* be characterized as "facial," "as applied," or a cognizable exception to the "as applied" prohibition. Instead, it merely announced that

---

[7] The court of appeals properly used a *de novo* standard of review to determine cognizability, **TAB 1** at 10 n.24, which is also the standard of review that should be applied if discretionary review is granted. *See Ex parte Brown*, 158 S.W.3d 449, 453 (Tex. Crim. App. 2005); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

[8] Tex. Const. art. II, § 1.

[9] Tex. Const. art. III, § 21.

Governor Perry himself had labeled them as "as applied." **TAB 1** at 11. Yet the court implicitly acknowledged that this was not quite true, as it observed that "Perry himself phrased *virtually all* of these claims in terms of the statutes' constitutionality `as applied' to him and his role as Governor at the time." **TAB 1** at 11 (emphasis added). But "virtually all" is not "all," and the court performed absolutely no analysis on those two challenges — claims 6 and 7 regarding the Speech and Debate Clause and related separation of powers claims — that were *not* presented as "as applied" challenges.[10] *See* **TAB 2**. But in the thirty-two pages addressing Perry's challenges to Count I, the court's only reference to these doctrines comes in describing Perry's arguments. The court's failure to analyze or decide these claims is, by itself, sufficient to justify discretionary view under Tex. R. App. P. 66.3(f).

But more fundamentally, even if the court of appeals had actually analyzed all of Governor Perry's claims and determined that they were "as applied," its

_____

[10] The court of appeals also included seven of the claims challenging Count II, thus making a total of sixteen supposedly "as applied" challenges, rather than (at most) fourteen. The court of appeals repeated the number "sixteen" a total of ten times in its opinion as the number of "as applied" claims made, **TAB #1** at 9, 10 (twice), 11 (twice), 17 (twice), 20, 22 and 32, but it never explained why Governor Perry's separation of powers and Speech or Debate Clause claims had been included in that total. This failure alone justifies discretionary review under Tex. R. App. P. 66.3(f).

8

decision to deny relief based on this "magic label" approach would contravene this Court's functional approach to deciding when a claim is cognizable in habeas.[11]

Remarkably, the court of appeals recited, and discussed at length, various functional and common-sense tests and standards that this Court has used to demarcate what is cognizable in habeas from what is not. It noted that this Court will grant habeas relief when double jeopardy has attached to a subsequent prosecution (**TAB 1** at 21, 30), or when a prosecution would be barred by limitations (**TAB 1** at 21, 23). But it apparently felt it lacked the authority to examine the rationale for these outcomes, must less whether that rationale mandates the same result here. All that seemed to matter to that court was the

---

[11] Because this Court has never defined the parameters of an "as applied" challenge, Governor Perry relied upon *Karenev v. State*, 281 S.W.3d 428, 435 (Tex. Crim. App. 2008) (Cochran, J., concurring, joined by Price, Womack, and Johnson, JJ.) for the proposition that "[a] facial challenge is based solely upon *the face of the penal statute and the charging instrument*, while an applied challenge depends upon the evidence adduced at a trial or hearing." (emphasis added). *See* CR41 (writ application), CR417-419 (reply to State's answer to the writ); App.Br. at 34; App. Reply. Br. at 19. Accordingly, Governor Perry argued that he was not making "typical" or "true" "as applied" challenges, as none of his issues required evidence. The court of appeals discounted the concurring opinion in *Karenev* as providing "little support for Perry's notion that his `as-applied-to-the- indictment' constitutional challenges should be considered tantamount to facial challenges, let along provide[] guidance regarding the cognizability of such claims on pretrial habeas." **TAB 1** at 29-30, n.96. The court of appeals' pronouncements about *Karenev*, given the absence of a definition from this Court, merits this Court's review under Tex. R. App. P. 66.3(b & c).

Similarly, the court did not address Governor Perry's reliance, *see* App. Br. at 33, on the U.S. Supreme Court's pronouncement that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 320, 331 (2010); *see also United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995) (contrasting "a facial challenge" with "a narrower remedy"). This failure may well justify review under Tex. R. App. P. 66.3(f).

9

absence of binding precedent from this Court permitting pretrial review against a prosecution presenting the *exact* circumstances presented here (a prosecution of a Texas Governor for threatening to exercise, and then exercising, a veto).

Had the court of appeals followed this Court's guidance, rather than deeming itself disempowered to do so, it would have concluded that this Court's precedents in fact compelled granting the writ on *all* of Governor Perry's claims. Governor Perry easily satisfies all the standards for extraordinary relief announced by this Court and actually discussed by the court of appeals:

| Court of Criminal Appeals standards correctly quoted by court of appeals | Why Governor Perry satisfies each standard |
|---|---|
| Habeas is an "extraordinary remedy (**TAB 1** at 9) | The court acknowledged this to be an extraordinary case (**TAB 1** at 31-32) |
| Habeas to be used "only in very limited circumstances" (**TAB 1** at 9) | Prosecuting a Governor for veto a bill is unprecedented; remedying that abuse is a "very limited circumstance" |
| Habeas is "reserved for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be best served by interlocutory review" (**TAB 1** at 9) | Not merely a governor's own constitutional rights, but the preservation of each branch's separate and enumerated powers are threatened when an officeholder is indicted, with no allegation of bribery or corruption, for merely doing his job |

| | |
|---|---|
| Habeas is "not available to 'test the sufficiency' of the charging instrument" (**TAB 1** at 12, 14), and thus not available to challenge an indictment's failure to include an element (like mens rea) (**TAB 1** at 13), or a "hypothetical" complaint (like a pre-trial as applied challenge to a sentencing statute) (**TAB 1** at 15-16 & n.52), or where it would function like a "declaratory judgment" (**TAB 1** at 16) | Governor Perry does not challenge the sufficiency of this particular indictment in his writ, and certainly does not allege that it merely contains a technical defect; nor are his challenges hypothetical or speculative |
| Habeas is instead available "where the alleged defect would bring into question the trial court's power to proceed" (**TAB 1** at 12) | The gist of Governor Perry's claims are that the judicial branch cannot proceed against a Governor for threatening or exercising the veto itself |
| Examples of where habeas would lie include challenges based on limitations (**TAB 1** at 12), or on facial unconstitutionality (**TAB 1** at 13) | As described below, this proves too much—limitations and double jeopardy are not less "applied" to a particular defendant than the claims urged by Governor Perry |

*See also* **TAB 1** at 26 (summarizing some of these points). The court of appeals failed to recognize that, on every score, Perry's claims align with those that this Court has *allowed*, not those it has rejected. By drawing a wholly incorrect lesson from the cases it described in such detail, the court of appeals applied the wrong

11

legal standard and failed to faithfully apply this Court's case law, justifying discretionary review.[12]

Additionally, because of the court of appeals' erroneous framework for analyzing the question, it is unsurprising that its ultimate result was wrong. If the court truly believed its key propositions — (1) that "a `facial' constitutional challenge seeks to establish that the statute is unconstitutional and unenforceable *as to any person*,'" **TAB 1** at 11 (quoting *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex. Crim. App. 2011) (emphasis added), and (2) that only a facial challenge meeting that precise description can be heard in habeas — then it would be forced to conclude, for instance, that a habeas petitioner asserting double jeopardy must await trial to litigate that claim. After all, double jeopardy is the ultimate "as applied" challenge. Far from asserting that a criminal statute is "unconstitutional and unenforceable as to any person," a double jeopardy claim asserts that one particular defendant has already been tried and thus cannot be tried again. But if the standard that the court of appeals applied against Governor Perry

---

[12] For instance, the court of appeals failed to acknowledge or address prior cases relied upon by Governor Perry, *see* App. Br. at 40, where violations of the Separation of Powers Clause have been considered in pretrial habeas cases. *See, e.g.*, *Ex parte Gill*, 413 S.W.3d 425, 431-32 (Tex. Crim. App. 2013) (considering but rejecting on the merits an asserted violation of the Separation of Powers Clause); *Ex parte Elliott*, 973 S.W.2d 737, 738-43 (Tex. App.—Austin 1998, pet. ref'd) (same). This failure justifies discretionary review under Tex. R. App. P. 66.3(f). It also demonstrates that the instant opinion conflicts not only with this Court's decision in *Gill*, but with the court of appeals' own decision in *Elliott*. These conflicts justify discretionary review under Tex. R. App. P. 66.3(a & c).

were to be applied in such a case, the unfortunate defendant would simply have to suffer a second trial before having any opportunity to "vindicate" his right not to have been put to the second trial.

Yet the court of appeals did not advocate this absurd result. Rather, it acknowledged that double jeopardy claims can be brought in habeas, despite obviously constituting an "as applied" challenge. It viewed situations like double jeopardy and limitations as "exceptions," **TAB 1** at 13, but then, inexplicably, failed to examine whether the reason that they were "exceptions" applied just as equally to Governor Perry's claims under the Speech and Debate Clause or the constitutional separation of powers.[13]

---

[13] The court of appeals cursorily acknowledged Governor Perry's "second set of arguments," *see* App. Br. at 35-37, based upon claims that involve a "right not to be tried." **TAB 1** at 20-21. But it wholly failed to address his arguments and cases. Specifically, Governor Perry relied upon *Ex parte Robinson*, 641 S.W.2d 552 (Tex. Crim. App. 1982) and *Abney v. United States*, 431 U.S. 651 (1977). In *Abney*, as clarified by *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 266 (1982), the Supreme Court extended immediate interlocutory appeal to a defendant asserting a double jeopardy claim because the Fifth Amendment right not to be put in jeopardy a second time involved "a right not to be tried" and "to enjoy the full protection of the Clause," the claim "must be reviewable before that subsequent exposure occurs." *Id.* at 266 (quoting *Abney*, 431 U.S. at 662). *Robinson* followed *Abney* and found double jeopardy claims to be cognizable in pretrial habeas corpus.

Governor Perry also relied upon the Supreme Court's opinion in *Helstoski v. Meanor*, 442 U.S. 500 (1979), *see* App. Br. at 35-36, which followed the reasoning of *Abney* and allowed immediate interlocutory appeal in a criminal case to assert the immunity conferred by the Speech or Debate Clause of the U.S. Constitution. Critical to the holding was the Supreme Court's conclusion that the Speech or Debate Clause protects legislators "not only from the consequences of litigation's results but also from the burden of defending themselves," *Helstoski*, *supra*, at 508 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)), which right would have been lost if review did not occur prior to a trial.

If the court of appeals had analyzed, rather than ignored, that question, it is hard to imagine that it could have ultimately concluded that Governor Perry's claims were non-cognizable. After all, the rationales that it offered for the "exceptions" involving double jeopardy and limitations apply *at least* as clearly to Governor Perry's case, because they all challenge the trial court's "power to proceed" at all. **TAB 1** at 13 (internal quotation omitted). If a trial court cannot proceed to trial when the defendant invokes the Double Jeopardy Clause, then neither should it proceed to trial when the very trial itself would violate the constitutional separation of powers, or when an element of the offense is conduct that is privileged under the Speech or Debate Clause and hence subject to legislative immunity from being used. Given this point, this Court's cases require considering Governor Perry's challenges to Count I now, and discretionary review should be granted under Tex. R. App. P. 66.3(b & c).

Finally, this sensible result — that Governor Perry's challenges are no more or less cognizable than, for instance, double jeopardy or limitations challenges —

---

Because a veto of any "item[] of appropriations" is a legislative act under Texas' Speech or Debate Clause, *see Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 598 (Tex. 1976) (governor's "veto power is a legislative function and not an executive function"); *Fulmore v. Lane*, 140 S.W. 405, 411 (Tex. 1911); *Pickle v. McCall*, 24 S.W. 265, 268 (Tex. 1893), Governor Perry argued that the underlying rationale of *Helstoski*, *Abney* and *Robinson* dictated that his separation of powers and Speech or Debate Clause claims must be cognizable in pretrial habeas in order to protect his right not to be prosecuted for his gubernatorial veto. Because the court failed to discuss Governor Perry's reliance upon *Helstoski*, *Abney* and *Robinson*, and their underlying rationale is inconsistent with the court's conclusion of non-cognizability, discretionary review is justified under Tex. R. App. P. 66.3(c & f).

14

would leave this Court's jurisprudence wholly intact. Reviewing Governor Perry's Count I challenges, or at a minimum, those based upon separation of powers and the Speech or Debate Clause would in no way upset the principle that classic "as applied" challenges are not cognizable in habeas; it would in no way usher in the flood of premature, fact bound individuated challenges that this Court has determined to be non-cognizable. Likewise, it would not diminish the principle that "facial" challenges typically are cognizable in habeas.

While the facial/as-applied dichotomy may resolve the vast bulk of cases, what the court of appeals missed was that they are only *general* descriptions of the true test, which is whether a claim challenges the judiciary's power to proceed and would result in the immediate release of the applicant, as opposed to some lesser sort of premature, individuated remedy; hence the "exceptions" for double jeopardy and limitations. Nothing in any case previously decided by this Court demands that constitutional challenges to the trial court's authority to proceed with a prosecution must be ignored in pretrial habeas if they arise under the Speech and Debate Clause but can be reviewed if they arise under the Double Jeopardy Clause. The same governing principle requires that *both* be cognizable. While the court of appeals expressed confusion that, in *Ex parte Boetscher*, 812 S.W.2d 600 (Tex.

15

Crim. App. 1991)[14] (and perhaps elsewhere), this Court "employ[ed] `as applied'

phrasing" even as its "analysis resembled that in a conventional facial challenge,"

**TAB 1** at 28, there is nothing surprising about this at all.[15] This Court was focused

on the common-sense, functional outcome based on a meaningful principle

separating cognizable from non-cognizable claims; it was not obsessed with which

arbitrary label to affix to the claim.[16]

---

[14] In *Boetscher*, the defendant was charged with criminal nonsupport of his children, which a statute enhanced to a felony because he resided out of state. 812 S.W.2d 600, 601 (Tex. Crim. App. 1991). He brought a pretrial habeas proceeding to challenge the enhancement provision of the statute on equal-protection grounds "as applied to the unusual circumstances of his case" (i.e., his out-of-state residence at the time of the offense). *Id.* at 603. The indictment specifically stated that "the defendant was then residing in another state, to-wit: Michigan," at the time of the offense. *Id.* at 602. This Court held that this as- applied-to-the-indictment challenge was cognizable in pretrial habeas, sustained the challenge, and ordered the indictment dismissed. *Id.* at 603-04. This Court also expressly declined to consider whether the statute would be constitutional as applied in other scenarios. *Id.* at 604 n.8.

[15] The court of appeals struggled mightily and at great length to classify *Boetscher* as either an "as applied" or "facial" challenge. *See* **TAB 1** at 17-20, 22-24, 27-29. This effort was needless. The child-support statute was obviously not invalid as to everyone; those who would flee the jurisdiction to avoid payment could well justify heightened punishment, and this Court did not decide otherwise. So it was at least "as applied" in the sense that the court of appeals uses the term. The reason that the label is not of absolute and overriding significance is that this Court has recognized that *functionally*, the particular constitutional challenge raised — even if not a pure "facial" challenge — cut to the power of the courts to proceed because an unconstitutional impediment to the federally protected right to travel could not be the basis for a prosecution.

[16] Because this Court has specifically recognized the pretrial cognizability of as-applied-to- the-indictment challenges in *Boetscher*, discretionary review is justified under Tex. R. App. P. 66.3(c). Furthermore, the court's conclusion that *Boetscher* is distinguishable from Governor Perry's separation of powers and Speech or Debate Clause related claims, *see* **TAB 1** at 28-29, justifies review under Tex. R. App. P. 66.3(b, c & f).

In fact, the court of appeals at least implicitly acknowledged that this Court rejected the cognizability of habeas claims in *Weise*[17] and *Ellis*[18] — key cases for the court of appeals — for reasons wholly unrelated to anything about Governor Perry's challenges to Count I. Those challenges were about "the sufficiency of the charging instrument," **TAB 1** at 14 (internal quotation omitted), in *Weise* because of the alleged omission of a state-of-mind allegation, and in *Ellis* because of the assertion that the money-laundering statute "did not apply to checks." **TAB 1** at 14. But Governor Perry is not alleging any technical mistake in the indictment, much less seeking a narrowing construction of the statute. To the contrary, he is arguing that the trial court cannot proceed because the specific constitutional provisions he invokes bars those proceedings.[19]

That argument is why Governor Perry's claims are not meaningfully different for cognizability purposes from those raised by defendants who invoke

---

[17] *Ex parte Weise*, 55 S.W.3d 617 (Tex. 2001).

[18] *Ex parte Ellis*, 309 S.W.3d 71 (Tex. Crim. App. 2010).

[19] The same analysis applies to *Lykos*, *supra*, which the court addressed at **TAB 1** at 15. A capital defendant has no pre-trial basis to challenge a sentencing statute "as applied" to him before sentencing — that is what an appeal is for — precisely because there is no question that the trial court does have power to impose a sentence on someone who is duly convicted. By contrast, in this case, Governor Perry contends that the trial court does not have constitutional power to compel him to stand trial for a gubernatorial veto under Tex. Const. art. IV, § 14 because it is an act in his legislative capacity, *see Jessen Assocs.*, 531 S.W.2d at 598; *Fulmore,* 140 S.W. at 411; *Pickle*, 24 S.W. at 268, entitled to protection under the Speech or Debate Clause embodied in Tex. Const. art. III, § 21.

limitations or double jeopardy. Those defendants are not arguing that there is something technically wrong with or missing from the indictment, or that the statute itself needs to be read in a narrower way. They are saying — much like Governor Perry is here — that separate and independent constitutional provisions eliminate the power of the courts to proceed.[20] That argument does not require showing that the statute is always unconstitutional. That is exactly why this Court and the court of appeals have entertained the merits of separation of powers challenges in pretrial habeas proceedings in *Ex parte Gill*, 413 S.W.3d at 431-32 and *Ex parte Elliott*, 973 S.W.2d at 738-43.

A conclusion that Governor Perry's constitutional challenges are cognizable, in short, requires no change to this Court's jurisprudence, but simply requires faithful adherence to this Court's precedents and application of the same type of analysis by which this Court found double jeopardy claims to be cognizable in Texas pretrial habeas. And given that nothing in this case threatens the current law of Texas criminal procedure, it is all the more important for this Court to prevent

---

[20] Governor Perry also relied upon *Ex parte Mattox*, 683 S.W.2d 93, 95-96 (Tex. App.—Austin 1984, pet. ref'd), App. Reply. Br. at 20-21, where this same court of appeals affirmatively acknowledged its authority to consider and grant habeas relief upon *a challenge to the legal authority of the State to prosecute the accused. Id.* This is exactly the challenge that Governor Perry has made, and in *Mattox*, the court *did* examine the merits of Mattox's third and fourth issues challenging the constitutionality of the commercial bribery statute as "vague on its face and as applied to the facts alleged in the indictment." *Id.* The instant opinion therefore conflicts with the court's prior decision in *Mattox* and given the court's failure to address it, discretionary review is appropriate under Tex. R. App. P. 66.3(b & f).

18

the judicial system from being complicit in undermining the very structure of Texas government.

## Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Governor Perry respectfully prays that this Court grant discretionary review, establish an expedited briefing schedule, and thereafter reverse the judgment of the court of appeals denying relief.

Respectfully submitted,

THE BUZBEE LAW FIRM
*/s/ Anthony G. Buzbee*
Anthony G. Buzbee
State Bar No. 24001820
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, Texas 77002
Tbuzbee@txattorneys.com
Telephone:    713-223-5393
Facsimile:    713-223-5909

BAKER BOTTS L.L.P.
*/s/ Thomas R. Phillips*
Thomas R. Phillips
State Bar No. 00000102
San Jacinto Center
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4078
tom.phillips@bakerbotts.com
Telephone:    512-322-2565
Facsimile:    512-322-8363

BOTSFORD & ROARK
*/s/ David L. Botsford*
David L. Botsford
State Bar No. 02687950
1307 West Ave.
Austin, Texas 78701
dbotsford@aol.com
Telephone:    512-479-8030
Facsimile:    512-479-8040

## Certificate of Compliance

I hereby certify that this document contains 4,492 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by counsel's word-processing software.

/s/ David L. Botsford
David L. Botsford

## Certificate of Service

This is to certify that a true and complete copy of this document has been emailed to Mr. Michael McCrum at michael@McCrumlaw.com and to Mr. David Gonzalez at david@sg-llp.com and also mailed to the State Prosecuting Attorney, P.O. Box 12405, Capital Station, Austin, Texas, 78711, on the same date it was electronically filed with the Clerk of the Court of Criminal Appeals.

/s/ David L. Botsford
David L. Botsford

# TAB 1

**Opinion of the Court of Appeals**

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-15-00063-CR**

---

**Ex parte James Richard "Rick" Perry**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NO. D-1-DC-14-100139, HONORABLE BERT RICHARDSON, JUDGE PRESIDING**

---

## O P I N I O N

This appeal arises from an ongoing criminal prosecution that, as the district court observed, involves "unique circumstances" that "have been widely reported, argued, and discussed by many with no standing in the case."[1] Whatever the focus of such commentary, our disposition of this appeal turns on *legal* issues—primarily procedural in nature—that may be of somewhat less public renown.

To summarize the proceedings below, the appellant—James Richard "Rick" Perry, who until recently served as Governor of Texas—sought dismissal, through a pretrial writ of habeas corpus, of two pending criminal charges ("abuse of official capacity" and "coercion of a public servant") that are predicated on alleged acts preceding or relating to his line-item veto of a proposed legislative funding appropriation. In seeking dismissal, Perry has contended chiefly that the statutes on which each charge is based, "as applied" to him, violate constitutional protections related to free expression and the separation of powers. Even while terming these "as applied" constitutional

---

[1] Order Denying Defendant's First Application for Pretrial Writ of Habeas Corpus (Order) at 5 n.3.

challenges "compelling,"[2] the district court determined that it could not decide their merits at that juncture, let alone grant relief, due to procedural limitations the Court of Criminal Appeals has imposed on the ability of lower courts to address such "as applied" challenges when raised through pretrial habeas corpus, as Perry has attempted here. While Perry contends this ruling was error, we reach the same conclusion that the district court did—under the Court of Criminal Appeals's binding precedents, Perry cannot bring his "as applied" constitutional challenges through pretrial habeas corpus.

Perry has also asserted that the statute on which the "coercion of a public servant" charge is based "facially" violates the First Amendment to the United States Constitution. While recognizing that defendants may bring such facial constitutional challenges through pretrial habeas corpus, the district court rejected Perry's claims on the merits. As to this ruling we respectfully disagree with the district court—the statute on which the "coercion of a public servant" is based, as written, and as we are bound to construe it, violates the First Amendment and, accordingly, cannot be enforced.

As a consequence of these holdings, we affirm the district court's denial of relief as to the "abuse of official capacity" charge, because Perry's "as-applied" constitutional challenges cannot be addressed through pretrial habeas corpus under current Texas law. However, because the First Amendment bars enforcement of the statute on which the "coercion of a public servant" charge is based, that charge must be dismissed.

---

[2] *Id*. at 9.

2

**BACKGROUND**

**The indictment**

Through an indictment returned by a Travis County grand jury, appellant Perry has been charged with two counts. Count I alleges that Perry violated section 39.02, subsection (a)(2) of the Texas Penal Code—"Abuse of Official Capacity"—which in pertinent part makes it an offense for a "public servant," "with intent to harm . . . another," to intentionally or knowingly "misuse government property . . . that has come into the public servant's custody or possession by virtue of the public servant's office or employment."[3] Count II alleges that Perry violated Penal Code section 36.03(a)(1)—"Coercion of Public Servant"—which makes it an offense for a person, "by means of coercion" (a term defined under the Penal Code to include "a threat, however communicated, . . . to take or withhold action as a public servant") to "influence" or attempt to "influence" a "public servant" to certain ends.[4] Although the parties are continuing to litigate the precise content of the indictment before the district court, it suffices for present purposes to note their general agreement that both charges relate to alleged conduct by Perry preceding or relating to his line-item veto of a legislative appropriation to fund the "Public Integrity Unit," then housed within the Travis County District Attorney's Office, while he was serving as Governor of Texas.

In response to the indictment, Perry has vigorously disputed that the alleged conduct actually equals a crime under either of the statutes under which he was charged, properly construed, and he urges that any prosecution for such conduct would infringe not only his personal free-speech rights under the Texas and federal constitutions, but also core powers vested in all Texas governors

---

[3] Tex. Penal Code § 39.02(a)(2).

[4] *Id*. § 36.03(a)(1); *see id*. § 1.07(a)(9)(F) (defining "coercion" as used in Penal Code).

3

by the Texas Constitution. Were the pending criminal charges civil claims instead, Perry would have in his defensive arsenal an array of procedural mechanisms through which he could raise such challenges to the legal viability of the State's theories at the outset and possibly obtain dismissal prior to trial—e.g., special exceptions,[5] motions for summary judgment,[6] and the recently created motion to dismiss a cause of action that "has no basis in law or fact,"[7] with possible immediate recourse to appellate courts in the event such relief was denied at the trial level.[8] But the pretrial remedies presently available to defendants in Texas criminal cases are more limited[9]—as the Texas Court of Criminal Appeals has put it, "trial on the merits" remains "'the main event.'"[10] Whether it is sound policy to draw such a distinction between defendants faced with loss of property

---

[5] Tex. R. Civ. P. 91.

[6] *Id*. R. 166a.

[7] *Id*. R. 91a.

[8] *See In re Essex Ins. Co.*, 450 S.W.3d 524, 528 (Tex. 2014) (per curiam) (granting mandamus relief to remedy trial court's erroneous denial of Rule 91a dismissal motion; reasoning, under Texas Supreme Court's contemporary mandamus standards, that remedy of ordinary appeal after final judgment was "inadequate" because immediate relief "is appropriate to spare the parties and the public the time and money spent on fatally flawed proceedings" (citing *In re John G. & Marie Stella Kenedy Mem'l Found.*, 315 S.W.3d 519, 523 (Tex. 2010) (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004)))).

[9] *See, e.g.*, *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 919 (Tex. Crim. App. 2011) (holding that "there is no basis under Texas law to conduct a pretrial evidentiary hearing to determine the 'as applied' constitutionality of a state penal law or state criminal procedural statute" and that such a challenge must await trial); *see also id*. at 909 (observing that Texas criminal courts are not empowered to issue declaratory judgments (citing *Ex parte Usener*, 391 S.W.2d 735, 736 (Tex. Crim. App. 1965); *Ex parte Hammonds*, 230 S.W.2d 820, 821 (Tex. Crim. App. 1950)); *id*. at 919 (observing that "Texas law does not permit a defendant in a criminal case to attack the sufficiency or adequacy of an indictment by evidence beyond the four-corners of that indictment" (citing *State v. Rosenbaum*, 910 S.W.2d 934, 948 (Tex. Crim. App. 1994) (op. on reh'g)).

[10] *Id*. at 919.

4

versus loss of liberty is not a question that this intermediate appellate court is empowered to address—we are instead duty-bound to follow that existing law unless and until the Legislature or the Court of Criminal Appeals instructs us otherwise.[11]

**Proceedings below**

This appeal arises from Perry's attempt to invoke one of the pretrial remedies that potentially may be available to defendants in Texas criminal cases—an application for a pretrial writ of habeas corpus. Generally described, a criminal defendant may obtain pretrial habeas corpus relief from a trial court when he or she is (1) "restrained" or "confined" (2) illegally and (3) does not possess what is deemed an "adequate remedy by appeal" against such restraint or confinement.[12] Further, an applicant who is denied that relief at the trial level, such as Perry, has a right to appeal that order,[13] a potential avenue for obtaining what amounts to interlocutory appellate review regarding a pending prosecution.[14]

---

[11] *See, e.g.*, *State v. DeLay*, 208 S.W.3d 603, 605-07 (Tex. App.—Austin 2006), *aff'd*, 233 S.W.3d 870 (Tex. Crim. App. 2007).

[12] *See Ex parte Weise*, 55 S.W.3d 617, 619 (Tex. Crim. App. 2001) (citing *Ex parte Hopkins*, 610 S.W.2d 479, 480 (Tex. Crim. App. 1980); *Ex parte Powell*, 558 S.W.2d 480, 481 (Tex. Crim. App. 1977); *Ex parte Groves*, 571 S.W.2d 888, 890 (Tex. Crim. App. 1978); *Ex parte Strother*, 395 S.W.2d 629, 630 (Tex. Crim. App. 1965); *Ex parte Rios*, 385 S.W.2d 677, 678 (Tex. Crim. App. 1965)).

[13] This is so because the habeas application is considered to be an original proceeding that concludes with a final, appealable judgment. *See* 43 George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice and Procedure* § 34:25 (3d ed. 2011).

[14] *See Ex parte Ellis*, 309 S.W.3d 71, 79 (Tex. Crim. App. 2010).

There has been no dispute that Perry is "restrained" in the sense required for pretrial habeas relief pursuant to each of the two charges alleged in the indictment.[15] As for the remaining requirements for such relief, he has challenged the legality of his restraint pursuant to Count I of the indictment ("Abuse of Official Capacity") on nine distinct constitutional grounds:

1.  Section 39.02(a)(2) [of the Texas Penal Code] violates the Fifth and Fourteenth Amendments to the Constitution of the United States as applied because its prohibitions of "misuse" of "government property . . . that has come into the [Governor's] custody or possession" is unconstitutionally vague as a matter of law if extended to a mere gubernatorial veto of any appropriation of State funds.

2.  Section 39.02(a)(2) violates Article I, Sections 10 and 19 of the Texas Constitution as applied because its prohibition of "misuse" of "government property . . . that has come into the [Governor's] custody or possession" is unconstitutionally vague as a matter of law if extended to a mere gubernatorial veto of any appropriation of State funds.

3.  Section 39.02(a)(2) is unconstitutional as applied because it infringes upon the Governor's absolute constitutional right and duty to approve or disapprove "items of appropriation" under Article IV, Section 14 of the Texas Constitution.

4.  Section 39.02(a)(2) is unconstitutional as applied because it violates the separation of powers between the various departments of government that is guaranteed to the People by Article II, Section 1 of the Texas Constitution.

5.  Because a governor acts in a constitutionally-prescribed legislative capacity in vetoing legislation, Section 39.02(a)(2) is unconstitutional as applied because it violates the protection afforded by the Speech and Debate Clause of Article III, Section 21 of the Texas Constitution.

6.  Because the Governor was acting in a legislative capacity in vetoing the appropriation at issue, Count I of the indictment is void because it is

---

[15] *See Weise*, 55 S.W.3d at 619 (observing that pretrial habeas applicant "was restrained of his liberty . . . when he was charged with [an offense] and released on bond to await trial.") (citing *Ex parte Robinson*, 641 S.W.2d 552, 553 (Tex. Crim. App. 1982)).

necessarily based on evidence privileged by the Speech and Debate Clause of Article III, Section 21 of the Texas Constitution.

7. Because the Governor was acting in a legislative capacity in vetoing the appropriation at issue, trial on Count I of the indictment is barred as a matter of law because the State could only sustain its burden, if at all, by introducing evidence privileged by the Speech and Debate Clause of Article III, Section 21 of [t]he Texas Constitution.

8. Section 39.02(a)(2) is unconstitutional as applied because Governor Perry had the right to do any and all acts of which he is charged in the exercise of his rights under the Free Speech guarantee of the First Amendment to the Constitution of the United States.

9. Section 39.02(a)(2) is unconstitutional as applied because Governor Perry had the right to do any and all acts of which he is charged in the exercise of his rights under the Free Speech guarantee of Article I, Section 8 of the Texas Constitution.

Regarding Count II ("Coercion of Public Servant"), Perry has brought the following constitutional claims:

1. Section 36.03(a)(1) violates the First and Fourteenth Amendments to the United States Constitution because, as enacted into law, it is unconstitutionally overbroad on its face.

2. Section 36.03(a)(1) violates Article I, Section 8 of the Texas Constitution because, as enacted into law, it is unconstitutionally overbroad on its face.

3. Section 36.03(a)(1) violates the First and Fourteenth Amendments to the United States Constitution because, as enacted into law, it is unconstitutionally vague on its face.

4. Section 36.03(a)(1) violates Article I, Section 8 of the Texas Constitution because, as enacted into law, it is unconstitutionally vague on its face.

5. Section 36.03(a)(1) violates the First, Fifth, and Fourteenth Amendments to the United States Constitution because it is unconstitutionally vague as applied.

7

6.        Section 36.03(a)(1) violates Article I, Sections 8, 10, and 19 of the Texas Constitution because it is unconstitutionally vague as applied.

7.        Section 36.03(a)(1) violates the First, Fifth, and Fourteenth Amendments to the United States Constitution because it is unconstitutionally overbroad as applied.

8.        Section 36.03(a)(1) violates Article I, Sections 8, 10, and 19 of the Texas Constitution because it is unconstitutionally overbroad as applied.

9.        Section 36.03(a)(1) is unconstitutional as applied because it infringes upon the Governor's absolute constitutional right and duty to approve or disapprove "items of appropriation" under Article IV, Section 14 of the Texas Constitution.

10.      Section 36.03(a)(1) is unconstitutional as applied because it violates the separation of powers between the various departments of government that is guaranteed to the People by Article II, Section 1 of the Texas Constitution.

11.      Section 36.03(a)(1) is unconstitutional as applied because it violates the Speech and Debate Clause of Article III, Section 21 of the Texas Constitution.[16]

As the district court observed, the claims raised by Perry are "unique," "important," and "certainly deserve careful consideration in an appropriate forum."[17] The court even went as far as to term "compelling" Perry's arguments regarding the Separation of Powers and the Speech and Debate Clause.[18] However, the district court was bound, as are we, to adhere to Court of Criminal Appeals precedents instructing lower courts that we cannot reach the merits of any claim presented

---

[16] In addition to these constitutional challenges regarding the "Coercion of Public Servant" charge, Perry also challenged whether the indictment alleged sufficient facts to negate an exception to that offense that we will discuss below. That claim is not at issue in this appeal.

[17] Order at 9-10 (quoting *Lykos*, 330 S.W.3d at 911).

[18] *Id*. at 8-10; *see also id*. at 5 n.3 (similarly terming "persuasive" arguments urged by amici "Constitutional and Criminal Law Experts").

through pretrial habeas, however meritorious it may potentially be, without first determining, as a "threshold" matter, that the claim is properly "cognizable" through that procedural mechanism—that is, whether the court can properly decide the merits of the claim at that juncture or must leave it to be addressed through other trial-level proceedings and any subsequent post-conviction appellate remedy.[19] This requirement rests on jurisprudential policies, frequently emphasized by the Court of Criminal Appeals in recent years, that "pretrial habeas, followed by interlocutory appeal, is an 'extraordinary remedy'" and should not be "'misused to secure pretrial appellate review of matters that in actual fact should not be put before appellate courts at the pretrial stage.'"[20] The court has similarly stressed that "[a] defendant may use a pretrial writ of habeas corpus only in very limited circumstances"[21] and that the remedy "should be reserved for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be best served by interlocutory review."[22]

The district court thus proceeded immediately to that threshold inquiry and determined, without hearing evidence, that, under "the current state of the law in Texas," only Perry's challenges to the constitutionality of the statutory basis for the "Coercion of Public Servant" charge "on its face"—i.e., claims 1-4 regarding Count II—were cognizable in pretrial habeas. As for the remaining claims—sixteen in all, including all of Perry's claims regarding Count I—the

---

[19] *Ellis*, 309 S.W.3d at 79 (citing *Ex parte Doster*, 303 S.W.3d 720, 721 & n.2, 727 (Tex. Crim. App. 2010)).

[20] *Id*. (quoting *Doster*, 303 S.W.3d at 724).

[21] *Ex parte Smith*, 178 S.W.3d 797, 801 (Tex. Crim. App. 2005) (per curiam).

[22] *Weise*, 55 S.W.3d at 620.

district court concluded each was not cognizable—as the district court put it, "**the court's hands are tied**" (emphasis in original)[23]—because the claim asserted an "as applied" constitutional challenge.

Accordingly, the district court denied relief as to the sixteen claims asserting "as applied" challenges without reaching their merits. Although it did reach the merits of the facial constitutional challenges it held to be cognizable, the court rejected them. On appeal, Perry insists that both sets of rulings were in error.

## COGNIZABILITY ISSUES

We will begin with Perry's arguments relating to the sixteen "as applied" claims the district court declined to reach, because these arguments concern a threshold issue and because Perry devotes the majority of his issues on appeal to arguing the claims' cognizability and merits.[24] Perry's specific contentions are best understood against the backdrop of the "the current state of the law in Texas" on which the district court relied.[25]

---

[23]  Order at 10.

[24]  As the district court observed, the cognizability of Perry's claims turns on issues of law, and we review such questions de novo. *See generally Ellis*, 309 S.W.3d at 79-82; *cf. State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004) (reasoning that de novo standard governed review of trial court rulings to quash indictment because the sufficiency of the indictment is a question of law that does not turn on evaluations of witness credibility or demeanor or on disputed facts (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997))).

[25]  The district court's order includes approximately twenty pages of analysis, with citation to case authorities.

**The Court of Criminal Appeals has held that "as applied" constitutional challenges are not cognizable in pretrial habeas corpus**

The district court emphasized several recent Court of Criminal Appeals decisions addressing the extent to which an "as applied" constitutional challenge to a penal statute can be properly decided through pretrial proceedings, including pretrial habeas corpus, in lieu of awaiting trial on the merits and any post-conviction appeal. As the Court of Criminal Appeals has explained, an "as applied" constitutional challenge "concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to [the defendant's] particular facts and circumstances."[26] In contrast, a "facial" constitutional challenge seeks to establish that the statute is unconstitutional and unenforceable as to any person.[27] As between these two classifications, the district court concluded that each of the sixteen claims it did not reach was an "as applied" challenge because it asserted that a penal statute violated constitutional limitations as it would operate against Perry's particular circumstances—with emphasis on his unique duties and powers as Governor—as opposed to contending that some constitutional defect rendered the statutes unenforceable as to anyone against whom it could be applied. Indeed, as the district court noted, Perry himself phrased virtually all of these claims in terms of the statutes' constitutionality "*as applied*" to him and his role as Governor at the time.

Having classified the sixteen claims as "as applied" challenges, the district court looked to *Ex parte Weise*,[28] in which the Court of Criminal Appeals granted review to address

---

[26] *Lykos*, 330 S.W.3d at 910.

[27] *Id*. at 908.

[28] 55 S.W.3d 617.

"whether a pretrial writ of habeas corpus may issue on the ground that a penal statute is being unconstitutionally applied because of the allegations in the indictment or information."[29] The applicant, Weise, had been charged with illegal dumping and sought pretrial habeas corpus on the basis that the illegal-dumping statute was unconstitutional "as applied" to him because the charging instrument did not allege a mens rea.[30] In evaluating whether pretrial habeas was available as a remedy, the court emphasized a longstanding general rule that pretrial habeas corpus is not available to "test the sufficiency" of the charging instrument.[31] The Court of Criminal Appeals acknowledged, however, that it had also recognized certain "exceptions" to this general rule that it had deemed to fall into a broader category of cases in which it had long permitted pretrial habeas relief where "the alleged defect would bring into question the trial court's power to proceed."[32] One such "exception," the court noted, was where the face of the charging instrument showed that the prosecution was barred by limitations.[33] Another recognized "exception" noted by the *Weise* court—and of more

---

[29] *Id.* at 618, 619.

[30] *Id*. at 618-19.

[31] *Id*. at 620 (citing *Ex parte Delbert*, 582 S.W.2d 145 (Tex. Crim. App. 1979); *Ex parte Mangrum*, 564 S.W.2d 751, 752 (Tex. Crim. App. 1978); *Ex parte Ward*, 560 S.W.2d 660, 660-61 (Tex. Crim. App. 1978); *Ex parte Dickerson*, 549 S.W.2d 202, 203 (Tex. Crim. App. 1977)).

[32] *Id*. at 619 (citing *Mangrum*, 564 S.W.2d at 752 (indictment based on repealed statute); *Menefee v. State*, 561 S.W.2d 822, 830 (Tex. Crim. App. 1977) (juvenile indicted without examining trial); *Ex parte Trillo*, 540 S.W.2d 728, 733 (Tex. Crim. App. 1976), *overruled on other grounds by Aguilar v. State*, 621 S.W.2d 781 (Tex. Crim. App. 1981) (probation-revocation proceedings without required hearing); *Ex parte Becker*, 459 S.W.2d 442, 443 (Tex. Crim. App. 1970) (indictment returned by irregularly empaneled grand jury)).

[33] *Id*. at 620 (citing *Ex parte Tamez*, 38 S.W.3d 159, 161 (Tex. Crim. App. 2001) (citing *Dickerson*, 549 S.W.2d at 203). *But see Doster*, 303 S.W.3d at 724-25 (more recently suggesting that this line of cases may be founded on an outmoded notion of jurisdiction).

direct relevance here—is a complaint that a statute defining the charged offense is unconstitutional on its face, as this would mean that "there is no valid statute and the charging instrument is void."[34]

The Court of Criminal Appeals concluded that Weise's complaint did not fit under any of these recognized exceptions that would permit his claim to be raised through pretrial habeas corpus. It observed that Weise was not making a challenge to the facial constitutionality of the statute, nor "claiming that the trial court lacked the power to proceed."[35] Instead, the court reasoned, "he is claiming that the statute *as applied via the information* is unconstitutional because it fails to allege a mens rea."[36] It termed this sort of challenge, "in reality, simply an attack on the charging instrument."[37] Absent any "alleged . . . deficiencies that we have recognized as cognizable on habeas corpus," the court held that the issue of whether the illegal-dumping statute required a culpable mental state "is not yet ripe for review."[38]

In addition to *Weise*, the district court also looked to the Court of Criminal Appeals's more recent decision in *Ex parte Ellis*.[39] *Ellis* involved an attempt by defendants to raise by pretrial habeas and subsequent appeal what they had styled as a "facial" vagueness challenge to Texas's money-laundering statute. The thrust of this challenge, however, was not that the statute was vague in all of its applications, but that it was unconstitutionally vague if it was construed to apply to

---

[34] *See Weise*, 55 S.W.3d at 620.

[35] *Id*. at 620-21.

[36] *Id*. at 621 (emphasis in original).

[37] *Id*.

[38] *Id*.

[39] 309 S.W.3d 71.

checks, an issue of eventual significance in the underlying prosecution.[40] The district court denied

relief, and that ruling was appealed to this Court. This Court affirmed the district court's ruling,

concluding that the money-laundering statute was not unconstitutionally vague, but its reasoning

turned on a holding that the statute did not apply to checks.[41] The Court of Criminal Appeals granted

the State's request for review and held that the defendants' challenge was not cognizable because,

in the court's view, the defendants "did not really advance a facial challenge." Specifically, the

court reasoned that the defendants had presumed there were some valid applications of the money-

laundering statute and had thus "advanced an 'as applied' claim that was disguised as a facial

challenge."[42]

Citing *Weise*, the *Ellis* court emphasized the longstanding rule that "pretrial habeas

is not available to test the sufficiency of the charging instrument."[43] Nor, the *Ellis* court added, could

the remedy be used "to construe the meaning and application of the statute defining the offense

charged."[44] Additionally, while acknowledging that "[p]retrial habeas can be used to bring a facial

challenge to the constitutionality of the statute that defines the offense," the Court of Criminal

Appeals stressed that the remedy "may not be used to advance an 'as applied' challenge," again

---

[40] *Id*. at 75.

[41] *Id*. at 76-77.

[42] *Id*. at 80-82.

[43] *Id*. at 79 (citing *Weise*, 55 S.W.3d at 620).

[44] *Id*. (citing *Ex parte Smith*, 185 S.W.3d 887, 893 (Tex. Crim. App. 2006); *Weise*, 55 S.W.3d at 620-21).

citing *Weise* for that proposition.[45]  "Addressing the 'as applied' substance of the claim," the high court held, thus "resulted in a circumvention of the pretrial habeas cognizability limitations."[46]

Another Court of Criminal Appeals case of significance to the district court was *Lykos v. Fine*.[47]  *Lykos* arose out of a pending capital murder case in which the State had given notice of its intent to seek the death penalty.[48]  The defendant filed a novel pretrial motion seeking a ruling declaring the death-penalty sentencing statute unconstitutional "as applied" to him, and attempted to demonstrate by pleadings and proof that he faced what he claimed to be an unconstitutionally high systemic risk of wrongful conviction or other error at trial.[49]  After the trial court set an evidentiary hearing on the motion, the State sought to bar the proceedings via mandamus and prohibition, challenging the trial court's legal authority to conduct such a hearing before trial.[50]  Concluding that "there is no basis under Texas law to conduct a pretrial evidentiary hearing to determine the 'as applied' constitutionality of a state penal or criminal procedural statute" and that the trial court, consequently, was "acting beyond the scope of his lawful authority," the Court of Criminal Appeals conditionally granted relief.[51]

---

[45]  *Id*. (citing *Weise*, 55 S.W.3d at 620-21).

[46]  *Id*. at 81.

[47]  330 S.W.3d 904.

[48]  *Id*. at 906.

[49]  *See id*. at 906-08.

[50]  *Id*. at 906-07.

[51]  *Id*. at 919-20.

In reaching that conclusion, the Court of Criminal Appeals relied heavily on the view that "as applied" constitutional challenges could only be brought "during or after a trial on the merits, for it is only then that the trial judge and reviewing courts could have the particular facts and circumstances of the case needed to determine whether the statute or law has been applied in an unconstitutional manner."[52]  The court also relied upon prior decisions in which it had emphasized that the Legislature had not seen fit to provide criminal courts procedural mechanisms by which they could grant "declaratory judgments"[53] or test, prior to trial, the sufficiency of evidence supporting or defeating the elements of charged offenses.[54]  In that regard, the court cited with approval a 1950 case, *Ex parte Hammonds*,[55] in which it had refused to entertain a pretrial habeas claim seeking determination of whether a set of agreed facts submitted by the parties constituted the crime of rape. In *Hammonds*, the court had observed that "[i]n Texas, procedure such as demurrer to the evidence, declaratory judgment or pre-trial judgment, in criminal cases, is not recognized," and refused to allow pretrial habeas to be used to achieve effectively the same ends.[56]

Emphasizing *Weise*, *Ellis*, and *Lykos*, the district court concluded that "[t]he Texas Court of Criminal Appeals has made it crystal clear that a trial court has no authority to consider the merits of a pretrial writ of habeas corpus based upon an 'as applied' challenge to the

---

[52]  *Id*. at 910; *see also id*. at 911-12 (emphasizing the "hypothetical" nature of the constitutional complaint).

[53]  *See id*. at 909 (citing *Ex parte Usener*, 391 S.W.2d at 736).

[54]  *Id*. at 919 & n.68 (citing *Rosenbaum*, 910 S.W.2d at 948).

[55]  230 S.W.2d 820; *see Lykos*, 330 S.W.3d at 909 n.18.

[56]  *Hammonds*, 230 S.W.2d at 821.

16

constitutionality of a statute"[57] and held that this principle barred it from reaching the merits of the sixteen claims it had classified as "as applied" constitutional challenges.

**But Perry insists these precedents are distinguishable**

Although not disputing that the sixteen claims each assert a form of "as applied" constitutional challenge rather than what is generally considered a facial one, Perry insists his particular "as applied" challenges are nonetheless cognizable in pretrial habeas, notwithstanding the Court of Criminal Appeals precedents discussed above, for two related sets of reasons. First, while acknowledging that the Court of Criminal Appeals in *Ellis* "has made the broad statement that pretrial habeas 'may not be used to advance an 'as applied' challenge,'" Perry insists that the high court's jurisprudence is actually more nuanced than the district court assumed. He reasons that the "as applied" constitutional challenges that have been the concern of the Court of Criminal Appeals in cases like *Ellis* and *Lykos* refer only to challenges that, as a practical matter, could not be determined without recourse to evidence. While such evidentiary development may be necessary to assert "typical as-applied challenges," Perry maintains, this is not true of all "as applied" challenges, because some "can be decided solely by reference to the indictment and the statute." In fact, Perry urges, the Court of Criminal Appeals has previously entertained on pretrial habeas this very sort of "as-applied-to-the-indictment" challenge, as he terms it, in a 1991 decision, *Ex parte Boetscher*.[58]

---

[57] Order at 6.

[58] 812 S.W.2d 600 (Tex. Crim. App. 1991).

17

In that case, Boetscher, a resident of Michigan, was indicted in Lubbock County for criminal nonsupport of his children, which the then-applicable version of the Penal Code enhanced to a felony on the sole basis that he had resided out of state at the time the offense was allegedly committed.[59] Boetscher sought relief by pretrial habeas corpus, and the Court of Criminal Appeals summarized his contentions as "argu[ing] that [the enhancement provision], as applied to the unusual circumstances of his case, denies him equal protection [under the Fourteenth Amendment] because it makes his alleged conduct a felony, rather than a misdemeanor, 'solely because he is not a resident of Texas.'"[60] There is no indication in the opinion that the State disputed the cognizability of Boetscher's equal-protection challenge in pretrial habeas, and the Court of Criminal Appeals did not address that issue beyond dropping a footnote stating, "We have previously entertained pretrial habeas corpus proceedings challenging the constitutionality of penal statutes."[61] In support of that assertion, the court cited two cases, *Ex parte Crisp*,[62] and *Ex parte Psaroudis*.[63] *Crisp* involved a facial challenge to amendments to the Controlled Substances Act that was founded on an asserted defect in the bill caption.[64] *Psaroudis*, on the other hand, addressed whether there was a "valid statute under which [the defendant] can be charged" without any explicit reference to an asserted constitutional defect; the court instead construed the Controlled Substances Act to determine

---

[59] *See id*. at 601 (citing Tex. Penal Code § 25.05).

[60] *Id*. at 603.

[61] *Id*. at 601 n.2.

[62] 661 S.W.2d 944 (Tex. Crim. App. 1983).

[63] 508 S.W.2d 390 (Tex. Crim. App. 1974).

[64] *Crisp*, 661 S.W.2d at 945-48.

whether the statute prohibited the acts with which the applicant had been charged, possession or delivery of hashish.[65]

The *Boetscher* court preceded its analysis of the claim by quoting the indictment "in relevant part," noting allegations that Boetscher had failed to provide child support for his children in Lubbock County and that "the defendant was then residing in another state, to-wit:  Michigan."[66] The court subsequently observed that statutory amendments had changed the enhancement provisions, which had previously applied to persons who committed the offense in Texas and then fled the state, to "provide a felony penalty for all defendants *who commit the offense while simply residing in another state*."[67] This new enhancement scheme, the court concluded, "plainly implicates one of the basic rights of all Americans," the right to travel, and was thus deemed invalid under the Equal Protection Clause of the Fourteenth Amendment unless "the government can show it is truly *necessary* to the promotion of a *compelling* governmental interest."[68] Because the State had not attempted to make any such showing, the court went on to hold that "the equal protection clause of the Fourteenth Amendment prohibits the application of [the enhancement provision] to appellant under this indictment."[69] In closing, the court expressly disclaimed any opinion as to

---

[65] *Psaroudis*, 508 S.W.2d at 391-92.  *But cf. Ellis*, 309 S.W.3d at 79 (pretrial habeas generally not available "to construe the meaning and application of the statute defining the offense charged" (citing *Smith*, 185 S.W.3d at 893; *Weise*, 55 S.W.3d at 620-21)).

[66] *Boetscher*, 812 S.W.2d at 602.

[67] *Id*. at 603 (emphasis in original).

[68] *Id*. at 603-04 (emphases in original).

[69] *Id*. at 604.

whether the statute could be applied against "nonsupport offenders who commit the offense in this state and then flee."[70]

Perry argues that his sixteen "as-applied-to-the-indictment" constitutional challenges are like those the Court of Criminal Appeals reached in *Boetscher*. As Perry sees it, his indictment, on its face, establishes that he "is being prosecuted for a veto and an alleged veto threat," infringing not only his personal free-speech rights and immunities he possesses under the Speech and Debate Clause, but also the separation of powers mandated by the Texas Constitution, amounting to unlawful interference with the policymaking branches by entities within the Judicial Department.[71] In these ways, Perry reasons, his indictment is akin to the one in *Boetscher*, which facially revealed that the State was seeking to impose penalties on the applicant that hinged on the fact that he resided in Michigan, violating the right to travel. Just as Boetscher was permitted to challenge the constitutionality of the enhancement provision "as applied" to his circumstances via pretrial habeas, Perry urges, he is likewise permitted to bring his "as-applied-to-the-indictment" challenges that way.

Perry's second set of arguments draws upon additional jurisprudential policy justifications that the Court of Criminal Appeals has sometimes invoked when permitting pretrial habeas relief in other contexts. Foremost among these are cases where the high court has permitted the use of pretrial habeas to assert constitutional protections that it perceived would be effectively undermined otherwise. These have included claims regarding bail and those seeking to assert

---

[70] *Id*. at 604 n.8.

[71] The Judicial Department under the Texas Constitution includes not only district courts but also district attorneys. *See* Tex. Const. art. V, §§ 1, 21.

the protection against double jeopardy.[72]  Perry regards the double-jeopardy cases as particularly

instructive here because that constitutional protection entails a "right not to be tried" that

must be vindicated before trial if it is to be effective.  The same is true of his claims under the

Texas Constitution's Separation-of-Powers provision and Speech and Debate Clause, Perry insists,

because these protections shield public officials not only from ultimately being held criminally liable

based on acts within their scope, but also from being subjected to prosecution based on those

acts at all.

Perry further asserts that pretrial habeas relief would not only be the best (if not

exclusive) means of protecting his substantive rights as compared to trial and appeal, but would also

serve the broader jurisprudential policy interest of conserving judicial resources.[73]  In this regard,

Perry argues that his "as-applied-to-the-indictment" constitutional challenges are the "functional

equivalent" of facial constitutional challenges, turning on questions of law that require no evidentiary

development and could be resolved by appellate courts as well as trial courts could.  He adds that

favorable resolution of his claims would compel his immediate discharge from restraint, another

---

[72]  *See Weise*, 55 S.W.3d at 619-20 (citing *Martinez v. State*, 826 S.W.2d 620, 620 (Tex. Crim. App. 1992) (citing *Danziger v. State*, 786 S.W.2d 723, 724 (Tex. Crim. App. 1990) (per curiam) (bail)); *Ex parte Robinson*, 641 S.W.2d at 555 (double jeopardy)).

[73]  *See Weise*, 55 S.W.3d at 620 ("Pretrial habeas should be reserved for situations in which the protection of the applicant's substantive rights or the conservation of judicial resources would be best served by interlocutory review.").  In the same vein, Perry cites language in another Court of Criminal Appeals decision that noted, with reference to cognizable claims raising limitations bars established on the face of the charging instrument, "There is no point in wasting scarce judicial and societal resources or putting the defendant to great expense, inconvenience, and anxiety if the ultimate result is never in question." *Smith*, 178 S.W.3d at 802.  The high court has since characterized this language as "dicta," however, and intimated that this rationale would be insufficient in itself to make a pretrial habeas claim cognizable.  *See Doster*, 303 S.W.3d at 725.

21

consideration in the Court of Criminal Appeals's pretrial habeas jurisprudence.[74]  And besides these judicial policy considerations, Perry urges, immediate resolution of his claims via pretrial habeas and appeal is compelled by the separation-of-powers concerns he has invoked, "[t]he paramount public interest in the effective functioning of state institutions in general, and the untrammeled exercise of the line-item veto by the governor in particular."  In short, Perry maintains that prudential limitations that the Court of Criminal Appeals has imposed on the pretrial habeas corpus remedy within the Judicial Department should not serve to facilitate a more serious ongoing infringement by that Department on the other governmental branches.

**The State attacks Perry's proposed distinctions**

The State responds that the district court was correct—the Court of Criminal Appeals's decisions in *Ellis*, *Weise*, and *Lykos* ultimately control and are fatal to Perry's attempt to assert his sixteen "as-applied-to-the-indictment" claims via pretrial habeas corpus.  As for Perry's reliance on *Boetscher*, the State grants that the Court of Criminal Appeals permitted there an "as-applied equal protection challenge on the face of the indictment" via pretrial habeas.  However, the State insists, "[f]ew cases are as simple or unusual as *Ex parte Boetscher*," observing that the challenged statute "[o]n its face . . . treated in-state residents differently from out-of-state residents," that Boetscher's "out-of-state residence was the gravamen of the enhanced penalty," and that the indictment's allegation that Boetscher lived out of state was uncontroverted and "not subject to interpretation."  Under those particular circumstances, in the State's view, Boetscher's equal-

---

[74]  *See Weise*, 55 S.W.3d at 619.

protection challenge amounted to a "'pure law' challenge that is justiciable using only the language in the indictment."

In this regard, the State draws comparisons to the Court of Criminal Appeals's jurisprudence regarding cognizability of limitations-based challenges to charging instruments. As the high court noted in *Weise*, it has long recognized an "exception" against the general rule barring pretrial habeas challenges to "test the sufficiency" of the charging instrument "when the pleading, on its face, shows that the offense charged is barred by limitations."[75] But this principle has been further refined, as the State emphasizes, by a distinction between challenges based on charging instruments that establish an "incurable," "irreparable," and "absolute" limitations bar to prosecution, versus those that complain of asserted deficiencies in a "tolling paragraph," "explanatory averment," or "innuendo allegations" that would "suffice to show that the charged offense is not, at least on the face of the indictment, barred by limitations."[76] Only the former category—which the high court has elsewhere termed a "pure law" limitations defense—is deemed cognizable in pretrial habeas; the latter—what the court has labeled a "limitations factual defense"—is not.[77]

The State urges that Perry's "as-applied-to-the-indictment" constitutional challenges are far removed from the "pure law" challenge addressed in *Boetscher* and analogous limitations

---

[75] *Id*. at 620 (citing *Tamez*, 38 S.W.3d at 161 (citing *Dickerson*, 549 S.W.2d at 203)).

[76] *Smith*, 178 S.W.3d at 802-03.

[77] *Id*.; *see Phillips v. State*, 362 S.W.3d 606, 617-18 (Tex. Crim. App. 2011) (citing *Proctor v. State*, 967 S.W.2d 840, 844 (Tex. Crim. App. 1998)); *cf. Ex parte Heilman*, 456 S.W.3d 159, 168-69 (Tex. Crim. App. 2015) (overturning the distinction as it bears upon whether a limitations defense can be waived).

23

cases, requiring factual development beyond what can be determined from the face of the indictment alone. In fact, as the State emphasizes, the parties have continued to litigate the precise content of the indictment—the predicate of Perry's "as-applied-to-the-indictment" challenges—before the district court in the interim since that court issued the order on appeal, with the State having since filed a "Bill of Particulars & Amendment of Indictment" that purports to add "further clarity" to the asserted factual bases for both counts, and Perry objecting to that filing on numerous grounds and moving to quash. Among other changes, the State's filing purports to modify Count I, which in its original form did not allege explicitly that Perry's supposed "misuse [of] government property" made the basis for the charge consisted of a gubernatorial veto—a central premise of Perry's "as-applied-to-the-indictment" constitutional challenges. The new language would include specific allegations that Perry's "misuse [of] government property" underlying Count I was his use of "the lawful power of gubernatorial veto for an unlawful purpose, to-wit: eliminating funding for the Public Integrity Unit after Ms. Lehmberg refused to resign from her elected position as Travis County District Attorney."[78]

Leaving aside any such uncertainties regarding the content of the indictment, the State contends more broadly that Perry's "as-applied-to-the-indictment" challenges rest upon myriad speculations, hypotheses, and interpretations as to what the underlying facts actually are and how the two statutes at issue would apply to them—e.g., precisely what then-Governor Perry said and did,

[78] In light of these ongoing trial-court-level developments concerning the indictment, we requested and have received supplemental briefing from the parties addressing whether or how these events impact the justiciability or continued relevance of the issues Perry has raised in this appeal. We have concluded that the ongoing developments below do not impact our jurisdiction to decide the issues presented on appeal, but have considered the supplemental briefing as it informs our disposition of the cognizability questions.

whether these facts would constitute violations of Penal Code sections 36.03(a)(1) and 39.02(a)(2), and whether any such applications of the statutes would violate the constitutional provisions he has invoked. This factual record will exist only after evidence is presented at trial, the State insists, and Perry's attempts to adjudicate them via pretrial habeas amount ultimately to the sorts of impermissible pretrial challenges to the sufficiency of the indictment, attempts "to construe the meaning and application of the statute defining the offense charged," "declaratory judgment" claims, and "as applied" constitutional challenges that the Court of Criminal Appeals condemned in *Ellis* and *Weise*. The State further emphasizes additional Court of Criminal Appeals precedents that have refused pretrial habeas relief in other contexts when the court perceives evidentiary development at trial to be necessary or beneficial in resolving the claim.[79]

**Perry's "as applied" constitutional challenges are not cognizable under the Court of Criminal Appeals's current precedents**

Perry's arguments ultimately amount to assertions about what Texas pretrial habeas law currently is, on one hand, and what Perry contends it ought to be, on the other. With regard to

---

[79] *See Smith*, 185 S.W.3d at 893 ("[A]ppellant's *in pari materia* claim is not yet ripe for review. . . . Though we may have a general idea of the facts of this case based on . . . testimony at the evidentiary hearing and the representations in the defensive pleadings, which appear to be based on newspaper accounts of the incident, we believe it apparent from the portions of the record set out above that the State has more evidence to present about which we can only speculate at this time. An appellate decision on the *in pari materia* claim would be premature before the State has had an opportunity to develop a complete factual record during a trial, and we are not aware of any authority that would require the State to prove its case before this time. Deciding the *in pari materia* claim now on what would amount to a hypothetical set of facts that might be presented at appellant's trial would be merely advisory.") (internal citations omitted); *see also Doster*, 303 S.W.3d at 724 (stating that "pretrial habeas is unavailable when the resolution of a claim may be aided by the development of a record at trial" (citing *Smith*, 185 S.W.3d at 893)).

the existing law, the Court of Criminal Appeals has sent us lower courts the following unequivocal messages through its current pretrial habeas jurisprudence:

• Pretrial habeas and subsequent appeals are "extraordinary" remedies that are properly available "only in very limited circumstances."[80]

• Pretrial habeas typically cannot be used to test the sufficiency of a charging instrument or to determine the legal effect of particular facts under a criminal statute.[81] These limitations are grounded not only in concerns about the ripeness of material underlying facts before the evidence is presented at trial, but also a traditional reluctance by the high court (as emphasized in *Lykos*) to permit pretrial habeas to be used to achieve the effect of procedural mechanisms, such as a declaratory-judgment statute, that the Legislature has heretofore not seen fit to provide Texas criminal courts.[82] In fact, in the *Hammonds* case cited by the *Lykos* court, the Court of Criminal Appeals held for these reasons that pretrial habeas cannot be used to obtain a determination regarding the construction and application of a criminal statute even to underlying facts to which the parties had agreed.[83]

• An "exception" to this general rule is where the applicant asserts that the statute under which he or she is being prosecuted is unconstitutional on its face because, if successful, the challenge would establish that "there is no valid statute and the charging instrument is void."[84] The distinguishing characteristic of a facial challenge to a penal statute, as the Court of Criminal Appeals emphasized in *Ellis* and later in *Lykos*, is that it contends the statute is unconstitutional regardless against whom it is applied, such that it can be decided based on the face of the statute alone, without regard to a defendant's particular circumstances.[85]

• If a constitutional challenge to a criminal statute does not assert that the statute is wholly void, *Ellis* instructs us that it is to be classified as an "as applied" challenge, and that

---

[80] *E.g.*, *Ellis*, 309 S.W.3d at 79; *Smith*, 178 S.W.3d at 801.

[81] *See Ellis*, 309 S.W.3d at 79 (citing *Smith*, 185 S.W.3d at 893; *Weise*, 55 S.W.3d at 620-21).

[82] *See Lykos*, 330 S.W.3d at 909-10, 919.

[83] *See Hammonds*, 230 S.W.2d at 821.

[84] *Weise*, 55 S.W.3d at 620; *see Ellis*, 309 S.W.3d at 79.

[85] *See Lykos*, 330 S.W.3d at 908-09; *Ellis*, 309 S.W.3d 79-82.

"[p]retrial habeas . . . may not be used to advance an 'as applied' challenge."[86] *Weise* similarly held that pretrial habeas was unavailable for a claim purporting to challenge the constitutionality of a penal statute as it had been applied in the charging instrument, concluding that the claim ultimately fell under the general rule prohibiting the use of the writ to challenge the sufficiency of a charging instrument.[87] *Lykos* adds that "as applied" constitutional challenges characteristically require development through evidence presented at trial and cannot be decided at an earlier juncture.[88]

As the district court concluded, these precedents would appear to make "crystal clear" that Perry's "as-applied-to-the-indictment" claims are not cognizable in pretrial habeas. The closest existing Court of Criminal Appeals authority that Perry offers to support a contrary conclusion is *Boetscher*. That case, which predates *Weise*, *Ellis*, and *Lykos* by a decade or more, is somewhat difficult to reconcile with those more recent decisions, and the *Psaroudis* case, on which *Boetscher* partly founded its cognizability holding,[89] would appear to be squarely inconsistent with them.[90] At least one respected secondary authority has suggested that some Court of Criminal Appeals cognizability decisions from that earlier era "fail[ed] at the time to have fully embraced the distinction [between] challenges to statutes on their faces and as applied" and would likely be decided differently by the high court today.[91] As for the Court of Criminal Appeals's own pronouncements, it has never explicitly overruled *Boetscher*, but amid its synthesis of Texas pretrial

---

[86] *Ellis*, 309 S.W.3d at 79-81.

[87] *Weise*, 55 S.W.3d at 620-21.

[88] *Lykos*, 330 S.W.3d at 910.

[89] *Boetscher*, 812 S.W.2d at 601 n.2.

[90] *Psaroudis*, 508 S.W.2d at 391-92 (addressing, via pretrial habeas, whether Controlled Substances Act prohibited delivery of hashish, the act with which the defendant had been charged under the statute).

[91] Dix & Schmolesky, *supra* note 13, § 35:19.

habeas law in *Weise*, the court cited *Boetscher* as an illustrative case where it had held *facial* constitutional challenges to be cognizable in pretrial habeas.[92] Whether this aspect of *Weise* would imply support for Perry's notion that "as-applied-to-the-indictment" challenges are deemed tantamount to facial challenges and are thus cognizable, represents an after-the-fact attempt by the Court of Criminal Appeals to recharacterize *Boetscher* in line with its current views regarding the cognizability of "as applied" challenges, or neither, is unclear.

Without more definite guidance from the Court of Criminal Appeals, we must continue to follow *Boetscher* and, as neither case purported to overrule it, view it as an unstated qualification to the holdings of *Ellis* and *Weise* that "as applied" constitutional challenges are not cognizable in pretrial habeas.[93] However, we agree with the State that Perry's "as-applied-to-the-indictment" claims are distinguishable from those addressed in *Boetscher*. The factual bases for Boetscher's "as applied" challenge were straightforward and readily ascertainable from the face of his indictment: he was being prosecuted for child-support nonpayment, with a penalty enhancement because he resided in Michigan. The opinion reflects no dispute regarding either the underlying fact of Boetscher's Michigan residency or that the statute made him susceptible to higher penalties solely for that reason.[94] Consequently, while employing "as applied" phrasing, the Court of Criminal Appeals's analysis resembled that in a conventional facial challenge—the inquiry centered on the

---

[92] *Weise*, 55 S.W.3d at 620 & n.17.

[93] *See DeLay*, 208 S.W.3d at 607 ("As an intermediate appellate court, we lack the authority to overrule an opinion of the court of criminal appeals," and even where such a precedent has arguably been undermined by intervening developments, it remains "the law and we are not free to disregard it" until high court itself revisits the decision).

[94] *See Boetscher*, 812 S.W.2d at 601-04.

28

language of the statute itself, concluding that the statute's "classification scheme . . . implicates one of the basic rights of all Americans," the right to travel.[95]

Perry's "as applied" challenges, by contrast, are intertwined not only with disputes about what the underlying facts are—indeed, disputes even about what underlying facts have been alleged in the indictment—but also with disputes about whether those facts would constitute violations of the statutes under which he is charged. These features of his "as-applied-to-the-indictment" claims, unlike those in *Boetscher*, implicate jurisprudential policies against using pretrial habeas to test the sufficiency of allegations in a charging instrument or to obtain a "declaratory judgment" or otherwise determine the legal effect of particular facts under a criminal statute prior to trial. In these ways, Perry's "as-applied-to-the-indictment" claims more closely resemble the "as-applied" claims addressed in *Ellis* and *Weise*, and we accordingly conclude that those decisions, rather than *Boetscher*, control here.[96] Under *Ellis* and *Weise*, Perry's "as-applied-to-the-indictment"

---

[95] *Id*. at 603.

[96] We similarly are not persuaded by Perry that language in the concurrence to the Court of Criminal Appeals's more recent *Karenev v. State* decision, 281 S.W.3d 428 (Tex. Crim. App. 2009), warrants a different conclusion. Perry emphasizes the following excerpt from the concurrence:

> [W]hat is the difference between a facial challenge and an "as applied" challenge to the constitutionality of a penal statute? Evidence. A facial challenge is based solely upon the face of the penal statute and the charging instrument, while an applied challenge depends on the evidence adduced at a trial or hearing.

281 S.W.3d at 435 (Cochran, J., joined by Price, Womack, and Johnson, JJ., concurring). Perry deduces that this language supports his proposed distinction between the cognizability of "typical" or "true" "as applied" challenges and "as-applied-to-the-indictment" challenges that are tantamount to facial challenges. He ascribes particular importance to the concurrence's reference to a facial challenge being "based solely upon the face of the penal statute *and the charging instrument*." Leaving aside that this concurring opinion does not represent the authoritative view of the Court of Criminal Appeals, this excerpt is less helpful to Perry than he suggests once it is examined in context.

claims are not cognizable in pretrial habeas. While the subject matter of these claims may indeed

be "important," and "worthy of careful consideration," as the district court acknowledged, that

consideration alone has not been a controlling determinant for the Court of Criminal Appeals.[97]

Perry's remaining rationales for limiting or avoiding the effect of *Ellis* and *Weise* are

ultimately rooted not in any existing controlling precedent of the Court of Criminal Appeals, but

broader "factors" he identifies in what he terms the high court's "evolving jurisprudence regarding

cognizability in pretrial habeas." As we have already emphasized, this Court is not empowered to

"evolve" or otherwise alter the binding effect of the Court of Criminal Appeals's controlling

precedents, even if we might perceive sound justifications for doing so.[98] Such changes are the

---

*Karenev* presented the Court of Criminal Appeals with the issue of whether a facial challenge to the constitutionality of a penal statute could be raised for the first time on appeal. The majority concluded it could not. *Id*. at 435. The four concurring judges would have held that defendants should be allowed to raise facial challenges to penal statutes on appeal, reasoning in part that such a challenge presents a "pure" legal question "wholly divorced from the specific facts of the purported crime," and is thus not dependent on evidence, such that appellate judges could resolve them as well as a trial judge could. *See id.* at 435-38. The focus of the excerpt on which Perry relies, read in context, was merely to emphasize the "purely legal" nature of facial challenges and their suitability for resolution by appellate judges, as contrasted with "as applied" challenges. As for the reference to facial challenges being "based solely upon the face of the penal statute and the charging instrument," the succeeding discussion suggests that this is an allusion to the fact that a defendant bringing a facial challenge does "not need any evidence other than the fact of their prosecution"—as would be established by the charging instrument itself—"to give them standing to challenge the constitutionality of the penal statute under which they were convicted." *Id*. at 435. In sum, the *Karenev* concurrence ultimately provides little support for Perry's notion that his "as-applied-to-the-indictment" constitutional challenges should be considered tantamount to facial challenges, let alone provides guidance regarding the cognizability of such claims on pretrial habeas.

[97] *See Weise*, 55 S.W.3d at 620 ("[W]e have held that an applicant may not use a pretrial writ to assert his or her constitutional rights to a speedy trial, challenge a denial of a pretrial motion to suppress, or make a collateral estoppel claim that does not involve a double jeopardy violation. Those issues are better addressed by a post-conviction appeal.") (internal citations omitted).

[98] *See DeLay*, 208 S.W.3d at 607.

prerogative of the high court itself, and until it so acts, we remain bound by *Ellis* and *Weise*.[99]

Similarly, "'[a]s an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court [or the Texas Court of Criminal Appeals] unless and until the high court[s] overrule[] them or the Texas Legislature supersedes them by statute.'"[100] In similar instances where that principle has required us to reject proposed modifications of the existing law that would conflict with higher court precedents, litigants have sometimes succeeded later in obtaining the desired change in a higher court or from the Legislature.[101] But unless and until such changes occur here, Perry's "as-applied-to-the-indictment" challenges are not cognizable in pretrial habeas corpus.

As a final note regarding cognizability of these "as applied" challenges, we acknowledge a broader concern raised by Perry and also by amici who support him—in their view, this case represents an instance where a defendant has been made to face criminal charges of dubious legal viability (and/or politically motivated origins) and will inevitably be vindicated, the only question being at what point in the proceedings this will occur. In such circumstances, they urge, the opportunity and eventuality of obtaining a favorable judgment at trial or on appeal will often do

---

[99] *Id.*

[100] *Texas Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 287 S.W.3d 390, 394-95 (Tex. App.—Austin 2009) (quoting *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.), *rev'd on other grounds*, 343 S.W.3d 112 (Tex. 2011).

[101] *See id.* at 392, 394-95, 398 (declining to recognize proposed expansion of common-law or constitutional privacy exceptions so as to shield travel vouchers for then-Governor Perry's security detail against mandatory disclosure under the Public Information Act). *Cf.* 343 S.W.3d at 120 (on appeal, Texas Supreme Court recognized a new common-law "public safety" exception); *see also* Act of May 30, 2011, 82d Leg., R.S., ch. 1229, § 2, 2011 Tex. Gen. Laws 3271, 3271 (codified at Tex. Gov't Code § 552.022(a)).

31

little to rectify the harm the defendant suffers to reputation, professional standing, and the like during the meantime. In fact, they suggest, inflicting such harms may be the primary goal of those who pursue the charges. We express no opinion at this juncture as to whether these characterizations of the charges pending against Perry are accurate—the more relevant observation now is that similar things were said of the proceedings that gave rise to *Ellis* and related cases, yet it was only through trial and post-judgment appeals that the now-former public official at the center of the cases was able to refute the legal viability of the charges against him.[102] Under *Ellis* and similar decisions of the Court of Criminal Appeals, such potential harms incurred by defendants in the meantime, however considerable they may be, are simply deemed insufficient in themselves to provide a basis for relief through pretrial habeas corpus. If the Texas criminal justice system should operate differently, that change must come from the Court of Criminal Appeals or the Legislature.

As the law stands now, the district court did not err in denying Perry pretrial habeas relief on all sixteen of his claims that assert "as applied" constitutional challenges. And because these include the sole claims Perry asserts regarding Count I ("Abuse of Official Capacity"), we affirm the district court's denial of relief as to that charge. But as to Count II ("Coercion of Public Servant"), there remain to be considered Perry's alternative facial constitutional challenges.

## FACIAL CONSTITUTIONAL CHALLENGES

In claims 1-4 concerning Count II, Perry challenges the facial constitutionality of the statute on which that charge is based, section 36.03(a)(1) of the Penal Code, as it incorporates the relevant portion of the Penal Code's definition of "coercion." These claims are grounded in the

---

[102] *See generally DeLay v. State*, 443 S.W.3d 909 (Tex. Crim. App. 2014).

established doctrines of "overbreadth" and "vagueness" that derive from the "freedom of speech" guaranteed by the First Amendment to the United States Constitution,[103] which has been applied to the states through the Fourteenth Amendment.[104] Although Perry has also based these claims on the Texas Constitution's free-speech provision, Article I, Section 8,[105] his arguments, at least on appeal, rely entirely on case decisions applying the First Amendment, and he does not identify any feature of the Texas provision that would cause it to operate any differently than its federal counterpart. Accordingly, we will focus our analysis entirely on the First Amendment protection and jurisprudence.[106]

**The First Amendment prohibits overbroad and vague speech restrictions**

The First Amendment overbreadth doctrine holds that a statute is facially invalid if, as written, it sweeps within its coverage a "substantial" amount of First Amendment-protected

---

[103] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech"). "Speech" in this sense includes not only oral statements, but also writings and other mediums of communication or expression. *E.g.*, *Boos v. Berry*, 485 U.S. 312, 316-18 (1988) (displays of signs were "classically political speech" protected by First Amendment); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("[P]eaceful pamphleteering is a form of communication protected by the First Amendment.").

[104] *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358 (2003); *Ex parte Thompson*, 442 S.W.3d 325, 334 (Tex. Crim. App. 2014) (citing *Board of Educ. v. Barnette*, 319 U.S. 624, 638-39 (1943)).

[105] *See* Tex. Const. art. I, § 8.

[106] *See, e.g.*, *Gilley v. State*, 418 S.W.3d 114, 120 n.23 (Tex. Crim. App. 2014) (declining to reach right-to-counsel complaint grounded in Texas Constitution where appellant "makes no independent argument that it should be construed more protectively in the right-to-counsel context than the Sixth Amendment" (citing *Barley v. State*, 906 S.W.2d 27, 35-36 (Tex. Crim. App. 1995))).

expression as compared to any activity it proscribes constitutionally.[107] The doctrine thus presumes that the challenged statute might otherwise have some legitimate applications, contrary to the typical character of facial challenges,[108] and it follows that a party may bring an overbreadth challenge without regard to whether he would otherwise have suffered a constitutional violation from the statute's application, an exception to typical standing requirements.[109] This result is deemed justified by concerns that the statute would otherwise suppress or "chill" the constitutionally protected free expression of numerous persons not before the court.[110] The Court of Criminal Appeals, quoting the United States Supreme Court, recently summarized these underlying jurisprudential policies in *Ex parte Lo*:

> "The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." This rule reflects the judgment that "[t]he possible harm to society in permitting some unprotected speech to go

---

[107] *E.g.*, *Ex parte Lo*, 424 S.W.3d 10, 18 (Tex. Crim. App. 2013) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)); *Morehead v. State*, 807 S.W.2d 577, 579-80 (Tex. Crim. App. 1991) (citing *Bynum v. State*, 767 S.W.2d 769, 772 (Tex. Crim. App. 1989)).

[108] *Cf. Ellis*, 309 S.W.3d at 80 (stating general rule that facial challenge must demonstrate that statute is invalid in all of its applications). Thus, the State's reliance on the general rule is misplaced if, as Perry urges, the challenged statutes implicate First Amendment-protected expression. *See id*.

[109] *See id*. at 90-91 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *see also Board of Trustees v. Fox*, 492 U.S. 469, 482-84 (1989) (observing that "the person invoking overbreadth may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him" and that the doctrine's "principal advantage . . . for a litigant is that it enables him to benefit from the statute's unlawful application *to someone else*.") (internal citations and quotations omitted).

[110] *Morehead*, 807 S.W.2d at 580 (quoting *Coates v. Cincinnati*, 402 U.S. 611, 619-20 (1971)).

unpunished is outweighed by the possibility that protected speech of others may be muted[.]"[111]

But because the overbreadth doctrine departs from normal standing concepts and has broader effects than case-by-case adjudication—the constitutional defect is not merely a bar to the statute's enforcement against a particular defendant, but causes the statute to be invalidated altogether—the high courts have emphasized that the overbreadth doctrine is "strong medicine" that should be employed "sparingly" and "only as a last resort,"[112] and "must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted."[113] Consequently, before a court invalidates a statute for overbreadth, the statute's reach to impermissible applications "'must be not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'"[114] Otherwise, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."[115]

The vagueness doctrine, on the other hand, derives in part from due-process notice concerns that require a criminal law to be sufficiently clear to afford a person of ordinary intelligence a reasonable opportunity to know what is prohibited while also establishing determinate

---

[111] 424 S.W.3d at 18 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *Broadrick*, 413 U.S. at 612)) (quotations and alterations in original).

[112] *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick*, 413 U.S. at 613); *accord Ellis*, 309 S.W.3d at 91.

[113] *Ferber*, 458 U.S. at 769.

[114] *Ellis*, 309 S.W.3d at 91 (quoting *Broadrick*, 413 U.S. at 613, 615).

[115] *Broadrick*, 413 U.S. at 615-16.

guidelines for law enforcement.[116]  According to the Texas Court of Criminal Appeals in *Ellis*, a facial vagueness challenge ordinarily must demonstrate that a criminal law fails this standard "in all of its applications."[117]  However, "'[w]hen a statute is capable of reaching First Amendment freedoms, the doctrine of vagueness 'demands a greater degree of specificity than in other contexts'" for reasons similar to those underlying the overbreadth doctrine—"to preserve adequately the right of free expression because 'uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'"[118]  Thus, "where First Amendment freedoms are implicated, the law must be sufficiently definite to avoid chilling protected expression" or be struck down.[119]  Likewise, when a vagueness challenge involves First Amendment considerations, a criminal law may be held invalid on its face, as with an overbroad law, "even if the law has some valid application" and "even though it may not be unconstitutional as applied to that defendant's conduct."[120]  However, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'"[121]

---

[116]  *See Long v. State*, 931 S.W.2d 285, 287-88 (Tex. Crim. App. 1996) (citing *Grayned v. Rockford*, 408 U.S. 104, 108-09 (1972); *Kramer v. Price*, 712 F.2d 174, 176-77 (5th Cir. 1983).

[117]  *Ellis*, 309 S.W.3d at 80.  *But cf. Johnson v. United States*, ___ U.S. ___, ____, 192 L. Ed. 2d 569, 582 (June 26, 2015) (more recently rejecting the "theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp").

[118]  *Long*, 931 S.W.2d at 287-88 (quoting *Grayned*, 408 U.S. at 109; *Kramer*, 712 F.2d at 177).

[119]  *Id*. at 287 (citing *Grayned*, 408 U.S. at 109); *accord Ellis*, 309 S.W.3d at 86.

[120]  *Ellis*, 309 S.W.3d at 86; *Long*, 931 S.W.2d at 288 (citing *Gooding v. Wilson*, 405 U.S. 518, 521 (1972); *Kramer*, 712 F.2d at 176 n.3)).

[121]  *Ellis*, 309 S.W.3d at 86 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989))).

Furthermore, the concern of the vagueness doctrine "'is not the possibility that it will be sometimes difficult to determine whether the incriminating fact [the statute] establishes has been proved; but rather the indeterminancy of precisely what that fact is.'"[122]

The State does not dispute that Perry's claims asserting that Penal Code section 36.03(a)(1) is unconstitutionally overbroad and vague "on its face" are, in both form and substance, facial constitutional challenges, as opposed to being "disguised" as-applied claims of the sort *Ellis* condemned. Nor does the State dispute that facial constitutional challenges like these are cognizable in pretrial habeas corpus[123]—in fact, the Court of Criminal Appeals has recently decided both facial overbreadth and vagueness challenges to criminal statutes that had been raised through that procedural mechanism[124]—or that the district court could properly reach the merits of both challenges here. On appeal, however, the State urges us to decline to reach Perry's appeal of the district court's decision rejecting those challenges on the merits. Instead, the State argues, we should remand those claims to the district court, allow proceedings there to run their course, and weigh in only when and if warranted by an appeal from a judgment after trial. To support that notion, the State cites language from Supreme Court decisions emphasizing the jurisprudential policies favoring judicious use of the overbreadth doctrine as an alternative to awaiting "as applied"

---

[122] *Id*. at 89-90 (quoting *Williams*, 553 U.S. at 306).

[123] *See Ellis*, 309 S.W.3d 79-82; *Weise*, 55 S.W.3d at 620.

[124] *See Lo*, 424 S.W.3d at 13-14 (addressing facial overbreadth challenge to Penal Code section 33.021(b) raised via pretrial habeas); *Ellis*, 309 S.W.3d at 82-90 (addressing facial vagueness challenge to Election Code provision raised through pretrial habeas); *id*. at 90-92 (addressing facial overbreadth challenge to same provision); *cf*. *id*. at 79-82 (analyzing whether ostensibly facial vagueness challenge to money-laundering statute was truly cognizable in pretrial habeas or a "disguised" as-applied challenge).

37

constitutional challenges raised through case-by-case adjudication.[125]  It also argues more generally that analysis of First Amendment facial challenges tends to benefit from development of a full evidentiary record at trial, as opposed to relying on more abstract analysis of the statutory language and its hypothetical implications.

While such considerations might inform application of the overbreadth doctrine here, we cannot agree that they permit us to defer or avoid addressing Perry's facial challenges altogether. The State does not cite, nor are we aware of, any Court of Criminal Appeals decision where the court has deemed these considerations to impact the cognizability of a facial overbreadth or vagueness challenge on pretrial habeas or the subsequent availability of appellate relief.  To the contrary, the Court of Criminal Appeals's holdings instruct us that trial and appellate courts should reach facial constitutional challenges at the pretrial habeas stage because they implicate "the trial court's power to proceed," a jurisdiction-like concern.[126]  These decisions leave us no more discretion to defer addressing Perry's facial challenges at this juncture, as the State urges, than they permit us to decide his "as-applied-to-the-indictment" challenges now, as he insists.

---

[125]  *See Fox*, 492 U.S. at 484-85 ("It is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied.  Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws.  Moreover, the overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires determination [of] whether the statute's overreach is *substantial*, not only as an absolute matter, but 'judged in relation to the statute's plainly legitimate sweep,' and therefore requires consideration of many more applications than those immediately before the court." (quoting *Broadrick*, 413 U.S. at 615)).

[126]  *Weise*, 55 S.W.3d at 619-20; *see also Lo*, 424 S.W.3d at 13-14; *Ellis*, 309 S.W.3d at 82-92.

Accordingly, we proceed to the merits of Perry's facial constitutional challenges. Whether a statute is facially unconstitutional is a question of law that we review de novo.[127] We begin by inquiring whether Penal Code section 36.03(a)(1), as it incorporates the relevant portion of the Code's "coercion" definition, reaches a substantial amount of First Amendment-protected activity.[128] The "first step" in that analysis "is to construe the challenged statute," as "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[129]

**Section 36.03(a)(1) is an expansive criminal prohibition of speech**

When construing statutes, we ordinarily focus on the literal text and determine the objective meaning of the words the Legislature used, as "the text of the statute is the law, in the sense that it is the only thing actually adopted by the legislators" and it "is the only definitive evidence of what the legislators . . . had in mind when the statute was enacted into law."[130] Penal Code section 36.03(a), titled "Coercion of a Public Servant or Voter," states:

(a)    A person commits an offense if by means of coercion he:

(1)    influences or attempts to influence a public servant in a specific exercise of his official power or a specific performance of his official

---

[127]  *Lo*, 424 S.W.3d at 14-15 & n.8.

[128]  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (suggesting that where party asserts both facial overbreadth and vagueness challenges to a law, the court's "first task" is to determine whether law reaches substantial amount of constitutionally protected conduct; "[i]f it does not, then the overbreadth challenge must fail," and court then turns to the vagueness issue).

[129]  *United States v. Stevens*, 559 U.S. 460, 474 (2010) (quoting *Williams*, 553 U.S. at 293).

[130]  *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

39

> duty or influences or attempts to influence a public servant to violate the public servant's known legal duty; or
>
> (2) influences or attempts to influence a voter not to vote or to vote in a particular manner.[131]

The focus of the offense created by section 36.03(a)(1) is thus the use of "coercion" to "influence" (i.e., bring about or cause[132]), or attempt to so "influence," certain behavior of a "public servant."[133] Other Penal Code provisions require that these actions must be committed intentionally or knowingly.[134] Consequently, a person violates section 36.03(a)(1) if he employs "coercion" with the

---

[131] Tex. Penal Code § 36.03(a).

[132] Although "influence" is not defined specifically, the word in both its noun and verb forms would ordinarily denote the exercise of a power or capacity to cause an effect upon or to bring about a particular result. *Webster's Third New Int'l Dictionary* 1160 (2002); *see, e.g.*, *Olivas v. State*, 203 S.W.3d 341, 345-46 (Tex. Crim. App. 2006) (looking to common dictionary definitions for guidance in determining plain meaning of undefined words in Penal Code). The Legislature used "influence" in a similar sense throughout chapter 36 of the Penal Code. *See* Tex. Penal Code §§ 36.04 (creating offense of "improper influence," "privately address[ing] a representation, entreaty, argument, or other communication to any public servant who exercises or will exercise official discretion in an adjudicatory proceeding with an intent to *influence* the outcome of the proceeding on the basis of considerations other than those authorized by law") (emphasis added), 36.05 (creating witness-tampering offense, defined in part as "offer[ing], confer[ring], or agree[ing] to confer any benefit on a witness in an official proceeding" "with intent to *influence* the witness") (emphasis added). In fact, chapter 36 as a whole is titled "Bribery and Corrupt *Influence*" (emphasis added).

[133] *See Phillips v. State*, 401 S.W.3d 282, 290 (Tex. App.—San Antonio 2013, pet. ref'd) (making a similar observation in context of evidentiary-sufficiency and procedural challenge to convictions for attempted coercion of public servant through threats of felonious bodily injury).

[134] *See* Tex. Penal Code § 6.02(b), (c). A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. *Id*. § 6.03(a). A person acts knowingly with respect to the nature of his conduct when he is aware of the nature of his conduct. *Id*. § 6.03(b).

conscious objective or desire, or actual awareness of, bringing about, or in an attempt to bring about, the behavior of a "public servant" described in the statute.[135]

In both the legal arena and ordinary usage, the precise parameters of "coercion" and when it occurs have often been elusive,[136] although the concept frequently denotes some sort of impingement on a listener's free will or autonomy through force or threat.[137] As "coercion" is used

---

[135] Thus, we disagree with Perry's assertion that section 36.03(a)(1) "defin[es] the crime with reference to consequences ('influencing a public servant') without requiring that offenders have any intent or knowledge regarding those consequences."

[136] *See, e.g.*, *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985) (acknowledging that "the ambiguity of such words as threat, intimidate, and coerce" had presented First Amendment problems when used to define criminal conduct in broadly written statutes); *see also* Oren Bar-Gill & Omri Ben-Shahar, *Credible Coercion*, 83 Tex. L. Rev. 717, 720-21 & nn. 4-5 (2005) (referencing some of the scholarly literature attempting to distinguish "coercion" and "threats" from mere "offers" and "bargaining"); Comment: *Coercion, Blackmail, and the Limits of Protected Speech*, 131 U. Pa. L. Rev. 1469, 1471-72 & n.12 (1983) (noting scholarly disagreement as to the meaning of "coercion" and proposing that "coercive speech" means only "speech forcing the listener to choose between two things when the listener has a legitimate claim to both things," thereby "reduc[ing] a listener's legitimate options").

[137] *Webster's Third New Int'l Dictionary* 439 (2002) ("to compel to an act or choice by force, threat, or other pressure"); *Black's Law Dictionary* 258 (6th ed. 1990) ("Compulsion; constraint; compelling by force or arms or threat. It may be actual, direct, or positive, as where physical force is used to compel act against one's will, or implied, legal or constructive, as where one party is constrained by subjugation to other to do what his free will would refuse."); *see Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010) ("Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973))); *In re Frank Kent Motor Co.*, 361 S.W.3d 628, 632 (Tex. 2012) (noting that "elements of economic duress or business coercion" include "a threat that overcomes the other party's free will and causes it to do what it otherwise would not have done and that it was not legally bound to do"); *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 405-06 (2003) (explaining that "the crime of coercion," as created by the statutes of some states other than Texas, "involves the use of force or threat of force to restrict another's freedom of action," and contrasting it with extortion, a crime with common-law roots that focuses on the obtaining of property); *Model Penal Code* § 212.5 (Official 1962 Draft and Revised Comments) (American Law Institute 1980) (offense of "criminal coercion" defined as the making of certain types of threats with the purpose "unlawfully to restrict another's freedom of action").

in the Texas Penal Code, however, the Legislature has defined the term more specifically. This definition currently appears in paragraph (9) of the Code's general definitions provision, section 1.07(a):

> "Coercion" means a threat, however communicated:
>
> (A)     to commit an offense;
>
> (B)     to inflict bodily injury in the future on the person threatened or another;
>
> (C)     to accuse a person of any offense;
>
> (D)     to expose a person to hatred, contempt, or ridicule;
>
> (E)     to harm the credit or business repute of any person; or
>
> (F)     to take or withhold action as a public servant or to cause a public servant to take or withhold action.[138]

Thus, the defining feature of "coercion" under the Penal Code is "a *threat*" to do or perform one or more of the six types of acts specified in paragraphs (A)-(F) of the definition. And, as confirmed by the phrase "however *communicated*" that immediately follows "threat," the Legislature has limited "coercion" to speech and excluded means of compulsion that might be considered non-communicative in nature, such as bare physical force.[139]

Further guidance regarding the nature of these "threats" is found in *Olivas v. State*, where the Court of Criminal Appeals examined "the meaning of the term 'threaten' as used in the

---

[138]  Tex. Penal Code § 1.07(a)(9).

[139]  *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam) (stating that federal law prohibiting the willful or knowing making of written or oral threats "to take the life of or inflict bodily harm upon the President" or others in line of succession "makes criminal a form of pure speech").

Penal Code" in order to identify the elements of the Code's assault-by-threat prohibition.[140]  After

observing that "[t]he word 'threaten' is not statutorily defined in the Penal Code," the court turned

to, and cited approvingly, the following definition of "threaten" from Webster's:

1.     to declare an intention of hurting or punishing; to make threats against;

2.     to be a menacing indication of (something dangerous, evil, etc.); as the clouds
       *threaten* rain or a storm;

3.     to express intention to inflict (injury, retaliation, etc.);

4.     to be a source of danger, harm, etc., to.[141]

The court similarly quoted a definition of "threat" from Black's Law Dictionary:  "A communicated

intent to inflict harm or loss on another or another's property."[142]  Because the court couched its

analysis in terms of determining the meaning of "threaten" "as used in the Penal Code," we must

presume that it would ascribe a similar meaning to "threat" as used in the Penal Code's "coercion"

definition.  Accordingly, "threat" as used there would denote a declared or expressed intention "of

hurting or punishing" or "to inflict injury," a "menacing indication of . . . something dangerous or

evil," or "a source of danger [or] harm" that is communicated to another through speech.  It also

seems implicit in the notion of such a "threat" that the communication would be sufficiently specific

---

[140]  *Olivas*, 203 S.W.3d at 345-49; *see* Tex. Penal Code § 22.01(a)(2) ("A person commits an offense if the person . . . intentionally or knowingly threatens another with imminent bodily injury").

[141]  *Olivas*, 203 S.W.3d at 345 (quoting Noah Webster, *Webster's New Twentieth Century Dictionary of the English Language Unabridged* 1901 (2d ed. 1983)).

[142]  *Id*. at 345-46 (quoting *Black's Law Dictionary* 1203 (7th ed. 2000)).

to generate expectation that the actor could and would actually carry out particular harm on a particular person, thereby excluding more generalized complaints or advocacy.[143]

In turn, paragraphs (A)-(F) of the definition specify six categories of threatened harm or loss that would distinguish "coercion" under the Penal Code.[144] If the threatened harm or loss would itself constitute a felony offense, the offense created by section 36.03(a)(1) would be a third-degree felony; otherwise, it is a Class A misdemeanor.[145] The specific focus of Perry's facial challenges is the portion of paragraph (F) that references "threats . . . *to take or withhold action as a public servant*."[146] "*Public servant*" as used in the Penal Code is defined as:

> a person elected, selected, appointed, employed, or otherwise designated as one of
> the following, even if he has not yet qualified for office or assumed his duties:

---

[143] That is not to say that the Penal Code's "coercion" definition requires that the actor actually have intended to carry out the threatened harm. *Cf. Velasquez*, 772 F.2d at 1357 (regarding federal retaliation statute barring threats of violence or property damage against witnesses, observing that "[i]t . . . can make no difference whether the threatener intends to carry out the threat. . . . When making a threat one hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs.").

[144] *Accord Board v. State*, No. 03-96-00024-CR, 1998 Tex. App. LEXIS 3206, *16-17 (Tex. App.—Austin May 29, 1998, pet. ref'd) (not designated for publication) (holding that "threat" as used in the "coercion" definition, as that definition is incorporated into section 36.05's witness-tampering prohibition, was not unconstitutionally vague because nature of "threat" was informed by the harms enumerated in the definition, in that case "hatred, contempt, and ridicule"); *see* Tex. Penal Code § 36.05 ("a person commits an offense if, with intent to influence the witness, he . . . coerces a witness or a prospective witness in an official proceeding" in regard to testimony or other participation in the proceeding).

[145] *See* Tex. Penal Code § 36.03(b).

[146] Perry emphasizes that he is challenging section 36.03(a)(1) only as it incorporates this portion of paragraph (F) and that he not challenging either section 36.03 or section 1.07(a)(9) standing alone. *Cf. Lo*, 424 S.W.3d at 13-14, 17-27 (addressing—and ultimately sustaining—facial overbreadth challenge to single subsection within Penal Code section 33.021).

44

(A) an officer, employee, or agent of government [and "government" is defined in the Penal Code to mean "the state; . . . a county, municipality, or political subdivision of the state; or . . . any branch or agency of the state, a county, municipality, or political subdivision"[147]];

(B) a juror or grand juror; or

(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy; or

(D) an attorney at law or notary public when participating in the performance of a governmental function; or

(E) a candidate for nomination or election to public office; or

(F) a person who is performing a governmental function under a claim of right although he is not legally qualified to do so.[148]

In short, "public servant" encompasses public officials and employees in every permutation of Texas state or local government, without distinction or limitation regarding branch or department (legislative, executive, judicial), level (county, city, district, etc.), or how the position is selected (elected, appointed, etc.). The definition also extends to certain other persons who provide a specific or limited form of governmental service or function—jurors, grand jurors, attorneys and notaries "participating in performing a governmental function," and arbitrators and other private adjudicators of causes or controversies. Even candidates for public office, others not yet having qualified or assumed their official duties, and persons performing a governmental function under a claim of right come within the definition.

---

[147] Tex. Penal Code § 1.07(a)(24).

[148] *Id*. § 1.07(a)(41).

As is implicit in the phrase "threat . . . to take or withhold action *as a public servant*," the focus of paragraph (F), as it relates to Perry's facial challenges, is on threats made by a public servant that he will take or withhold action in his official capacity or under color of his delegated authority.[149] We can also discern that paragraph (F) contemplates a taking or withholding of action by a public servant that would "hurt," "punish," inflict injury" upon, amount to "danger" to, or "harm" another person, as this would follow from the definition of "threat" endorsed in *Olivas*.[150]

With this understanding of the "coercion" element in mind, we now return to the remaining text of Penal Code section 36.03(a)(1). Combining the two, section 36.03(a)(1), as it operates against threats made by a public servant concerning his own actions, prohibits that public servant from:

- communicating an intent to take or withhold action in his official capacity or under color of his delegated authority that would "hurt," "punish," inflict injury" upon, amount to "danger" to, or "harm" another person . . .

- with the conscious objective, desire, or actual awareness of bringing about, or in an attempt to bring about . . .

---

[149] Paragraph (F) of the "coercion" definition also encompasses threats made by a different category of actors—threats made by any person, whether a public servant or ordinary citizen, that he or she will *cause* a public servant to take or withhold action. *See* Tex. Penal Code § 1.07(a)(9). Because Perry's arguments are directed entirely at the other component of paragraph (F)—threats made *by* public servants to take or withhold action themselves—we have no occasion to address the constitutionality of paragraph (F) and section 36.03(a)(1) as they would proscribe threats by members of the public and others to cause such public-servant actions as a means of bringing about actions by other public servants. *But cf.* U.S. Const. amend. I (protecting "the right of the people . . . to petition the Government for a redress of grievances"). Except where indicated otherwise, all subsequent references to "paragraph (F)" or "section 36.03(a)(1) and paragraph (F)" denote only the portion of paragraph (F), as it is incorporated into section 36.03(a)(1), that Perry has challenged.

[150] *See Olivas*, 203 S.W.3d at 345-46 (explaining that ordinary meaning of "threat" includes a declared or expressed intent "of hurting or punishing" or "to inflict injury," as well as a "menacing indication of . . . something dangerous [or] evil," or "a source of danger [or] harm").

46

- any of the following actions by another "public servant" (defined the same way as with the actor; i.e., expansively):

  - "a specific exercise of his official power," or

  - "a specific performance of his official duty," or

  - a "violat[ion of] the public servant's known legal duty."

The required mens rea element, as previously indicated, relates to the actor's intent or awareness of using the threat to induce, or in an attempt to induce, the desired conduct of the other public servant. Neither section 36.03(a)(1) nor paragraph (F) requires that the actor make any explicit demand or quid-pro-quo offer regarding the desired action on the part of the public servant sought to be influenced; it is enough that a specific threat to take or withhold action was made with the requisite mens rea.[151] While proof of an explicit demand for action would certainly be probative of an aim to "influence" the second public servant to those ends, nothing in the statute forecloses proof of the prohibited aim through other circumstances. Further, neither section 36.03(a)(1) nor paragraph (F) requires that the public servant sought to be influenced necessarily be the same person who would be harmed if the threat were carried out.[152]

---

[151] *Cf. Isassi v. State*, 330 S.W.3d 633, 644 (Tex. Crim. App. 2010) ("The improper-influence statute does not require . . . a quid pro quo. That conduct is covered by the bribery statute."); *State v. Robertson*, 649 P.2d 569, 577-79 (Or. 1982) (addressing a state criminal coercion statute requiring proof of an explicit demand (citing Or. Rev. Stat. § 163.275)).

[152] *See Phillips*, 401 S.W.3d at 289-90 (upholding conviction for coercion of a public servant based on evidence that defendant communicated oral threat to dispatcher (a "public servant") that he would inflict felonious bodily injury on a police officer (another "public servant") in order to influence the dispatcher's performance of duty, and noting, "The fact that the threatened third person in this case happened to be another public servant does not matter.").

As for the action desired of the public servant sought to be "influenced," the exact phrase "influence [a public servant] to violate his known legal duty" appears in section 240.2 of the Model Penal Code, the analog to both section 36.03 and section 36.04 (the improper-influence prohibition) in the Texas Penal Code.[153] As the drafters of the model code (the American Law Institute) explained, "influence . . . to violate his known legal duty" denotes an attempt to secure action by a public servant that would "violate a specific obligation of his office."[154] Such "legal duties," the Institute elaborated, are those "specific[ally] and clearly delineated" by constitutional provisions, statutes, rules, or other legal authorities governing his performance of official functions, in contrast to discretionary decisions or any "general obligation of fidelity to the public interest or other implicit moral obligation."[155] Furthermore, according to the Institute, "the requirement of knowledge" of the legal duty applies both to the public servant sought to be influenced and the actor

---

[153] *See Model Penal Code* § 240.2 (Official 1962 Draft and Revised Comments) (American Law Institute 1980). Subsections (a)-(c) of section 240.2 are the counterparts to Texas Penal Code section 36.03—with subsection (c) containing the language quoted above—while subsection (d) of section 240.2 corresponds to section 36.04. The Court of Criminal Appeals has previously sought guidance from section 240.2 and accompanying commentary when construing parallel language that appears in section 36.04, and we will follow its lead in construing the parallel language that appears in section 36.03. *See Isassi*, 330 S.W.3d at 638-39; *see also id*. at 645 (Keller, P.J., dissenting) (observing that "Section 240.02 . . . is comparable to our Penal Code § 36.03 (Coercion of Public Servant or Voter) and § 36.04 (Improper Influence) together.").

"Public servant" as used in the model code is defined similarly to the Texas version. *Model Penal Code* §§ 240.0(7) ("any officer or employee of government, including legislators and judges, and any person participating as a juror, advisor, consultant or otherwise, in performing a governmental function; but the term does not include witnesses"), 240.2 (no defense "that a person whom the actor sought to influence was not qualified to act in the desired way, whether because he had not yet assumed office, or lacked jurisdiction, or for any other reason").

[154] *Id*. § 240.2 cmt. 2, at 51-52.

[155] *Id*. § 240.2(c) cmt. 2, at 51-52; *see id*. § 240.1(3) & cmt. 3, at 13, cmt. 8, at 35-36.

seeking to influence him.[156]  The import of this language, in other words, is to proscribe threats that are calculated to bring about action by a public servant whom the threatener knows does not have lawful authority or discretion to so act.  To this extent, the language has some parallels to section 36.04's improper-influence prohibition, which criminalizes certain private communications made to public servants who exercise official discretion in adjudicatory proceedings (e.g., courts, administrative law judges, or prosecutors) made "with an intent to influence the outcome of the proceedings *on the basis of considerations other than those authorized by law*."[157]

Standing in contrast to this portion of section 36.03(a)(1) are the other two types of desired public-servant conduct that the statute addresses, "specific exercise of . . . official power" and "specific performance of . . . official duty."  These components would extend more broadly to capture threats calculated to cause action by a public servant who would possess lawful authority and discretion to so act based on the threat,[158] as well as those aimed at public servants whom the threatener does not know to lack such authority.  The modifiers "*specific* exercise of . . . official power" and "*specific* performance of . . . official duty" make clear, however, that some particular

---

[156]  *See id*. § 240.1(3) cmt. 8, at 35.

[157]  Tex. Penal Code § 36.04(a) (emphasis added); *see also Isassi*, 330 S.W.3d at 642-45 (upholding improper-influence conviction based on evidence that county attorney made series of contacts with district attorney's office that "might be regarded as lawful when viewed in a vacuum," yet there was sufficient evidence county attorney intended the contacts to cause dismissal of aunt's pending charges because of that relationship rather than considerations authorized by law).

[158]  *See Phillips*, 401 S.W.3d at 288-89 ("specific performance" of dispatcher's "official duty" was manner in which dispatcher responded to 911 call); *see also City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009) (distinguishing between "government officer's exercise of discretion" and conduct actionable under "ultra-vires exception" to sovereign immunity); *Tobias v. State*, 884 S.W.2d 571, 574-76, 580-81 (Tex. App.—Fort Worth 1994, pet. ref'd) (upholding conviction for attempted coercion, through threats of violence, of appellate court justices with aim of achieving favorable decision in pending case).

49

action or conduct by the public servant must be sought and not merely some effect on the public servant's general comportment in office.[159]

The range of threats made by public servants that are ultimately criminalized by section 36.03(a)(1) is limited somewhat by a subsection (c) of section 36.03. That provision states:

> It is an exception to the application of Subsection (a)(1) of this section that the person who influences or attempts to influence the public servant is a member of the governing body of a governmental entity, and that the action that influences or attempts to influence the public servant is an official action taken by the member of the governing body. For the purposes of this subsection, the term "official action" includes deliberations by the governing body of a governmental entity.[160]

Negation of this exception has been held to be an element of the offense.[161] In other words, in cases where the asserted violation of section 36.03(a)(1) is predicated on a threat by a public servant, the State must prove, in addition to the other elements of the offense, that (1) the public servant who made the threat is not "a member of the governing body of a governmental entity," and (2) the threat was not an "official action" of that member, a phrase that denotes an act performed by the member in his official capacity and under color and by virtue of his office.[162]

A key effect of subsection (c), as Perry acknowledges and the district court agreed, is to exclude from section 36.03(a)(1)'s proscription threats to take or withhold action made

---

[159] *See Black's Law Dictionary* 1398 (6th ed. 1990) (defining specific as "[h]aving a certain form or designation; observing a certain form; particular; precise; tending to specify, or to make particular, definite, limited, or precise").

[160] Tex. Penal Code § 36.03(c).

[161] *See Tobias*, 884 S.W.2d at 578.

[162] *See Black's Law Dictionary* 1084 (6th ed. 1990) (defining "official act" as one "done by an officer in his official capacity under color and by virtue of his office. Authorized act.").

by members of the Legislature (who would be part of the "governing body" of a "governmental entity," the State of Texas) made in the course of their wranglings over legislation and policy. Subsection (c) would have similar application to other elected officials and policymakers who serve on city councils, school boards, and county commissioners' courts, to name but a few examples. In fact, subsection (c) originated in a package of three amendments impacting section 36.03 (which originated in the 1974 Penal Code[163]) that were made by the Seventy-First (1989) Legislature following controversy regarding the existing statute's potential ramifications for policymakers at the county level.[164] The documented legislative history reflects that proponents advocated the amendments "[t]o protect public officials from criminal prosecution arising from the execution of their legal duties," and cited a purported incident where "certain county commissioners" had come under grand jury investigation regarding possible violations of the existing statute "in response to budget cuts" they had imposed.[165] The timing of the 1989 amendments also corresponds to the prosecution that gave rise to *State v. Hanson*.[166] *Hanson* (which we will explore in more detail when analyzing section 36.03(a)(1)'s First Amendment implications) arose from charges brought under the original versions of section 36.03(a)(1) and paragraph (F) against the then-constitutional county judge for Bosque County, Hon. Regina Hanson.[167] As the Tenth Court of Appeals

---

[163] Act of May 24, 1973, 63d Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 944 (amended 1989, 1993) (current version at Tex. Penal Code § 36.03).

[164] Act of April 27, 1989, 71st Leg., R.S., ch. 67, §§ 1, 2, 1989 Tex. Gen. Laws 380, 380 (current versions at Tex. Penal Code §§ 1.07(a)(9), 36.03(c)).

[165] House Comm. on State Affairs, Bill Analysis, Tex. H.B. 594, 71st Leg., R.S. (1989).

[166] 793 S.W.2d 270 (Tex. App.—Waco 1990, no pet.).

[167] *See id*. at 271-73.

summarized the charges, it had been alleged that Judge Hanson had "intentionally or knowingly threatened to terminate the county's funding of the salaries of a deputy district clerk and an assistant district attorney in an attempt to coerce the district judge into firing the county auditor and the county attorney into revoking a misdemeanant's probation."[168]

Another of the 1989 amendments added the phrase "influences or attempts to influence a public servant to violate the public servant's known legal duty,"[169] thereby specifying that section 36.03(a)(1)'s prohibition extends to threats aimed at causing action by another public servant whom the threatener knows does not have lawful authority or discretion to so act. The final change consisted of an amendment to the "coercion" definition (which was then located in Penal Code section 36.01(1)) to require in paragraph (F) that the threatened taking or withholding of action by a public servant must be "unlawful,"[170] a term that the Penal Code defines as conduct that would be either criminal or tortious absent a defense amounting to justification or privilege.[171] However, the Legislature removed the "unlawfully" qualifier from paragraph (F) in 1993, amid sweeping changes to the Penal Code in which the Legislature also moved the "coercion" definition to

---

[168] *Id*. at 271. Although the Legislature enacted the 1989 amendments during the pendency of *Hanson*, the case was controlled by the prior version of the law. *See id*. at 273.

[169] Act of April 27, 1989, 71st Leg., R.S., ch. 67, § 3, 1989 Tex. Gen. Laws 380, 380 (current version at Tex. Penal Code § 36.03(a)(1)).

[170] Act of April 27, 1989, 71st Leg., R.S., ch. 67, § 2, 1989 Tex. Gen. Laws 380, 380 (current version at Tex. Penal Code § 1.07(a)(9)). As amended, paragraph (F) was limited to threats:

(F)     to unlawfully take or withhold action as a public servant, or to cause a public servant to unlawfully take or withhold action.

*Id*.

[171] Tex. Penal Code § 1.07(a)(48).

52

its current location in section 1.07.[172]  The remainder of section 36.03(a)(1) and the "coercion" definition—including the other two 1989 amendments—has survived without substantive change to this day.

In addition to excluding a category of public-servant threats from section 36.03(a)(1)'s prohibition, subsection (c) also provides further illumination regarding the nature of threats that remain covered.  By requiring that an excepted threat be an "*official action*" of a "governing board" member, subsection (c) implies that section 36.03(a)(1)'s proscription reaches a range of threats that would *not* be considered official actions of a public servant, whether governing board members or other kinds.  This category, as it relates to threats covered by paragraph (F) of the "coercion" definition, would seem to contemplate exceptional instances in which a public servant has utilized threats to take or withhold official action to ends wholly beyond the servant's delegated powers, such as when used to pursue some sort of entirely personal benefit or interest.[173]  The same feature of subsection (c) also confirms that 36.03(a)(1)'s proscription would reach a range of threats that would be considered official actions of the public servants who are not

---

[172]  Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3588, 3659 (current version at Tex. Penal Code §§ 1.07(a)(9), 36.03).

[173]  *Cf. Tobias*, 884 S.W.2d at 584 (observing that "threatening specific criminal acts of violence with a firearm against an appellate justice . . . could never constitute an 'official action' within the meaning of the exception of section 36.03(c)").  Other examples might include a juror threatening to vote unfavorably to a municipality in a pending case in order to sway city personnel to cease charging the juror for city services, or a city manager threatening employees of the city's municipal road crew with adverse personnel actions as a means of causing them to improve a private road on his property.

governing board members. In fact, as the State seems to recognize, this would be the principal effect of the statute.[174]

If the sparse volume of appellate opinions addressing section 36.03 to date is any indication, the statute has rarely been utilized. However, the evident purpose of criminal statutes of this sort—like the improper-influence statute, the prohibition against bribery of public servants in section 36.02,[175] and other provisions within chapter 36 of the Penal Code—is "to reach various means by which the integrity of government can be undermined."[176] In that regard, prohibitions like that in section 36.03(a)(1), at least in theory, serve as a "complement" to the bribery offense, in that bribery focuses on the corruptive influence of offering or conferring a "benefit" as consideration for a public servant's actions, whereas section 36.03(a)(1) combats the use of a negative incentive—threats of certain kinds of harm—to induce the public servant's actions.[177] The definition of "coercion" incorporated into section 36.03 also has some similarities to the types of threats that would be criminalized under the Model Penal Code through a "residual," stand-alone "coercion" offense when used "with purpose unlawfully to restrict another's freedom of action to his detriment" and not done with "benign purpose."[178]

---

[174] E.g., the State's heavy reliance on First Amendment theories relating to "governmental speech" and speech made by public servants pursuant to official duties, discussed below.

[175] Tex. Penal Code § 36.02.

[176] *Isassi*, 330 S.W.3d at 639 (quoting *Model Penal Code* §§ 240.0-240.7 explanatory note); *see also id*. at 645 (Keller, P.J., dissenting) (making a similar observation).

[177] *See Model Penal Code* § 240.2 cmt. 1, at 49; *see also id*. (further noting "the congruence of rationale[s] between the two offenses" and that model code section 240.2(a)-(c) (the Penal Code section 36.03(a)(1) counterpart) "proscribes use of threat against the same classes of persons with the same illicit objective").

[178] *See id*. § 212.5 & cmt. 2, at 264-67.

But translating such concepts into specific statutes presents numerous line-drawing challenges in regard to a wide range of communications made to, by, or between public servants that can be fairly characterized as "threats," yet are considered to be a commonplace and accepted—if not also constitutionally protected—component of the day-to-day debate, bargaining, and give-and-take that is characteristic of American governmental and political processes.[179] In this regard, section 36.03 (aside from subsection (c)), as it incorporates paragraph (F), is most notable in the lines it does *not* attempt to draw, as revealed by our review of the statutory text:

[179] As the Institute observed in regard to section 240.2 of the Model Penal Code:

> The chief difficulty in drafting a statute of this sort lies in drawing the line between permissible and impermissible threats. Many kinds of harm may be threatened or inflicted without contravening accepted standards of behavior and without impairing the integrity of government. A threat to withdraw political support, for example, is not only a legitimate means of influencing political decisions but is in most instances constitutionally protected. More commonly, use of threat may be either appropriate or blameworthy depending on the motives of the actor and the sympathies of the observer. Thus, for example, a public official's threat to discharge a subordinate over a difference in policy may be legitimate supervision or reprehensible interference with the independence of another public servant. And a threat to arrest may be a proper means to induce another to abide by the law or a method of improper intimidation. These distinctions are too subtle for resolution by the blunt instrument of a criminal prosecution. However one may characterize the facts of a particular case, it would be intolerable to subject all such decisions to review under the penal law.

*Id*. § 240.2 cmt. 2, at 50-51; *see also id*. § 240.1 cmt. 3, at 9-10 (expressing concern that blanket prohibition in bribery statute against offers or acceptance of "benefits" could criminalize "logrolling" or similar bargaining in legislative or political processes); *id*. § 212.5(1) cmt. 2, at 264-65 (regarding stand-alone coercion offense, observing that "analysis and experience confirms the wisdom of assigning definite limits to criminal liability for threats. Such constraints are an inevitable part of a society where individuals are free to confer or to withhold benefits desired by others. Thus, absent improper purpose, a person who has a legal right to take a certain action is also free to threaten to do so. Indeed, threat is implicit in the idea of bargain. Threats to cut an expectant legatee out of a will or to sell or use one's land in a lawful manner deemed undesirable by neighbors, or to cease patronizing a merchant, or to foreclose a mortgage are all permissible tactics in striking a bargain, whether for money or for other concession not in itself unlawful.").

- While the term "threat" that is incorporated into paragraph (F) and section 36.03(a)(1) denotes (per *Olivas*) the declared intention to take or withhold action so as to "hurt," "punish," "inflict injury" upon, amount to "danger" to, or "harm" another person, the Legislature has not currently seen fit to require that such threatened detriments rise to the level of crimes or otherwise be unlawful (i.e., amount to *legal* "injury" or "harm"). In fact, as previously explained, the Legislature specifically removed any such limitation from paragraph (F) in 1993 after having inserted it in 1989. The current versions of section 36.03(a)(1) and paragraph (F) thus stand in contrast to other provisions of the Texas Penal Code that require proof of threats that foretell unlawful action (e.g., section 36.06's prohibition against obstruction and retaliation, which requires proof of an intentional or knowing threat to harm another "by an unlawful act"[180]) as well as Model Penal Code § 240.2's general rule.[181]

- Section 36.03(a)(1) and paragraph (F) do not require proof that the threat cause or be aimed at causing any physical or emotional harm to the recipient of the threat, only that the threat be aimed at "influencing" (i.e., bringing about) certain governmental actions by the recipient.[182] And, aside from its prohibition against threats aimed at inducing a knowing

---

[180] Tex. Penal Code § 36.06(a).

[181] Section 240.2 of the model code would criminalize, subject to a single exception, threats of harm aimed at influencing a "decision, opinion, recommendation, vote, or other exercise of discretion as a public servant" only when the threatened harm would be "*unlawful*," *Model Penal Code* § 240.2(a) (emphasis added), with "unlawful" having a meaning similar to the Texas Penal Code's definition of the term. *See id*. § 240.2 cmt. 2, at 52 ("The term 'unlawful' includes threats of physical attack, threat of property damage forbidden by penal statute or by the law of torts, and threat to discharge a public servant in violation of applicable civil service statutes or regulations."). The exception to this general rule would apply to a "decision, opinion, recommendation, vote or other exercise of discretion *in a judicial or administrative proceeding*"—in that context only, any threat of harm aimed at influencing the public servant's actions, not just threats of unlawful harm, would be prohibited. *Id*. § 240.2(b) (emphasis added). Additionally, the Institute proposed to proscribe any threat of harm, not merely unlawful harm, that was aimed at influencing a public servant to "*violate his known legal duty*," as opposed to obtaining a decision or act that was within the public servant's lawful discretion to make. *Id*. § 240.2(c) (emphasis added).

Incidentally, the rationale for the model code's general rule, the Institute explained, was to "exclude from coverage accepted behavior, such as threat of political opposition, with respect to the exercise of discretion by a public servant." *Id*. § 240.2 cmt. 2, at 52.

[182] *Cf. Scott v. State*, 322 S.W.3d 662, 668-70 (Tex. Crim. App. 2010) (upholding telephone-harassment statute against First Amendment challenge; statute "is directed only at persons who, with the specific intent to inflict emotional distress, repeatedly using the telephone to invade another

violation of a public servant's legal duties, section 36.03(a)(1) does not require that the threat seek conduct of the other public servant that would be unlawful if performed.

- Similarly, section 36.03(a)(1) and paragraph (F) prohibit even threats aimed at bringing about official actions that the threatener could lawfully demand or require through other means. This statutory feature differs from, e.g., the Model Penal Code's stand-alone coercion offense,[183] coercion concepts known to civil law,[184] and certain federal extortion prohibitions that have been held to require, in cases where a threat foretells lawful rather than unlawful harm, that the objective of the threat be "wrongful" in the sense of seeking property to which the actor had no plausible claim of right.[185]

- Nor is there any requirement in section 36.03(a)(1) or paragraph (F) that the threat in question lack a "nexus" or logical relationship to the desired conduct.[186] Such a limitation has been held to be an aspect of the "wrongfulness" requirement under certain federal extortion prohibitions.[187] The Model Penal Code's stand-alone coercion offense incorporates a similar limitation in the form of an affirmative defense that would apply, in regard to threats by public servants to take or withhold action, where the actor "believed . . . the proposed official action justified and that his purpose was limited to compelling the other to behave in a way reasonably related to the circumstances which were the subject of the . . . proposed official action, as by desisting from further misbehavior, making good a wrong done, refraining from taking any action or responsibility for which the actor believes

---

person's personal privacy, and do so in a manner reasonably likely to inflict emotional distress."), *overruled on other grounds*, *Wilson v. State*, 448 S.W.3d 418, 422-23 (Tex Crim. App. 2014).

[183] *Id*. § 212.5(1) & cmt. 2, at 265 (defining stand-alone offense of "coercion" to require proof of certain threats "with purpose unlawfully to restrict another's freedom of action to his detriment," and explaining that "'unlawfully' means that the actor must intend to coerce conduct that he has no legal right to require").

[184] *See Frank Kent Motor Co*., 361 S.W.3d at 632 (elements of economic duress or business coercion include "a threat of an act that the actor had no legal right to do" that also causes another party "to do what it otherwise would not have done and that it was not legally bound to do").

[185] *See United States v. Jackson*, 180 F.3d 55, 70-71 (2d Cir. 1999).

[186] This concept is illustrated by the distinction between a threat that seeks recovery of a valid debt (something the actor can lawfully demand or require payment of) by threatening to initiate garnishment proceedings against the debtor or to publicly disclose the debt's existence, which would be deemed permissible, versus threatening to disseminate unrelated secrets regarding the debtor's sexual indiscretions, which would not be. *See id*. at 70-71.

[187] *See id*.

the other disqualified."[188]  No corresponding limitation is found in the Texas Penal Code, however.

Absent such limitations, the net result is that section 36.03(a)(1), as it incorporates paragraph (F), would criminalize:

- A threat by a public servant to take or withhold official action lawfully.

- A threat by a public servant to take or withhold official action lawfully that seeks only to bring about lawful conduct by another public servant.

- A threat by a public servant to take or withhold official action lawfully that seeks only to bring about lawful conduct by another public servant that the first public servant has the lawful right to demand or require.

- A threat by a public servant to take or withhold official action lawfully that seeks only to bring about lawful conduct by another public servant that the first public servant has the lawful right to demand or require, even where the threat has a logical nexus to the conduct being sought of the other public servant.

These sorts of implications are the focus of Perry's facial constitutional challenges. In these ways, he urges, section 36.03(a)(1), as it incorporates paragraph (F), criminalizes a "virtually endless" array of threats that are in the nature of "ordinary give and take" between and among the public servants who are not excepted by subsection (c).  He posits hypothetical examples that include:

- "[A] manager could not threaten to fire or demote a government employee for poor performance."

- "A judge could not threaten to sanction an attorney for the State, to declare a mistrial if jurors did not avoid misconduct, or to deny warrants that failed to contain certain information."

---

[188]  *Model Penal Code* § 212.5(1).

- "An inspector general could not threaten to investigate an agency's financial dealings."

- "A prosecutor could not threaten to bring charges against another public servant."

- "A [public] university administrator could not threaten to withdraw funding from a professor's research program."

- "A public defender could not threaten to file a motion for suppression of evidence to secure a better plea bargain for his client."

At least to the extent each hypothetical threat would be aimed at bringing about some specific action on the part of another public servant, we agree that Perry's illustrations would indeed come within section 36.03(a)(1)'s proscription, as written. Each example would, in terms of the statutory language, represent a "public servant" (under the Penal Code's broad definition) seeking "by means of coercion" (defined, again, as a "threat" to "take or withhold action as a public servant" that, while "harmful" or detrimental to another, need not be unlawful) to "influence[] or attempt[] to influence" (i.e., bring about) some "specific exercise" or "specific performance" of another public servant's duties or powers (which also need not be unlawful, nor beyond the first public servant's powers to demand or require).

And it is not difficult to think of other similar examples. Among them, it has occurred to the members of this panel that unless appellate court justices can shoehorn themselves into subsection (c)'s exception, section 36.03(a)(1) would seemingly put at risk that time-honored practice whereby one justice will seek changes to another justice's draft majority opinion by threatening to write a dissent exposing flaws in the other's legal reasoning.[189] Similar concerns

---

[189] *See also Robertson*, 649 P.2d at 580 (citing the example of one appellate judge telling another, "Change your opinion, or I shall dissent and expose your complete ignorance of this area of the law." (quoting *State v. Paige*, 638 P.2d 1173, 1176 (Or. App. 1982) (Gillette, J., dissenting))).

would arise regarding the standard letter our Clerk issues to prompt action whenever briefs or records are late, in which he warns of imminent dismissal if the deficiency is not promptly rectified, at least when the party in interest is a government entity or official.

One's view of section 36.03(a)(1) is further informed by considering its implications as it incorporates a portion of paragraph (F) that Perry has not challenged in this case—a threat "*to cause* a public servant to take or withhold action."[190]  Within the literal scope of this prohibition would be ordinary citizens who make credible threats to obtain legislative or judicial remedies as a means of prompting some action by a local government official,[191] not to mention members of the media who might have to resort to similar means of persuasion in order to overcome governmental foot-dragging on Public Information Act requests.  We mention this not to plant ideas in the minds of local prosecutors across Texas who may be inclined to protect their fellow public servants, but to provide stark demonstration that section 36.03(a)(1) and the "coercion" definition it incorporates were not crafted with the sort of precision necessary to avoid First Amendment problems when, as with these statutes, government purports to criminalize speech.

In rejecting Perry's overbreadth challenge, the district court evidently perceived that section 36.03(a)(1) and paragraph (F) are much more limited in scope than we have concluded they are.  And it is this vast breadth that causes section 36.03(a)(1), as it incorporates

---

[190]  *See* Tex. Penal Code § 1.07(a)(9)(F) (defining "coercion" as a "threat . . . to take or withhold action as a public servant, or *to cause a public servant to take or withhold action*") (emphasis added).

[191]  Subsection (c)'s exemption would be unavailing—that protection, again, benefits only public servants, and only those who are members of governing bodies of governmental entities.

paragraph (F), to impinge upon substantial amounts of First Amendment-protected speech among

Texas's public servants.

**Section 36.03(a)(1), as it incorporates paragraph (F), criminalizes First Amendment-protected speech**

There is little room for disagreement that section 36.03(a)(1) and paragraph (F) criminalize speech—that much is apparent in the phrase "a threat, however *communicated . . .*" that is a defining characteristic of all types of "coercion" prohibited by section 36.03(a)(1).[192] But it is a somewhat closer question whether this speech is a type that the First Amendment actually protects.

In contending that the proscription reaches protected speech (and a substantial amount at that), Perry emphasizes the First Amendment's central concern with protecting and fostering discussion and advocacy concerning public issues and political change[193] and what the Supreme Court has termed the provision's embodiment of a "profound national commitment" to the ideal that "debate on public issues should be uninhibited, robust, and wide-open."[194] This is not simply liberty to engage in "abstract discussion" or "merely to describe facts," as the Supreme Court has emphasized, but the liberty "to persuade to action," as "[t]he First Amendment is a charter for

---

[192] *See, e.g.*, *Watts*, 394 U.S. 707 (stating that federal law prohibiting the willful or knowing making of written or oral threats "to take the life of or inflict bodily harm upon the President" or other officials "makes criminal a form of pure speech").

[193] *See, e.g.*, *Boos*, 485 U.S. at 318; *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988).

[194] *Boos*, 485 U.S. at 318 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) ("'[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.'" (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964))).

government, not for an institution of learning."[195] The court has also said that the First Amendment's protections are at their "zenith" for such "core political speech,"[196] and Perry insists that this is precisely the sort of speech section 36.03(a)(1) and paragraph (F) reach—speech by public servants regarding their official actions that is aimed at prompting other public servants to undertake official action.

Perry similarly emphasizes the Supreme Court's longstanding recognition that discussion, debate, and advocacy regarding public issues "is often vituperative, abusive, and inexact," yet is protected by the First Amendment nonetheless.[197] In *Hanson*, the then-Chief Justice of the Tenth Court of Appeals, the late Bob Thomas, made a similar observation regarding speech to and in Texas government at its local levels:

> A preeminent purpose of the First Amendment is to guarantee free and unfettered political discussions within government and among the citizenry. Consequently, those who enter the political arena are fair game for sharp attacks inflicted by both the electorate and the elected. The hurly-burly world of courthouse politics is an arena where robust debate, often accompanied by blunt, caustic and even intemperate and vituperative language, is the by-product of public officials clashing over divisive issues. However, as long as the means are peaceful and their actions lawful, the boundaries of their political debates cannot be measured for constitutional protections by conventional standards of acceptability. Freedom of speech must encompass the liberty of elected officials to discuss matters of public concern without prior restraint or fear of punishment.[198]

---

[195] *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982) (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)).

[196] *Meyer*, 486 U.S. at 421-22, 425.

[197] *Claiborne Hardware Co.*, 458 U.S. at 911 (quoting *Watts*, 394 U.S. at 708).

[198] *Hanson*, 793 S.W.2d at 272-73 (citing *Keefe*, 402 U.S. at 419; *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 10-12 (1970); *Garrison*, 379 U.S. at 74-75; *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940)).

The State counters that section 36.03(a)(1) and paragraph (F) do not implicate any First Amendment interests due to the identity of the speakers who are targeted—public servants—and the content and effect of the speech that is prohibited—what the State characterizes as "coercive" or "extortionate" threats.

### *Contrary to the State's arguments, public servants have First Amendment rights*

The State insists that "[s]tatements made by public officials to other public officials are unprotected" under the First Amendment, at least when uttered as part of an official's job. The State derives this proposition from its understanding of the United States Supreme Court's holdings in *Garcetti v. Ceballos*.[199] *Garcetti* involved a section 1983 claim brought by a deputy district attorney (Ceballos) against his governmental employer to obtain relief based on alleged violations of Ceballos's First Amendment rights.[200] The asserted violations consisted of a job reassignment, transfer, and promotion denial that Ceballos perceived to be in retaliation for a memorandum that he had written—undisputedly as part of his job duties[201]—concerning a pending case.[202] The Supreme Court framed the dispositive issue as "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties."[203] After analysis, the court concluded that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment

---

[199]  547 U.S. 410 (2006).

[200]  *See id*. at 414-15.

[201]  *See id*. at 421.

[202]  *See id*. at 413-15.

[203]  *Id*. at 413.

purposes, and the Constitution does not insulate their communication from employer discipline."[204]

And because "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities," the court held that Ceballos's claim of unconstitutional retaliation "must fail."[205]

The State reads *Garcetti* to mean that statements made by public employees while performing their official duties enjoy no First Amendment protection not only as against employer discipline—the issue in *Garcetti*[206]—but for all other purposes, even as against criminal penalties that might be imposed based on that official speech. In that regard, the State places great emphasis on the *Garcetti* court's phrasing of its holding in terms of public employees "*not speaking as citizens for First Amendment purposes*" when making statements pursuant to their official duties, while diminishing the significance of the clause that immediately follows, ". . . *and the Constitution does not insulate their communications from employer discipline.*"[207] Perry disputes that *Garcetti* has any

---

[204] *Id*. at 421.

[205] *Id*. at 424.

[206] As the *Garcetti* court repeatedly made clear. *E.g.*, *id*. at 413 ("The question presented by the instant case is whether the First Amendment protects a government employee *from discipline* based on speech made pursuant to the employee's official duties."), 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications *from employer discipline*."), 421-22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe on any liberties the employee might have enjoyed as a private citizen . . . [but] simply reflects the *exercise of employer control* over what the employer itself has commissioned or created."), 424 ("[T]he First Amendment does not prohibit *managerial discipline* based on an employee's expressions made pursuant to official responsibilities."), 426 ("We reject . . . the notion that the First Amendment shields *from discipline* the expression employees make pursuant to their professional duties.") (emphases added).

[207] *Id*. at 421 (emphasis added).

64

bearing in the present context of a criminal prosecution based on speech, as opposed to a claim or issue involving employee discipline. We agree.

While *Garcetti* has admittedly generated occasional confusion of this sort among lower courts,[208] a close reading of that opinion, especially as informed by antecedent precedents on which the Supreme Court relied in that case, belies the State's expansive reading of it. *Garcetti*

---

[208] Although the State does not cite any case that has construed or applied *Garcetti* in the manner it proposes—let alone any precedents from the Supreme Court—a Texas federal district court once did so in the first round of the renowned First Amendment challenges to the Texas Open Meetings Act. *Rangra v. Brown*, No. P-05-CV-075, 2006 U.S. Dist. LEXIS 85833, at *1-4, 14-17 (W.D. Tex. Nov. 7, 2006). The district court extended *Garcetti* to claims asserted by elected city council members and reasoned that "[b]ecause the speech at issue [deliberations concerning official business or policy] is uttered entirely in the speaker's capacity as a member of a collective decision-making body, and thus is the kind of communication in which he or she is required to engage as part of his or her official duties, it is not protected by the First Amendment from the restriction imposed by the Texas Open Meetings Act." *Id*. at *14 (citing *Garcetti*, 547 U.S. at 420-22). The district court also refused to ascribe any significance to the plaintiffs' status as elected officials, in contrast to the unelected public employee whose claims were at issue in *Garcetti*, reasoning that "[f]or purposes of determining what is protected speech under the First Amendment, there is no meaningful distinction among public employees, appointed public officials, and elected public officials." *Id*. A panel of the Fifth Circuit Court of Appeals subsequently reversed, squarely rejecting the district court's application of *Garcetti* to the elected officials. *Rangra v. Brown*, 566 F.2d 515, 522-26 (5th Cir. 2009). Yet this panel decision—and the underlying case—was later vacated as moot by the full Fifth Circuit. *Rangra v. Brown*, 584 F.3d 206, 207 (5th Cir. 2009) (en banc). In the meantime, however, a different Fifth Circuit panel, addressing a state district judge's First Amendment challenge to judicial conduct sanctions, had similarly rejected *Garcetti*'s application to limit the First Amendment rights of elected officials. *Jenevein v. Willing*, 493 F.3d 551, 557-58 (5th Cir. 2007). In the subsequent round of First Amendment challenges to the Texas Open Meetings Act, the district court, while ultimately upholding the Act, did not revisit *Garcetti*'s implications beyond observing that the plaintiff elected officials "certainly [did] not lose their right to political expression once they attain public office" and enjoyed First Amendment protections for their official deliberations. *Asgeirsson v. Abbott*, 773 F. Supp. 2d 684, 694 (W.D. Tex. 2011), *aff'd*, 696 F.3d 454 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1634 (2013) (citing *Bond v. Floyd*, 385 U.S. 116, 135 (1966)). The Fifth Circuit's analysis similarly presumed that the officials enjoyed First Amendment protections in regard to their deliberations, focusing instead on whether the statutory restrictions were justified. *See generally* 696 F.3d at 458-67.

is rooted firmly in a series of cases (sometimes termed the *Pickering*[209]-*Connick*[210]-*Garcetti* line

of cases) that derives from a long-recognized principle that "a State cannot condition public

employment on a basis that infringes the employee's constitutionally protected interest in freedom

of expression."[211] *Pickering* and its progeny represent a particularized application of that principle

to the termination, discipline, or other adverse actions imposed by governmental employers

against their employees based on the employees' expression.[212] Accordingly, these cases have

consistently emphasized the unique nature of government's relationship to its citizens in that

context—government is acting in the role and capacity of *employer*, as opposed to its usual or

general role "as sovereign"[213]—and have, correspondingly, consistently involved government's

regulation or punishment of speech *within the context of that employment relationship*, such as

through termination or other adverse personnel actions, as opposed to the imposition of criminal

---

[209] *Pickering v. Board of Educ.*, 391 U.S. 563 (1968).

[210] *Connick v. Myers*, 461 U.S. 138 (1983).

[211] *Garcetti*, 547 U.S. at 413 (quoting this statement of the principle—as the first sentence of the opinion—from *Connick*, 461 U.S. at 142); *see also Connick*, 461 U.S. at 143-45 (explaining that the first case in the line, *Pickering*, was rooted in same rationale as 1950s-era cases invalidating loyalty oaths and political disclosure requirements made a condition of government employment).

[212] *See Connick*, 461 U.S. at 144-45; *see also Garcetti*, 547 U.S. at 419 (recognizing that "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens" (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972))).

[213] *See Garcetti*, 547 U.S. at 418-19 (contrasting relative powers of "government as employer" vis-a-vis "government as sovereign" (quoting *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality op.))).

66

penalties or other remedies that government administers in its sovereign capacity.[214]  In fact, *Pickering* contrasted the governmental personnel action at issue there (a school board's dismissal of a teacher in response to a letter to the editor that had been critical of the board) with "criminal sanctions and damage awards."[215]

A central premise of the *Pickering-Connick-Garcetti* line is that when government acts "as employer," it "has far broader powers than does the government as sovereign" to regulate speech.[216] The Supreme Court deems this distinction justified because "[g]overnmental employers, like private employers, need a significant degree of control over their employees' words and actions; [as] without it, there would be little chance for the efficient provision of public services."[217] Similarly, the court has voiced a reluctance to "'constitutionalize the employee grievance.'"[218] But while a citizen entering government service must thereby "accept certain limitations on his or her freedom,"[219] the Supreme Court has also emphasized that "a citizen who works for the government is nonetheless a citizen"[220] and "do[es] not surrender all [his] First Amendment rights by reason of

---

[214]  *See, e.g.*, *Lane v. Franks*, 573 U.S. ___, ___, 134 S. Ct. 2369, 2375 (2014) (alleged retaliatory discharge); *Garcetti*, 547 U.S. at 415 (alleged retaliatory transfer and failure to promote); *Connick*, 461 U.S. at 141 (termination); *Pickering*, 391 U.S. at 574 (termination).

[215]  *Pickering*, 391 U.S. at 574.

[216]  *Garcetti*, 547 U.S. at 418 (quoting *Waters*, 511 U.S. at 671).

[217]  *Id.*; *see also id*. at 419 (elaborating that government employees could otherwise "express views that contravene governmental policies or impair the proper performance of governmental functions").

[218]  *Id*. at 420 (quoting *Connick*, 461 U.S. at 154).

[219]  *Id*. at 418.

[220]  *Id*. at 419.

[his] employment."[221] The point of the *Pickering-Connick-Garcetti* line has been to delineate the parameters of the First Amendment rights that public employees retain against expression-based personnel actions, and the basic rule is this: a public employee may "speak as a citizen addressing matters of public concern," subject to the governmental employer's power to impose restrictions when there is "adequate justification for treating the employee differently from any other member of the general public."[222] *Pickering*, *Connick*, and *Garcetti* each illustrates different points along that continuum—*Pickering* is an example of a public employee's speech "as a citizen" (a teacher writing a letter to the editor outside of his job duties) addressing matters of "public concern" (school fiscal matters) and where no adequate justification was shown for employee discipline on that basis,[223] while *Connick* and *Garcetti* are on the opposite side of that line, with the former concerning discharge based on a public employee's speech deemed not to be of "public concern" (various internal office grievances)[224] and the latter involving personnel actions allegedly based on a public employee's speech deemed not to have been uttered "as a citizen" (a memo written as part of his job duties).[225] None of these cases addresses or would logically extend to the situation presented by the present case—the potential imposition of criminal penalties, as opposed to employee discipline, by the State of Texas acting in its capacity as sovereign rather than as an employer. If the *Pickering-*

---

[221] *Id*. at 417.

[222] *Id*. at 417, 418 (citing *Pickering*, 391 U.S. at 568); *see also id*. at 418 (observing that such "restrictions . . . must be directed at speech that has some potential to affect the entity's operations.").

[223] *See Pickering*, 391 U.S. at 568-75.

[224] *See Connick*, 461 U.S. at 144-48.

[225] *See Garcetti*, 547 U.S. at 421.

*Connick-Garcetti* line has any bearing here, it would only be to emphasize a baseline rule that public employees possess First Amendment rights just like other citizens do.[226]

In addition to its misplaced reliance on *Garcetti*, the State insists more broadly that public servants have no First Amendment protection against criminal punishment for their official speech because, in essence, it is not actually their speech, but that of their governmental employers. The State attempts to tie this notion to the Supreme Court's "governmental speech" jurisprudence, which is to the effect that the First Amendment generally permits the government to communicate its own viewpoints through, e.g., the types of specialty license plates the government decides to issue, the monuments it allows to be placed in public parks, or its promotion of beef consumption, without having a duty to subsidize or promote other viewpoints.[227] In that sense and context, the Supreme Court has said that "[t]he Government's own speech . . . is exempt from First Amendment scrutiny."[228] Seizing on this language, the State reasons that section 36.03(a)(1) implicates no First Amendment interests of public servants, at least with regard to speech made in their official capacities, because it represents Texas's regulation of its "own speech and actions" to advance a governmental "viewpoint" that "official speech should not be coerced speech." And because this

---

[226] *E.g.*, *id*. at 417 ("The Court has made clear that public employees do not *surrender* all their First Amendment rights by reason of their employment.") (emphasis added).

Even if *Garcetti* might otherwise have application in the present context, Perry points out the Fifth Circuit's holding in *Jenevein* that *Garcetti* does not govern analysis of elected officials' First Amendment rights. 493 F.3d at 57-58. Because we agree with Perry's primary contention that *Garcetti* has no application whatsoever here, we need not reach this narrower contention.

[227] *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. ___, ___, 135 S. Ct. 2239, 192 L. Ed. 2d 274, 282 (June 18, 2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559 (2005).

[228] *Johanns*, 544 U.S. at 553.

State-desired end product of non-coerced official speech is "governmental" speech, the State adds, the Legislature may likewise burden any private speech that might compete with that "viewpoint."

As an initial observation, if, as the State argues, public servants' official speech equals "governmental speech" in the sense of that doctrine, that theory would seem to suggest that the State itself would be criminally responsible for any violations of section 36.03(a)(1) through that official speech.[229]  And if, as the State suggests, speech inimical to the government's official "viewpoint" can be criminalized for that reason alone, there would seem to be little left of the First Amendment's rights of speech and petition.  But more to the point, the Supreme Court has never held (nor has any other court, as far as we can tell) that the "governmental speech" doctrine means that governments can freely criminalize the speech of their citizens (whether spoken in their official or individual capacities) free of any First Amendment constraints.  Rather, it is fundamental that the First Amendment limits the sovereign power of government to criminally punish the speech of its officials and agents, including that uttered in their official roles.[230]  Also belying the State's notion that public servants can be freely punished criminally for their speech in their official capacities, the Supreme Court has emphasized that the First Amendment's application does not turn solely on the identity of the speaker or source of the expression at issue.[231]

---

[229]  *See also* Tex. Penal Code § 9.21 (public-duty defense).

[230]  *See, e.g.*, *Garrison*, 379 U.S. at 67-75 (applying *New York Times Co. v. Sullivan* analysis in context of criminal libel prosecution of district attorney based on public criticism of local judges); *Wood v. Georgia*, 370 U.S. 375, 394-95 (1962) (First Amendment protected sheriff with respect to criminal contempt sanctions imposed for his public statements regarding voting-related controversy, whether made in his official or individual capacities).  *Accord Jenevein*, 493 F.3d at 557-58; *Asgeirsson*, 773 F. Supp. 2d at 694.

[231]  *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 784-85 (1978) (political speech by corporation).

In short, contrary to the State's arguments, "[s]tatements made by public officials to other public officials" on public issues *are* generally protected by the First Amendment—and neither the "governmental speech" doctrine nor *Garcetti* holds otherwise. Consequently, if the State is correct that section 36.03(a)(1), as it incorporates paragraph (F), does not impinge upon First Amendment-protected speech, that must be so because of the nature of the speech the statute proscribes.

### *Nor does any historical exception to the First Amendment's protections apply*

The State's arguments concerning the content or effect of the threats proscribed by section 36.03(a)(1) and paragraph (F) implicate the Supreme Court's jurisprudence delineating certain types of speech for which even content-based restrictions have not been considered "to raise any Constitutional problem."[232] In recent years, the Supreme Court has rejected any "free-floating test for First Amendment coverage . . . [based on] an ad hoc balancing of relative social costs and benefits"[233] in favor of a categorical approach that looks instead to certain "historic and traditional categories long familiar to the bar."[234] These categories, as identified by the court to date, include the likes of obscenity, defamation, and so-called "fighting words."[235] Another refers specifically to

---

[232] *Stevens*, 559 U.S. at 469 (quoting *Chaplinski v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

[233] *Id*. at 470.

[234] *Id*. at 468-69.

[235] *Id*. (listing examples of obscenity, defamation, "fraud," "incitement," and "speech integral to criminal conduct"); *Black*, 538 U.S. at 358-59 (citing "fighting words," "advocacy . . . directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action," and "true threats").

a type of threat—what the Supreme Court has termed "true threats."[236] But "true threats," according to the court, are only "those statements where the speaker means to communicate a serious expression of intent to commit an act of unlawful violence to a particular individual or group of individuals."[237]

Although the few reported appellate cases arising from prosecutions under Penal Code section 36.03(a)(1) have tended to involve "true threats,"[238] such threats of violence would comprise a relatively small fraction of section 36.03(a)(1)'s potential applications, especially with respect to the threats by public servants to take or withhold official action that would be within the coverage of paragraph (F). Further, as Perry emphasizes, the Supreme Court has never seen fit to extend this unprotected category of threats beyond those parameters, and it has also demarked the category's boundaries strictly in relation to political speech by holding that a wide range of

---

[236] *Black*, 538 U.S. at 359.

[237] *Id*. at 359-60 (concerning state ban on cross-burning with intent to "intimidate" in "the constitutionally proscribable sense," "a type of true threat where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily injury or death"); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (observing that "threats of violence are outside the First Amendment," further citing justifications of "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur"); *Watts*, 394 U.S. at 707-08 (indicating that First Amendment did not protect a threat to assassinate the President of the United States).

[238] *See Tobias*, 884 S.W.2d at 580-81 (rejecting overbreadth challenges to section 36.03 where "coercion" was predicated on threats of violence against appellate court justices because threats were "true threats" rather than mere political hyperbole); *see also Phillips*, 401 S.W.3d at 287-90 (procedural and evidentiary-sufficiency challenges to conviction under section 36.03 where "coercion" based on threats of violence against police officers).

"intemperate" and "vituperative" expression related to public issues—even some referencing or advocating violence—falls short of "true threats" and is protected by the First Amendment.[239]

Aside from these limitations on proscribable "true threats," Perry points out Supreme Court holdings to the effect that the First Amendment's protections are not rendered inapplicable merely because political speech can be said to be "coercive" in nature. He refers us to *Organization for a Better Austin v. Keefe*,[240] in which the Supreme Court overturned, as an invalid prior restraint, an injunction restraining a pamphleteering campaign by the organization that had been aimed at pressuring a real estate broker to sign an agreement not to engage in certain business practices the group perceived to be detrimental to the community.[241] In so doing, the Supreme Court rejected a lower court's view that the campaign was unprotected by the First Amendment because

---

[239] *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 386-87 (1987) (First Amendment protected statement by government employee, following attempted assassination of President Reagan, expressing employee's "hope they get him" in any subsequent attempts; reasoned that context of statement—a political discussion—revealed that statement addressed matter of public concern rather than making an actionable threat); *Hess v. Indiana*, 414 U.S. 105, 107-09 (1973) (anti-war protester's statement, to no one in particular, that "[w]e'll take the f__ing street later" was protected by First Amendment); *Brandenburg v. Ohio*, 395 U.S. 444, 446-49 (1969) (Ku Klux Klan leader's referencing "possibility" of "revengeance" fell short of specific threat of violence and was protected by First Amendment); *Watts*, 394 U.S. at 706, 708 (holding utterance that "[i]f they ever make me carry a rifle [upon being drafted into the U.S. military] the first man I want to get in my sights is L.B.J." was merely "a kind of very crude offensive method of stating a political opposition to the President" and was thus protected by the First Amendment).

[240] 402 U.S. 415.

[241] *See id*. at 415-18. The pressuring tactics employed by the organization included distributing pamphlets in the broker's town of residence—and to his neighbors and members of his church—publicizing the broker's "panic peddling," harshly criticizing the practice, and urging recipients to call the broker—at his home, providing the number—and urge him to sign the "no solicitation" agreement the group desired. *See id*. at 416-17. Other leaflets communicated a more explicit threat and demand that "[w]hen he signs the agreement, we stop coming to [the broker's town of residence]." *Id*. at 417.

73

the effort's aim had been to "force" the broker to sign the desired agreement rather than merely informing the public.[242]  The Supreme Court reasoned:

> The claim that the expressions were intended to exercise a coercive impact on respondent [the broker] does not remove them from the reach of the First Amendment.  Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper.[243]

More recently, in *N.A.A.C.P. v. Claiborne Hardware Company*,[244] on which Perry also relies, the Supreme Court cited *Keefe* for the proposition that "'offensive' and 'coercive' speech was nevertheless protected by the First Amendment."[245]  The court there also applied similar reasoning in holding that the First Amendment had protected various peaceful measures by which participants in a business boycott, aimed at achieving political and social goals related to racial equality and integration, had endeavored to compel participation through both advocacy and social pressure. While acknowledging that the boycott advocates had "admittedly sought to persuade others through social pressure and the 'threat' of social ostracism," the Supreme Court emphasized that "[s]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action."[246]

---

[242]  *Id*. at 419.

[243]  *Id*.

[244]  458 U.S. 886.

[245]  *Id*. at 911.

[246]  *Id*. at 909-10.

The State does not respond directly to Perry's arguments regarding the narrowness of proscribable "true threats" and the implications of *Claiborne Hardware* and *Keefe*. Instead, it advances arguments that, while not framed explicitly in these terms, potentially implicate a different "historic and traditional" category of proscribable speech—what the Supreme Court has termed "speech integral to criminal conduct."[247] The basic rationale underlying the court's recognition of this historical category of unprotected speech is that the First Amendment does not prohibit government from "mak[ing] a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."[248] Within this category, the Supreme Court has placed such activities as picketing having the sole objective of inducing a business to engage in an illegal restraint of trade,[249] speech soliciting illegal transactions or other crimes,[250] or speech that discloses our Nation's defense secrets in furtherance of treason.[251]

Applying a similar rationale, a number of courts have held or otherwise expressed the view that speech incident to bribery or extortion is not protected by the First Amendment—and these have included the Court of Criminal Appeals. In *Sanchez v. State*, the Court of Criminal Appeals

---

[247] *Stevens*, 559 U.S. at 468-69 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)).

[248] *Giboney*, 336 U.S. at 502.

[249] *See id*. at 492-504.

[250] *Williams*, 553 U.S. at 297 (regarding statute restricting pandering of child pornography). *Accord Lo*, 424 S.W.3d at 16-17 & n. 21 (observing that offers to engage in illegal transactions, such as online solicitation of a minor, have been "routinely upheld as constitutional" against First Amendment challenges, as the speech at issue is merely the "vehicle" for the conduct the statute prohibits).

[251] *See R.A.V.*, 505 U.S. at 389.

addressed overbreadth challenges to the sexual-harassment provision of the Penal Code's official-oppression statute, an offense that it summarized as having the elements of: (1) "an official's use of his official position"; (2) "to intentionally engage in conduct of a sexual nature or attempt to procure sexual favors"; (3) "which he knows is not welcomed by the recipient"; (4) "intending submission to which to be a term or condition of the recipient's or another person's enjoyment of something of value to the person."[252] The court anchored its analysis in the premise, derived from some federal intermediate appellate decisions, that "[b]ribery and extortion, while involving 'speech,' are not protected by the First Amendment."[253] Quoting language from the federal decisions, the Court of Criminal Appeals observed that "[t]hreats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal,"[254] and that "'[i]t may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.'"[255]

To resolve the overbreadth challenge presented in *Sanchez*, the Court of Criminal Appeals took this analysis a step further by comparing the sexual-harassment offense at issue to extortion as that crime had been known both historically and in modern times. The court observed that the crime of "extortion" had originated under English common law as a proscription against a public official's taking of "money not due him for the performance of official duties," which

---

[252] 995 S.W.2d 677, 687 (Tex. Crim. App. 1999).

[253] *Id*. at 688.

[254] *Id*. at 688 (quoting *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972), *cert. denied*, 409 U.S. 1063 (1972)).

[255] *Id*. (quoting *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975), *cert. denied*, 424 U.S. 955 (1976)).

76

the court termed "essentially a form of bribery."[256]  Over time, the court continued, extortion had

evolved by statute to encompass the taking of property by private individuals "through force,

fear, or threats"—essentially a species of theft.[257]  Today there is no "extortion" offense by that

name in the Texas Penal Code, but vestiges survive within the bribery offense under section 36.02[258]

and the theft offense created by section 31.03.  The theft offense—which was expressly intended to

subsume "extortion" and various other theft-related crimes previously known to the law[259]—in part

proscribes the appropriation of another's property through consent obtained by "coercion," thereby

incorporating the same "coercion" element and definition as does section 36.03(a)(1).[260]

In the view of the Court of Criminal Appeals, the sexual-harassment offense at issue

in *Sanchez* had several material similarities to extortion in both its historical and modern forms, so it

followed that any speech the offense proscribed lacked First Amendment protection:

---

[256]  *Id*. at 687-88 (citing *Evans v. United States*, 504 U.S. 255, 266 (1992)); *see Scheidler*, 537 U.S. at 402 ("At common law, extortion was a property offense committed by a public official who took 'any money or thing of value' that was not due him under the pretense that he was entitled to such property by virtue of his office." (quoting 4 William Blackstone, *Commentaries on the Laws of England* 141 (1765); 3 Ronald Anderson, *Wharton's Criminal Law and Procedure* § 1393, at 790-91 (1957))).

[257]  *Sanchez*, 995 S.W.2d at 687 (citing *Evans*, 504 U.S. at 261); *see United States v. Nardello*, 393 U.S. 286, 296 (1969) (terming threats by private individual to reveal private facts in order to obtain monetary payment as "a type of activity generally known as extortionate since money was to be obtained from the victim by virtue of fear and threats of exposure").

[258]  *See* Tex. Penal Code § 36.02(a) ("A person commits an offense if he intentionally or knowingly . . . solicits, accepts, or agrees to accept from another" a "benefit as consideration for" a "public servant's" official action or "violation of a duty imposed by law.").

[259]  *See id.* § 31.02.

[260]  *See id*. §§ 31.01(3)(A), .03(b)(1).

As with official extortion—what we would now call bribery—the sexual harassment provision is concerned with the use of official power to obtain a benefit to which the official was not otherwise entitled. In a bribery/official extortion case, that benefit was traditionally money or tangible property, but the receipt of someone's submission to sexual conduct seems to be as legitimate an object of government regulation. The First Amendment does not give an official the right to trade official services for sexual favors or for submission to conduct of a sexual nature.

Further, . . . the sexual harassment statute goes beyond mere bribery due to the requirement that the conduct be "unwelcome." With that requirement, the sexual harassment provision encompasses coercive conduct—analogous to private extortion. Sexual harassment under the statute is essentially sexual extortion: an official uses his official position to coerce submission to conduct of a sexual nature. And the statute criminalizes sexual harassment that is intentional. To be liable, the official must intend the sexual nature of his conduct, he must be aware that the conduct is unwelcome, and he must intend submission to the conduct to be made a term or condition of enjoying something of value to the recipient or another person—something of value that the official is in a position to withhold or provide. In other words, the official must intend to carry out sexual extortion. The First Amendment is not implicated by such activity.[261]

Subsequently, relying on *Sanchez*, the Fourth Court of Appeals summarily rejected an overbreadth

challenge to section 31.03's theft-by-coercion offense in *Roberts v. State*.[262]

The gist of the State's position is that we should, similar to the courts in *Sanchez* and

*Roberts*, regard any threats proscribed by section 36.03(a)(1) and paragraph (F) to be tantamount

---

[261] *Sanchez*, 995 S.W.2d at 688.

[262] 278 S.W.3d 778, 790-91 (Tex. App.—San Antonio 2008, pet. ref'd) ("The offense proscribed . . . is in many ways similar to bribery or extortion. Bribery and extortion, while involving 'speech,' are not protected by the First Amendment. Threats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal. Accordingly, the type of speech prohibited by [Penal Code] section 31.03 is not within the nature of speech protected by the First Amendment." (citing *Sanchez*, 995 S.W.2d at 687)).

The "coercion" at issue in *Roberts* involved threats by a private party to expose others to "hatred, contempt, or ridicule" and harm to "credit or business repute"—specifically, revelations of the victims' extramarital affairs with the defendant's wife—as means of eliciting monetary payments. *See id*. at 791 (citing Tex. Penal Code § 1.07(a)(9)(D), (E)).

or analogous to extortion or bribery and, for that reason, unprotected by the First Amendment. To similar effect, the State urges that the statutes reach only "conduct," and cites a Houston Court of Appeals case that rejected an overbreadth challenge to Penal Code section 38.15 (Interference with the Duties of a Public Servant), a statute that explicitly provides a defense where the acts in question "consist[] of speech only."[263]

In reply, Perry does not dispute that speech in furtherance of extortion or bribery would lack First Amendment protection, but he rejects the State's attempts to equate those crimes or the sexual-harassment offense addressed in *Sanchez* with section 36.03(a)(1), at least as it incorporates paragraph (F). At most, Perry suggests, any such comparisons could establish only that section 36.03(a)(1), as it incorporates paragraph (F), would have some constitutionally permissible applications, such as if a public servant threatened to take or withhold action as a means of obtaining some sort of personal benefit that would violate the theft-by-coercion or bribery prohibitions. But section 36.03(a)(1) and paragraph (F) extend far beyond this, Perry urges, to impinge First Amendment-protected speech. We ultimately agree with Perry. The threats proscribed by section 36.03(a)(1), as it incorporates paragraph (F), are not limited to those that would fall within any recognized category of speech integral to criminal conduct, like extortion, bribery, or (to follow the Court of Criminal Appeals's lead in *Sanchez*) any analogues or equivalents to those crimes.

To be sure, section 36.03(a)(1), as it incorporates paragraph (F), would reach some threats aimed at achieving illicit ends that the State could properly proscribe criminally. A public

---

[263] *Duncantell v. State*, 230 S.W.3d 835, 843-44 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("The interference statute provides that it is a defense to prosecution . . . if the interruption, disruption, impediment, or interference alleged consists of speech only. Therefore, we must only examine the interference statute's limitations on conduct to determine if it restricts a substantial amount of constitutionally protected conduct." (citing Tex. Penal Code § 38.15(d))).

servant's threat to take or withhold action in order to induce another public servant to knowingly violate his or her legal duties would resemble (and in some instances could include) solicitation of a crime, a recognized category of unprotected speech.[264]  Threats seeking some sort of prohibited personal benefit, *a la* extortion or bribery, would be another example.  But the extortion or bribery analogy does not extend much further—as the Court of Criminal Appeals observed in *Sanchez*, the crimes have long focused on the use of threats or official power to extract some form of *personal* benefit to which the actor would otherwise not be entitled.[265]  About the most that could be extrapolated from the extortion crime is that the State can validly prohibit the use of threats in situations where the parties' relationship does not provide the threatener a legitimate basis for seeking conduct of the recipient (i.e., he had no right to demand or require it) and where the recipient would have no underlying obligation to consider performing the conduct aside from the threat.[266] Such use of threats might also be said to seek or effect a sort of transaction in which a public servant interjects a threat to take or withhold official action, then offers freedom from the threatened harm solely to exchange for some otherwise-unrelated desired conduct by another public servant whose sole rationale or justification would be avoidance of the threatened harm.  In this respect, such threats would achieve an effect similar to bribery of the recipient.

---

[264]  *See* Tex. Penal Code § 15.03(a); *Williams*, 553 U.S. at 298 (indicating that "speech . . . that is intended to induce or commence illegal activities" is "undeserving of First Amendment protection").

[265]  *See Sanchez*, 995 S.W.2d at 688; *see also Robertson*, 649 P.2d at 586 (similarly observing that "the fact that the threatener's demand is for money or other selfish gain is a central element in robbery by threat, blackmail, and extortion," and adding that even threats to picket "when designed to gain financial payments or other legally permissible benefits" may be protected free speech).

[266]  *See Robertson*, 649 P.2d at 589 (making a similar observation regarding the nature of extortion and blackmail).

Perry also grants that if a public servant threatened to take or withhold action in a manner that would in itself be unlawful, that threat would "generally not [be] protected," even if not foretelling violence against persons.[267] Such threats would present the victim the choice of engaging in the sought-after conduct in order to regain a right that had belonged to him or her in the first instance—undertaking official action in order to regain freedom from the breach of criminal law or tort duties being threatened. The same basic dynamic is also a feature of robbery—the victim must hand over property in order to regain his or her preexisting right to personal safety—and extortion where the threat foretells unlawful action.

But these analogies do not fit the class of potential applications of section 36.03(1) and paragraph (F) that Perry emphasizes. Where government managers threaten to demote poor-performing employees unless they improve, public defenders threaten to file suppression motions in order to secure better plea deals, or an appellate justice threatens to write a dissent in order to prompt changes in a draft majority opinion, the threatened taking or withholding of action would generally be lawful; consequently, the recipient would have no right to be free of the threatened action in the first instance. The sought-after action would likewise be lawful—the threat would not be akin to solicitation of a crime. And in these sorts of instances, the desired action would generally be within the actor's lawful rights to demand or require of the recipient, and the threat in itself would typically have no independent impact on the recipient's ultimate rights or options relative to the public servant seeking the action. Whatever leverage that was possessed by the public servant

---

[267] *See United States ex rel Holder v. Circuit Court of 17th Judicial Cir.*, 624 F. Supp. 68, 71 (N.D. Ill. 1985) (acknowledging that threat to inflict property damage would not be protected). *But see Wurtz v. Risley*, 719 F.2d 1438, 1441-42 (9th Cir. 1983) (invalidating Montana "intimidation" statute proscribing threats "to commit any criminal offense" on basis that it reached First Amendment-protected threats to commit acts of civil disobedience).

making the threat, in other words, would derive not from the threat in itself, but from the underlying legal relationship and relative distribution of powers between public servants that the People have chosen through their Constitution and laws. The threat, as such, would amount merely to an articulated expression of that relative distribution of powers, in the nature of a warning of consequences that the public servant could lawfully impose in response to the recipient's failure to comply with a lawful request or demand.[268]

These kinds of threats are "speech incident to criminal conduct" only if the basic workings of government are considered criminal conduct, a proposition we cannot sanction. Nor, absent the sorts of unlawful means or ends we have described, would any characterization of these threats as "coercive" suffice to displace them from the First Amendment's protections, as the State would have us conclude; on the contrary, the Supreme Court has instructed in *Claiborne Hardware* and *Keefe* that "'offensive' and 'coercive' speech [is] nevertheless protected by the First Amendment."[269] These threats remain protected instead—indeed, as Perry urges, "[s]tatements

---

[268] *Cf. Jackson*, 180 F.3d at 70-71 (distinguishing "wrongful" threats under federal extortion statute as those made without any nexus to a plausible claim of right and "the only leverage to force the payment of money resides in the threat, where [carrying through on the threat] would be counterproductive, and compliance with the threatener's demands provides no assurance against additional demands based on renewed threats" of the same consequences); Kent Greenwalt, *Criminal Coercion and Freedom of Speech*, 78 Nw. U. L. Rev. 1081, 1095-1108 (1983) (positing a First Amendment theory distinguishing between "warning" and "situation-altering" threats).

[269] *Claiborne Hardware Co.*, 458 U.S. at 911 (citing *Keefe*); *see id.* at 909-10 ("Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action."); *Keefe*, 402 U.S. at 419 ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment."). *Cf. NLRB v. Gissel Packaging Co.*, 395 U.S, 575, 617-20 (1969) (previously holding that "coercive" speech, in form of threats of reprisals with the goal of unlawfully impeding union organizational efforts, are "without the protection of the First Amendment," but also noting uniqueness of communications in employer-employee context as compared to political speech among citizens generally).

so intrinsic to government, particularly when they relate to matters of public policy, lie at the core of First Amendment protection." In the very least, by criminalizing these types of threats, section 36.03(a)(1), as it incorporates paragraph (F), plainly impinges upon the First Amendment-protected speech of Texas's public servants.[270]

Our holding is hardly a novel one—*Hanson* reached essentially the same conclusions regarding section 36.03(a)(1) and paragraph (F) a quarter century ago. In that case, the Tenth Court had little difficulty determining that "[w]hen applied to Judge Hanson's alleged conduct" ("threaten[ing] to terminate the county's funding of the salaries of a deputy district clerk and an assistant district attorney in an attempt to coerce the district judge into firing the county auditor and the county attorney into revoking a misdemeanant's probation"), section 36.03(a)(1), as it incorporated paragraph (F), "clearly implicated [Hanson's] First Amendment rights because she was indicted for words allegedly spoken to other public officials"—she was charged with "having made a *threat* to take action as a public official in an attempt to *coerce* another public official into performing an official act."[271] The court elaborated that "[t]hreats may portend either lawful or unlawful action" and that "First Amendment protection is extended to the former but not the latter."[272] And it was likewise true, the court continued, that "[c]oercion of a lawful act by a threat

---

[270] By this, we do not rule out the possibility that other threats within the proscription's coverage would also be protected by the First Amendment, but we need not decide that here.

[271] *Hanson*, 793 S.W.2d at 271-72 (emphases in original). Although *Hanson* was governed by the pre-1989 version of section 36.03, its analysis remains material in cases involving public servants not excepted by subsection (c). Moreover, while paragraph (F) was amended in 1989, that provision, as previously explained, was subsequently returned to its original form.

[272] *Id*. at 272 (citing *Watts*, 394 U.S. at 707; *Wurtz*, 719 F.2d at 1441).

of lawful action is protected free expression."[273] In this regard, the court observed, with reference to the statutory powers of all three offices, and assuming the allegations in the charging instruments were true, "Judge Hanson could have lawfully taken the actions threatened, and the district judge and county attorney, had they acted as she desired, would have acted lawfully."[274] The State suggests that *Hanson* also involved a third variable, although one not obviously emphasized by the Tenth Court—as the State explains it, Judge Hanson "could legally request that the county attorney institute proceedings to revoke a misdemeanant's probation [such that] the act requested by the defendant as part of her threat was an act that was within the scope of the lawful authority that she, the defendant, otherwise had." Section 36.03(a)(1), as its incorporates paragraph (F), reaches threats having all of these features.

The Tenth Court addressed these First Amendment concerns under the rubric of vagueness, concluding that the statutes failed to afford Judge Hanson sufficient notice as to whether "the term 'threat' encompass[ed] a threat of lawful action or only prohibit[ed] a threat of unlawful action"[275] and whether Hanson could seek to "coerce" lawful actions of the other "public servants."[276] But the foundation for these holdings was the same conclusion we reach here—section 36.03(a)(1), as it incorporates paragraph (F), impinges upon speech that the First Amendment protects.

---

[273] *Id.*

[274] *Id.*

[275] *Id.* at 272.

[276] *Id.* ("Could Judge Hanson threaten to use her lawful authority and prerogatives of her office to coerce other public officials into taking lawful actions which she or the commissioners' court deemed expedient or desirable, or should she refrain from doing so out of fear of prosecution? What is and what is not lawful conduct cannot be left to such conjuncture.").

Our reasoning, and that of *Hanson*, is also consistent with decisions from other jurisdictions that have recognized threats to be protected by the First Amendment absent some applicable exclusion. Some of these courts have invalidated criminal prohibitions against threats on overbreadth grounds.[277] Still others have resorted to narrowing constructions of threat prohibitions in order to avoid these sorts of free-speech problems.[278]

**Section 36.03(a)(1)'s impingement upon First Amendment-protected speech is not justified**

Having concluded that section 36.03(a)(1), as it incorporates paragraph (F), reaches into the realm of First Amendment-protected speech, we must next consider whether that impingement can be justified. Under the Supreme Court's most recent guidance, it now seems clear that section 36.03(a)(1) must be classified as a "content-based" speech prohibition—on its face, it targets speech having a specified content (communicated intent to inflict one of the six categories of harms enumerated in the "coercion" definition) based on the communicative impact the threat

---

[277] *See, e.g.*, *Wurtz*, 719 F.2d at 1441-42 (invalidating Montana "intimidation" statute proscribing threats "to commit any criminal offense" on basis that it reached First Amendment-protected threats to commit acts of civil disobedience); *Holder*, 624 F. Supp. at 71 (similarly invalidating Illinois "intimidation" statute prohibiting threats to "commit any criminal offense"); *Robertson*, 649 P.2d at 589-90 (invalidating Oregon "coercion" prohibition that criminalized the "compel[ling] or induc[ing] of another person to engage in conduct from which he has a legal right to abstain, or to abstain from engaging in conduct in which he has a legal right to engage, by means of instilling in him a fear" of certain specified harms "if the demand is not complied with").

[278] *See State v. Pauling*, 69 P.3d 331, 336 (Wash. 2003) (construing state extortion statute to incorporate a "wrongfulness" element, borrowed from federal law, limiting its reach to threats aimed at obtaining property that lack any nexus to a claim of right (citing *Jackson*, 180 F.3d at 70-71)), *cert. denied*, 540 U.S. 986 (2003); *State v. Hynes*, 978 A.2d 264, 278-79 (N.H. 2009) (following *Pauling* in implying element of "wrongful" acquisition of property into extortion statute so as to exclude "legitimate claims to property through threats"); *People v. Hickman*, 988 P.2d 628, 636-37 (Colo. 1999) (holding that criminal "threat" prohibition was impliedly limited to threats of "illegal" or "unlawful" acts).

has or is intended to have (bringing about certain specified conduct of a public servant), and we are instructed that these facial features of the statute, not any asserted underlying content-neutral rationales, control.[279]  Where, as here, a statute "seeks to restrict and punish speech based on its content," "the usual presumption of constitutionality is reversed"—the statute is instead presumed invalid, and "the government bears the burden to rebut that presumption."[280]  In that event, courts apply "strict scrutiny," which requires that a law regulating speech be (1) necessary to serve (2) a compelling state interest and (3) be narrowly drawn (i.e., that it employ the least restrictive means to achieve its goal and there be a close nexus between the government's compelling interest and the restriction).[281]

The State posits that section 36.03(a)(1), as it incorporates paragraph (F), is justified by a "singular interest in intervening when public officials try to leverage the powers of government for their personal or political whims."  It also refers to perceived interests in protecting

---

[279]  *See Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2226-27, 2228-31 (June 18, 2015) (explaining that "content-based" laws "target speech based on its communicative content" and that "the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained . . . cannot transform a facially content-based law into one that is content-neutral"); *see also United States v. Williams*, 690 F.3d 1056, 1061-61 (8th Cir. 2012) (terming federal statutes prohibiting false threats to commit certain crimes as "content-based restrictions on speech"), *cert. denied*, *Williams v. United States*, ___ U.S. ___, 133 S. Ct. 1516 (2013); *United States v. Cassel*, 408 F.3d 622, 626-27 (9th Cir. 2005) (analyzing federal statute criminalizing "intimidation" hindering land sale as content-based because it prohibited speech based on communicative impact); *see also R.A.V.*, 505 U.S. at 394 ("Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton* [*v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)]. The emotive impact of speech on its audience is not a 'secondary effect.'" (quoting *Boos*, 485 U.S. at 321)).

[280]  *Lo*, 424 S.W.3d at 15 (citing *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004)).

[281]  *Id.* (citing *Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 755-56 (1996); *Sable Comms. of Ca., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)).

the "integrity" of Texas's government institutions (similar to the Court of Criminal Appeals's observations in *Isassi*[282]) or protecting public servants from "interference" in the performance of their duties. The State also refers us to various court of appeals cases that have referenced interests in protecting participants in the judicial system—such as judges, jurors, or witnesses—against threats of physical violence or threats of exposure to "hatred, contempt, and ridicule" in the course of rejecting overbreadth challenges to section 36.03(a)(1),[283] section 36.05's witness-tampering prohibition,[284] or section 36.06's retaliation provision.[285]

Assuming without deciding that each of these asserted interests would rise to the level of "compelling," it cannot be said that section 36.03(a)(1), as it incorporates paragraph (F), is "narrowly drawn" to achieve those objectives. Indeed, it begins to strain even rational-basis scrutiny to conclude that a statute that goes as far as to criminalize a public servant's threat merely to lawfully exercise his delegated powers as a related consequence of another public servant's failure or refusal

---

[282] *Isassi*, 330 S.W.3d at 638-39 (observing that section 36.03 and other provisions within chapter 36 of the Penal Code are "designed to reach various means by which the integrity of government can be undermined").

[283] *Tobias*, 884 S.W.2d at 580-81 (regarding threat of violence against appellate court justices, determining that threats in question were unprotected "true threats" and adding that "[t]he State has a valid and substantial interest in protecting the integrity of the judicial system and in allowing its appellate justices to perform their respective duties without interference from threats of physical violence" (citing *Puckett v. State*, 801 S.W.2d 188, 192-93 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd), *cert. denied*, 502 U.S. 990 (1991))).

[284] *Board*, 1998 Tex. App. LEXIS 3206, at *14 ("We believe the State of Texas has a very substantial interest in protecting witnesses from threats of exposure to hatred, contempt, and ridicule.").

[285] *Puckett*, 801 S.W.2d at 192-93 (citing Texas's "valid and substantial interest in protecting the integrity of its judicial system and in allowing public servants, witnesses, and prospective witnesses to perform their respective duties without interference from threats of physical violence").

to comply with a lawful demand for action would protect the "integrity" of government or prevent "interference" with public servants' performance of their delegated functions. If anything, the effect of the statutes in those circumstances would be to undermine these interests by criminalizing much of the ordinary day-to-day workings of government. And to the extent the unique circumstances of the judicial process might justify the proscription as it would apply in that context, we need only observe that the proscription extends far more broadly.[286]

Perry further questions the extent to which section 36.03(a)(1) and paragraph (F) are "necessary" to effectuate these professed state interests. He points out, for example, that other subsections of the Penal Code's "coercion" definition address threats of violence or other unlawful conduct and that other Code provisions—e.g., the bribery statute, the theft-by-coercion proscription, or the official-oppression prohibition[287]—address more directly any instances of public servants wielding their power merely to advance "personal whims." "The only discrete function of [paragraph (F)], when combined with Section 36.03(a)(1)," in Perry's view, "is to prohibit speech protected by the First Amendment." In this regard, Perry draws comparisons to the Court of Criminal Appeals's analysis in *Ex parte Lo*, in which the court struck down, on overbreadth grounds (and via pretrial habeas), subsection (b) of Penal Code section 33.021, which had prohibited a person

---

[286] *Cf. Model Penal Code* § 240.2 (differentiating between threats seeking to influence adjudicatory proceedings and those in other governmental contexts, and prohibiting the latter only when foretelling "unlawful" harm or seeking knowing violations of a public servant's legal duties).

[287] *See* Tex. Penal Code § 39.03(a) ("A public servant acting under color of his office or employment commits an offense if he: (1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful; (2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or (3) intentionally subjects another to sexual harassment.").

from communicating online in a "sexually explicit" manner (defined so broadly as to encompass "many modern movies, television shows, and 'young adult' books") with a minor if the person intended to arouse or gratify anyone's sexual desire.[288] While acknowledging that the State had a compelling interest—"indeed a solemn duty"—to protect minors from sexual predation, the high court concluded that the statute was not narrowly drawn where "*everything* that Section 33.021(b) prohibits and punishes is speech and is either already prohibited by other statutes (such as obscenity, distributing harmful materials to minors, or child pornography) or is constitutionally protected."[289] We agree that while some applications of section 36.03(a)(1) and paragraph (F) may be permissible or justified under the First Amendment, *Lo*'s rationale would be an additional reason for invalidating the statute as to other applications.

**There is no alternative to invalidation**

It remains to be addressed whether the potential unconstitutional applications of section 36.03(a)(1), as it incorporates paragraph (F), are so substantial relative to permissible ones that we should apply the "strong medicine" of invalidating the proscription for overbreadth. We conclude that the proscription's overreach into First Amendment-protected territory is to an extent and nature that cannot merely be left to remedy through future case-by-case adjudication. The proscription, as we have seen, can be fairly said to be of "alarming" breadth, reaching even a public servant's declared intention to take or withhold action lawfully, aimed at bringing about another public servant's lawful action that the first public servant could lawfully demand or require, and even

---

[288] 424 S.W.3d at 17-27.

[289] *Id*. at 20-21 (emphasis in original).

where is a close relationship between the foretold action and the desired action.[290] Furthermore, there is no requirement that the actor articulate a specific demand for action or quid-pro-quo offer to accompany the threat—it is enough that the public servant makes the threat and a fact-finder might infer the prohibited intent to bring about some sort of official action by the recipient. The statutes would criminalize many utterances that are ordinary and commonplace in the day-to-day workings of government—and that are protected by the First Amendment.

The State downplays the possibility that any perceived overbreadth of section 36.03(a)(1) and paragraph (F) gives rise to any chilling effect on the speech of Texas's public servants, or at least has until now. It emphasizes that the statutes have been on the books "for over four decades" and that there has not been (aside from this case) any evident outcry or concern regarding their potential reach. We must acknowledge being unaware of any widespread incidence of prosecutors pursuing "coercion of a public servant" charges for the likes of government managers who threaten to demote poor-performing employees or public defenders who threaten to file suppression motions, and it seems that the longstanding practice of appellate judges threatening to write dissents to prompt changes in majority opinions remains as vibrant as ever. But then again, section 36.03(a)(1) has apparently been rarely utilized—at least until now. Perhaps more importantly, for the past quarter century one of those few appellate decisions has been *Hanson*, and its recognition of First Amendment constraints on the enforcement of section 36.03(a)(1) and paragraph (F) would have had its own chilling effect on prosecutorial zeal. Nor have *Hanson*'s limits been seriously questioned since—at least until now.

---

[290] *See Thompson*, 442 S.W.3d at 350 (citing *Stevens*, 559 U.S. at 474).

Nor is it any answer to overbreadth concerns to say that prosecutors have heretofore not exercised their discretion to pursue charges under section 36.03(a)(1) and paragraph (F) as aggressively as they might have, or that we should assume they will display similar reticence in the future. The "First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige."[291] "We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."[292]

But before proceeding to invalidate section 36.03(a)(1) as it incorporates paragraph (F), we must consider whether we can stop short of that remedy by adopting some sort of reasonable narrowing construction that would cure the proscription's overreach into First Amendment-protected speech.[293] Yet as judges, our tools are limited in this regard—we "may not rewrite a statute that is not readily susceptible to a narrowing construction because such a rewriting constitutes a serious invasion of the legislative domain and would sharply diminish the legislature's incentive to draft a narrowly tailored statute in the first place."[294] And short of engaging in this sort of prohibited statutory rewriting, a viable narrowing construction of either section 36.03(a)(1) or paragraph (F) eludes us.

One potential option, followed by courts in some other states when addressing similar First Amendment problems with criminal proscriptions against threats, has been to construe the

---

[291] *Stevens*, 559 U.S. at 480.

[292] *Id*.

[293] *See Thompson*, 442 S.W.3d at 339 ("We have held that Texas courts have a duty to employ a reasonable narrowing construction" of a statute to avoid a constitutional violation (citing *Long*, 931 S.W.2d at 295)).

[294] *Id*. at 339 (citing *Stevens*, 559 U.S. at 481; *Long*, 931 S.W.2d at 295).

prohibition so as to apply only to threats of *unlawful* action.[295] While these courts have sometimes relied on textual features not found in the Texas statutes, at least one court relied on an alternative definition of "threat" that appears in Black's Law Dictionary—"[a] declaration of an intention to injure another or his property by some *unlawful act*."[296] But this definition of "threat" was not among those cited with approval by the Court of Criminal Appeals in *Olivas*—while referring to declared intention to "hurt," "punish," "inflict injury" upon, amount to "danger" to, or "harm" another person, the definitions cited in *Olivas* did not include the additional specification that such harm or injury rise to the level of unlawful harm.[297] Moreover, we cannot conclude, in any event, that the Legislature intended to incorporate an "unlawful" harm limitation into paragraph (F) or section 36.03(a)(1) where it has conspicuously omitted any mention of it in either provision, in contrast to other Penal Code provisions where it has explicitly included such a limitation.[298] Further, if we look to legislative history, we discover that the Legislature even specifically removed such a limitation from paragraph (F) in 1993 after having added it in 1989.[299] Against this backdrop, we can only conclude that if the Legislature desired to limit section 36.03(a)(1) or paragraph (F)

---

[295] *See Hickman*, 988 P.2d at 636-37.

[296] *Black's Law Dictionary* 1480 (6th ed. 1990) (emphasis added); *see Hickman*, 988 P.2d at 636-37 (relying on this narrower definition of "threat" as basis for holding that criminal "threat" prohibition was impliedly limited to threats of "illegal" or "unlawful" acts).

[297] *See Olivas*, 203 S.W.3d at 345-46.

[298] *See* Tex. Penal Code § 36.06(a) (obstruction and retaliation offense; requiring an intentional or knowing threat to harm another "by an unlawful act").

[299] Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3588, 3659 (current version at Tex. Penal Code §§ 1.07(a)(9), 36.03).

solely to threats by public servants to take or withhold action unlawfully, the statutes would read that way today.

Similar textual constraints preclude us from construing section 36.03(a)(1) or paragraph (F) so as to apply only to threats akin to criminal solicitation—again, section 36.03(a)(1) explicitly prohibits not only threats aimed at bringing about a "violat[ion of] the public servant's known legal duty," but also those seeking "a specific exercise of his official power" or "a specific performance of his official duty" that would be entirely lawful.[300] Likewise, we cannot, without baldly inserting new language into the statutes that the Legislature has not seen fit to include, construe section 36.03(a)(1) or paragraph (F) so as to proscribe only threats seeking conduct that the actor could not lawfully demand or require or that lack any nexus to such conduct. Had the Legislature intended such a limitation, section 36.03(a)(1) would have prohibited, e.g., "*wrongfully* influenc[ing] or attempt[ing] to influence a public servant" by means of "coercion"/threat. However, we acknowledge that courts in some other states have adopted this sort of fix.[301]

The State suggests no good alternatives, either. While condemning Perry's hypothetical applications of section 36.03(a)(1) and paragraph (F) as "alarmist," the State does not assert either that the statutes are ambiguous or that the Legislature could not possibly have intended

---

[300]  Tex. Penal Code § 36.03(a)(1).

[301]  *See Hynes*, 978 A.2d at 278-79; *Pauling*, 69 P.3d at 336.

93

them to reach as broadly as they do.[302]  Nor could it do so persuasively;[303] indeed, as previously

explained, other states had also enacted similarly broad threat prohibitions with similar implications

and outcomes.[304]  And even if we were to look to legislative history in lieu of the text,[305] it tends only

to confirm the Legislature's desire that section 36.03(a)(1) and paragraph (F) apply expansively.  In

addition to the Legislature's 1993 elimination of the "unlawfully" limitation it had added to

paragraph (F) in 1989, in the same session it rejected a proposal, initially passed by the House,

that would have criminalized only threats made with specific intent to "obtain a benefit" when

communicated by members of governing bodies.[306]

        The State does urge that "threat" should be construed in light of the connotation of

"coercion" as an overcoming of free will so as to exclude "threats" that would amount merely to

---

[302] *See Thompson*, 442 S.W.3d at 339-40 (referencing "our longstanding practice of giving effect to the plain meaning of a statute unless the language is ambiguous or the plain meaning leads to absurd results that the legislature could not possibly have intended" (citing *Boykin*, 818 S.W.2d at 785)).

[303] *See Boykin*, 818 S.W.2d at 785 (emphasizing that "absurd results" limitation is "a narrow exception to the plain meaning rule," applicable only where "the Legislature could not *possibly* have intended" the meaning of a statute as read literally) (emphasis in original).  The Court of Criminal Appeals has policed this limitation strictly.  *See, e.g.*, *Spence v. State*, 325 S.W.3d 646, 651 (Tex. Crim. App. 2010) (not an "absurd result" to construe statute requiring display of license plate at "front" of vehicle to mean front bumper rather than a windshield or similar location); *Boykin*, 818 S.W.2d at 786 (holding that prohibition against delivering a simulated controlled substance while "expressly represent[ing] the substance to be a controlled substance" excluded references made in slang terms and that this "literal application of [the provision's] plain language does not lead to absurd consequences").

[304] *E.g.*, *Robertson*, 649 P.2d at 579-80, 589 (discussing implications of Oregon's broad "coercion" prohibition, including the hypothetical about appellate justices we borrowed earlier, before invalidating the statute for overbreadth).

[305] *Boykin*, 818 S.W.2d at 785-86 (explaining that when literal reading of statute leads to "absurd results," courts look to extratextual factors like legislative history to determine meaning).

[306] H.J. of Tex., 73d Leg., R.S. 1945 (1993) (Naishtat amendment).

94

"negotiation."[307] But where the State would draw this line is unclear. The State posits that "coercive control . . . provides the context for the threat," that "[c]oercion implies intimidation to violate any choice or free will of the listener," that "[c]oercion depends on a listener acting against his own interest to avoid a greater harm," and that "[c]oercive threats are in the same category [as] extortion and blackmail [by] cross[ing] a societal line between acceptable and unacceptable areas of negotiation."

Leaving aside whether the State's proposed limitation could salvage the statutes in light of *Claiborne Hardware* and *Keefe*, it fails as a matter of statutory construction. Neither the "coercion" definition nor section 36.03(a)(1) provides textual support for imposing qualitative limitations along the lines the State proposes. Instead, the statutes' text, context, and structure embody legislative intent to prescribe a particular meaning for "coercion" under the Penal Code that departs somewhat from—and clarifies—what might otherwise be the dimensions of coercion in common or legal parlance. For example, "coercion" under the Penal Code definition is narrower in some respects than more general notions of "coercion," being limited exclusively to communicated threats regarding particular enumerated subjects; other threats or means of compulsion are excluded. Conversely, neither the "coercion" definition nor section 36.03(a)(1) makes any mention of any actual or potential deprivation of that public servant's free will or exertion of "control" over that public servant.[308] At most, the statutes might be said to deem or presume that a threat to inflict one

---

[307] The State also insists that "[t]he legislative exception under Section 36.03(c) provides a limitation [so] that the daily operations of governmental negotiation are not criminalized." But subsection (c), again, protects only members of governing bodies, and thus provides no protection for "the daily operations of government negotiations" by all other types of public servants.

[308] *Cf. Davis*, 313 S.W.3d at 337 (whether "[c]oercive government misconduct renders a confession involuntary" —i.e., "the defendant's will has been overborne and his capacity for self-

95

of the harms enumerated within the "coercion" definition should be considered, at least for purposes

of the Penal Code, to have coercive effects on a listener, as opposed to requiring proof of an actual

deprivation of free will.[309] Further confirming this intent is that the "coercion" definition, as we have

seen, eschews several other limitations on coercion as known to the common law and other statutes.

To the extent the State is suggesting that the Legislature intended merely to leave

the parameters of "coercion" or impermissible-versus-permissible "threats" to the discretion of

prosecutors or fact-finders, to determine ad hoc or subjectively whether a given threat "crosses the

line" or is deemed "unacceptable" in their own view, it has identified a different constitutional

defect—impermissible vagueness.[310] We would be required to strike down section 36.03(a)(1),

as it incorporates paragraph (F), for the same reasons the *Hanson* court held it unconstitutional

in that case.[311]

We cannot conceive of any viable means of construing the statutes more narrowly

than we have. As such, we are left with the "last resort" of invalidation. However, our analysis

may identify some factors the Legislature may wish to consider when and if it chooses to

---

determination critically impaired"—"is determined by assessing the totality of all the surrounding circumstances") (internal citations omitted).

[309] *Cf. Evans*, 504 U.S. at 266 (under federal Hobbs Act, which prohibits "extortion," the "obtaining of property from other, with his consent . . . under color of official right," the "coercive element" or "inducement" "is provided by the public office itself").

[310] *See Long*, 931 S.W.2d at 289-97 (invalidating, for vagueness, stalking statute that prohibited certain conduct intended to, inter alia, "annoy" or "alarm" another).

[311] *Hanson*, 793 S.W.2d at 272-73; *see also Johnson*, ___ U.S. at ____, 192 L. Ed. 2d at 581-82 (rejecting the "theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp" and labeling notion "a tautology" because "[i]f we hold a statute to be vague, it is vague in all its applications").

revise the statutes.  But in the meantime, we must hold that section 36.03(a)(1), as it incorporates paragraph (F) of the Penal Code's "coercion" definition, is facially invalid under the First Amendment and is thus unenforceable.  Because this holding entitles Perry to habeas relief with respect to Count II of the indictment, we need not address his remaining arguments.

## CONCLUSION

We reverse the district court's order to the extent it upholds the facial constitutionality of the statute on which Count II of the indictment is based, Penal Code section 36.03(a)(1), as that statute incorporates paragraph (F) of the Code's "coercion" definition.  However, because Perry has asserted only "as applied" constitutional challenges regarding Count I of the indictment ("Abuse of Official Capacity"), the binding precedents of the Court of Criminal Appeals preclude any relief as to that charge at this juncture.  Accordingly, we affirm the district court's denial of relief as to Count I.  We remand the case to the district court for further proceedings consistent with this opinion, including dismissal of Count II.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed in part, Reversed and Remanded in part

Filed:   July 24, 2015

Publish

# TAB 2

**Nine Claims Challenging Count I**

1. Section 39.02(a)(2) [of the Texas Penal Code] violates the Fifth and Fourteenth Amendments to the Constitution of the United States as applied because its prohibitions of "misuse" of "government property . . . that has come into the [Governor's] custody or possession" is unconstitutionally vague as a matter of law if extended to a mere gubernatorial veto of any appropriation of State funds.

2. Section 39.02(a)(2) violates Article I, Sections 10 and 19 of the Texas Constitution as applied because its prohibition of "misuse" of "government property . . . that has come into the [Governor's] custody or possession" is unconstitutionally vague as a matter of law if extended to a mere gubernatorial veto of any appropriation of State funds.

3. Section 39.02(a)(2) is unconstitutional as applied because it infringes upon the Governor's absolute constitutional right and duty to approve or disapprove "items of appropriation" under Article IV, Section 14 of the Texas Constitution.

4. Section 39.02(a)(2) is unconstitutional as applied because it violates the separation of powers between the various departments of government that is guaranteed to the People by Article II, Section 1 of the Texas Constitution.

5. Because a governor acts in a constitutionally-prescribed legislative capacity in vetoing legislation, Section 39.02(a)(2) is unconstitutional as applied because it violates the protection afforded by the Speech and Debate Clause of Article III, Section 21 of the Texas Constitution.

6. Because the Governor was acting in a legislative capacity in vetoing the appropriation at issue, Count I of the indictment is void because it is necessarily based on evidence privileged by the Speech and Debate Clause of Article III, Section 21 of the Texas Constitution.

7. Because the Governor was acting in a legislative capacity in vetoing the appropriation at issue, trial on Count I of the indictment is barred as a matter of law because the State could

1

only sustain its burden, if at all, by introducing evidence privileged by the Speech and Debate Clause of Article III, Section 21 of [t]he Texas Constitution.

8.  Section 39.02(a)(2) is unconstitutional as applied because Governor Perry had the right to do any and all acts of which he is charged in the exercise of his rights under the Free Speech guarantee of the First Amendment to the Constitution of the United States.

9.  Section 39.02(a)(2) is unconstitutional as applied because Governor Perry had the right to do any and all acts of which he is charged in the exercise of his rights under the Free Speech guarantee of Article I, Section 8 of the Texas Constitution.